LEVI & KORSINSKY, LLP
ADAM M. APTON (SBN# 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Telephone: 415-373-1671
aapton@zlk.com
*Attorneys for Lead Plaintiff James Cheng*
*and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDY DEAN STEPHENS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MAPLEBEAR INC. d/b/a INSTACART, FIDJI SIMO, NICK GIOVANNI, ALAN RAMSAY, APOORVA MEHTA, JEFFREY JORDAN, MEREDITH KOPIT LEVIEN, BARRY MCCARTHY, MICHAEL MORITZ, LILY SARAFAN, FRANK SLOOTMAN, and DANIEL SUNDHEIM, GOLDMAN SACHS & CO. LLC; J.P. MORGAN SECURITIES LLC; BOFA SECURITIES, INC.; BARCLAYS CAPITAL INC.; CITIGROUP GLOBAL MARKETS INC.; ROBERT W. BAIRD & CO. INCORPORATED; CITIZENS JMP SECURITIES, LLC; LIONTREE ADVISORS LLC; OPPENHEIMER & CO. INC.; PIPER SANDLER & CO.; SOFI SECURITIES LLC; STIFEL, NICOLAUS & COMPANY, INCORPORATED; WEDBUSH SECURITIES INC.; BLAYLOCK VAN, LLC; DREXEL HAMILTON, LLC; LOOP CAPITAL MARKETS LLC; R. SEELAUS & CO., LLC; SAMUEL A. RAMIREZ & COMPANY, INC.; STERN BROTHERS & CO.; TIGRESS FINANCIAL PARTNERS LLC<br><br>Defendants. | Case No. 5:24-cv-00465-EJD<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

1

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Court-Appointed Lead Plaintiff James Cheng ("Lead Plaintiff") and Named Plaintiff Carlo Viscusi ("Named Plaintiff," and, together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, alleges the following based upon personal knowledge as to each Plaintiff and each Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Maplebear Inc. d/b/a Instacart ("Instacart" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action asserting two separate sets of claims under the federal securities laws.

2. First, this complaint asserts strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). These claims (the "Securities Act Claims") are asserted on behalf of a class consisting of all persons and entities, other than Defendants, that purchased or otherwise acquired Instacart common stock pursuant or traceable to the Company's registration statement filed on Form S-1 with the SEC on August 25, 2023 and, as amended, declared effective on September 18, 2023 ("Registration Statement"). The Registration Statement was filed in connection with the initial public offering ("IPO") of Instacart's common stock, and included the Prospectus, on Form 424B4, dated September 20, 2023 that the Company filed with the SEC on that date ("Prospectus," and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

together with the Registration Statement, the "Offering Documents"). The Offering Documents were negligently prepared and contained material misstatements. The Securities Act Claims are asserted against Instacart, the signatories to the Registration Statement, Instacart's directors at the time the Registration Statement became effective, and the underwriters of Instacart's IPO

3.      Second, and separately, this complaint asserts securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, 17 CFR 240.10b-5. These claims (the "Exchange Act Claims") are asserted on behalf of a class consisting of all persons and entities, other than Defendants, who purchased or otherwise acquired Instacart common stock during the period September 19, 2023 to October 1, 2023, both dates inclusive ("Class Period"). The Exchange Act Claims are asserted against Instacart, as well as its CEO and CFO in connection with materially false and misleading statements they made or controlled during the Class Period.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

6.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Instacart is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

7.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## SECURITIES ACT CLAIMS

## I.     INTRODUCTION

8.     The Securities Act Claims are based solely on negligence and strict liability and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Securities Act Defendants (defined below). Plaintiffs specifically disclaim any allegation of fraud, scienter, or recklessness in these non-fraud claims. All the sources used in this complaint to support Plaintiffs' Securities Act Claims have been introduced solely for the purpose of showing there were material misstatements in Instacart's Registration Statement. Plaintiffs expressly disclaim any language in those sources that indicates that those misstatements were fraudulent or were made with scienter or recklessly for the purpose of their Securities Act Claims.

9.     Instacart purports to be "***the leading grocery technology company in North America***." The Company's core business is acting as an intermediary between customers and grocery stores. Customers use Instacart's mobile app or website to select a grocery store at which they would like to shop, including, for example, Safeway, Publix, Super Fresh, Harris Teeter, Shaw's, Mariano's, Jewel-Osco, Stanley's, or Costco, and the items they would like to purchase from that store. Instacart's personal "shoppers" gather the items the customer ordered and make them available for "pick-up," personally deliver them to customers, or provide them to individuals who deliver them to customers.

10.     Instacart's business skyrocketed during the COVID-19 pandemic, and, in the wake of the pandemic, the Company achieved a valuation of over ***$39 billion***. In the years after the pandemic ebbed, however, Instacart's growth stagnated and its valuation fell back to essentially its pre-pandemic level, creating potentially large losses for the Company's private equity and venture capital investors. As it

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

became clear that Instacart's position in the online grocery industry would not improve, the Company's investors decided to cut their losses and arranged for the Company to go public at a much smaller valuation.

11.    Instacart's Offering Documents thus needed to convince the market that despite its stagnant growth and plummeting valuation, it was still a worthwhile investment. To that end, the Offering Documents touted that Instacart had "**an efficient sales and marketing engine to support our organic motion and drive growth**," "**a broader set of marketing strategies to attract customers to, and increase their engagement with, Instacart**," and the "**ability to drive customer engagement through product enhancements and continued marketing investment**." The Offering Documents failed to disclose, however, that the Company's massive marketing and brand awareness campaign the prior year had been an utter failure. In fact, the Company's own data showed that awareness and recognition of Instacart's brand was ***declining***, while competitors' brand awareness and recognition were increasing.

12.    In addition, the Offering Documents assured investors that, even though growth had stalled, Instacart's forecasts pointed toward future growth. For example, in the IPO letter stated that "**We have demonstrated our ability to help our retail partners drive strong growth and stay competitive in a complex and increasingly digital industry**," and, while growth had been flat in the first half of 2023, there are "**higher levels of order volume growth in the second half of the year during the back-to-school period and holiday season**." While these statements communicated to investors that Defendants had a reasonable process for understanding and forecasting Instacart's potential future performance, they failed to disclose that the Company's forecasting process consisted of simply taking historical performance and projecting it into the future and did not consider Instacart's competitors. Further, as set forth above, Instacart's brand recognition and awareness was declining as its competitors' brand awareness and recognition was increasing, which made any reliance on historical performance all the more unreasonable.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

13.     Accordingly, the Offering Documents were negligently prepared, and contained a series of false and misleading statements about the Company's marketing, brand recognition and awareness, and ability to forecast future performance. The Securities Act Defendants are liable for those false and misleading statements either because they are strictly liable or because the statements were made negligently.

## II.    PARTIES

14.     Lead Plaintiff Cheng purchased the Company's common stock pursuant and/or traceable to the Registration Statement as set forth in his previously filed Certification (ECF No. 28-3).

15.     Named Plaintiff Viscusi purchased the Company's common stock pursuant and/or traceable to the Registration Statement as set forth in his previously filed Certification (ECF Nos. 34-3).

16.     Defendant Instacart is a Delaware corporation with principal executive offices located at all relevant times at 50 Beale Street, Suite 600, San Francisco, California 94105. The Company's common stock trades in an efficient market on the NASDAQ under the trading symbol "CART".

17.     Defendant Fidji Simo ("Simo") has served as Instacart's Chief Executive Officer and a Director of the Company at all relevant times. Defendant Simo has also served as the Chairperson of the Company's Board of Directors since September 2023. Defendant Simo signed or authorized the signing of the Registration Statement filed with the SEC.

18.     Defendant Nick Giovanni ("Giovanni") has served as Instacart's Chief Financial Officer at all relevant times. Defendant Giovanni signed or authorized the signing of the Registration Statement filed with the SEC.

19.     Defendants Simo and Giovanni possessed the power and authority to control the contents of Instacart's SEC filings, press releases, and other market communications. Defendant Simo was provided with copies of Instacart's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

them to be corrected. Because of her positions with Instacart, and her access to material information available to her but not to the public, Defendant Simo knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. Defendant Simo is liable for the false statements and omissions pleaded herein.

20.    Defendant Nick Giovanni ("Giovanni") has served as Instacart's Chief Financial Officer at all relevant times. Defendant Giovanni signed or authorized the signing of the Registration Statement filed with the SEC.

21.    Defendant Alan Ramsay ("Ramsay") has served as Instacart's Chief Accounting Officer at all relevant times. Defendant Ramsay signed or authorized the signing of the Registration Statement filed with the SEC.

22.    Defendant Apoorva Mehta ("Mehta") is Instacart's Co-Founder and served as Instacart's Chairperson until immediately prior to the effectiveness of the Registration Statement. Defendant Mehta signed or authorized the signing of the Registration Statement filed with the SEC.

23.    Defendant Jeffrey Jordan ("Jordan") has served as a Director of Instacart at all relevant times. Defendant Jordan signed or authorized the signing of the Registration Statement filed with the SEC.

24.    Defendant Meredith Kopit Levien ("Levien") has served as a Director of Instacart at all relevant times. Defendant Levien signed or authorized the signing of the Registration Statement filed with the SEC.

25.    Defendant Barry McCarthy ("McCarthy") has served as a Director of Instacart at all relevant times. Defendant McCarthy signed or authorized the signing of the Registration Statement filed with the SEC.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

26. Defendant Michael Moritz ("Moritz") has served as a Director of Instacart at all relevant times. Defendant Moritz signed or authorized the signing of the Registration Statement filed with the SEC.

27. Defendant Lily Sarafan ("Sarafan") has served as a Director of Instacart at all relevant times. Defendant Sarafan signed or authorized the signing of the Registration Statement filed with the SEC.

28. Defendant Frank Slootman ("Slootman") has served as a Director of Instacart at all relevant times. Defendant Slootman signed or authorized the signing of the Registration Statement filed with the SEC.

29. Defendant Daniel Sundheim ("Sundheim") has served as a Director of Instacart at all relevant times. Defendant Sundheim signed or authorized the signing of the Registration Statement filed with the SEC.

30. Defendants Simo, Giovanni, Ramsay, Mehta, Jordan, Levien, McCarthy, Moritz, Sarafan, Slootman, and Sundheim are sometimes referred to herein collectively as the "Individual Securities Act Defendants."

31. As directors, executive officers, and/or major shareholders of the Company, the Individual Securities Act Defendants participated in the solicitation and sale of Instacart securities in the IPO for their own benefit and the benefit of Instacart. The Individual Securities Act Defendants were key members of the IPO working group and executives of Instacart who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

32. Defendant Goldman Sachs & Co. LLC ("Goldman") served as an underwriter and lead book-running manager of the Company's IPO. In the IPO, Goldman agreed to purchase 9,684,400 shares of the Company's common stock.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

33.    Defendant J.P. Morgan Securities LLC ("JPM") served as an underwriter and lead book-running manager of the Company's IPO. In the IPO, JPM agreed to purchase 5,060,000 shares of the Company's common stock.

34.    Defendant BofA Securities, Inc. ("BofA") served as an underwriter and additional book-running manager of the Company's IPO. In the IPO, BofA agreed to purchase 1,540,000 shares of the Company's common stock.

35.    Defendant Barclays Capital Inc. ("Barclays") served as an underwriter and additional book-running manager of the Company's IPO. In the IPO, Barclays agreed to purchase 1,100,000 shares of the Company's common stock.

36.    Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter and additional book-running manager of the Company's IPO. In the IPO, Citigroup agreed to purchase 1,100,000 shares of the Company's common stock.

37.    Defendant Robert W. Baird & Co. Incorporated ("RWB") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, RWB agreed to purchase 440,000 shares of the Company's common stock.

38.    Defendant Citizens JMP Securities, LLC ("CJMP") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, CJMP agreed to purchase 440,000 shares of the Company's common stock.

39.    Defendant LionTree Advisors LLC ("LionTree") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, LionTree agreed to purchase 440,000 shares of the Company's common stock.

40.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Oppenheimer agreed to purchase 440,000 shares of the Company's common stock.

9

41.     Defendant Piper Sandler & Co. ("Piper") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Piper agreed to purchase 440,000 shares of the Company's common stock.

42.     Defendant SoFi Securities LLC ("SoFi") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, SoFi agreed to purchase 440,000 shares of the Company's common stock.

43.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Stifel agreed to purchase 440,000 shares of the Company's common stock.

44.     Defendant Wedbush Securities Inc. ("Wedbush") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Nicolaus agreed to purchase 220,000 shares of the Company's common stock.

45.     Defendant Blaylock Van, LLC ("Blaylock") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Blaylock agreed to purchase 30,800 shares of the Company's common stock.

46.     Defendant Drexel Hamilton, LLC ("Drexel") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Drexel agreed to purchase 30,800 shares of the Company's common stock.

47.     Defendant Loop Capital Markets LLC ("Loop") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Loop agreed to purchase 30,800 shares of the Company's common stock.

48.     Defendant R. Seelaus & Co., LLC ("RSC") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, RSC agreed to purchase 30,800 shares of the Company's Class A common stock.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

49.     Defendant Samuel A. Ramirez & Company, Inc. ("SARC") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, SARC agreed to purchase 30,800 shares of the Company's common stock.

50.     Defendant Stern Brothers & Co. ("SBC") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, SBC agreed to purchase 30,800 shares of the Company's common stock.

51.     Defendant Tigress Financial Partners LLC ("Tigress") served as an underwriter and co-book-running manager of the Company's IPO. In the IPO, Tigress agreed to purchase 30,800 shares of the Company's common stock.

52.     Defendants Goldman, JPM, BofA, Barclays, Citigroup, RWB, CJMP, LionTree, Oppenheimer, Piper, SoFi, Stifel, Nicolaus, Blaylock, Drexel, Loop, RSC, SARC, SBC, and Tigress are sometimes referred to herein collectively as the "Underwriter Defendants."

53.     Instacart, the Individual Securities Act Defendants, and the Underwriter Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

54.     As the issuer, Instacart is strictly liable under Section 11 of the Securities Act for any material misstatement or omission in the Registration Statement, while the other Securities Act Defendants are strictly liable under Sections 11 and/or 15 of the Securities Act are liable unless they prove that they conducted a reasonable investigation and had a reasonable ground to believe (and did believe) that there were no material misstatements or omissions.

## III.    CONFIDENTIAL WITNESSES

55.     CW1 worked in Instacart's advertising business at Instacart from April 2023 to July 2024. He was based in Ohio and reported to the Senior Director Sales Capability and Strategy, who reported to then-VP of Commercial Excellence and Current Vice President of Brand Partnerships Josh Rider ("Rider"), who reported to Chief Business Officer Chris Rogers ("Rogers"), who reported to Simo.

56. CW1's duties included reviewing the Company's advertising business, identifying areas that were driving advertising revenue and creating a revenue plan. This included analyzing the sales team's approach to revenue creation and conversations with customers. CW's revenue planning forecasts covered all accounts, "essentially just how we set up the business logistically and operationally and how we view that data."

57. CW2 worked in finance at Instacart until four months before the IPO. CW2 reported up to the Vice President of Finance who reported to Giovanni, who reported to Simo. CW2's responsibilities included revenue forecasting, planning, and growth. CW2 focused on forecasting in paid marketing and brand marketing.

58. CW3 was the Manager of Market Research for Brand, Campaigns, & Sentiment from May 2021 to March 2023. When CW3 joined Instacart, he reported to the Senior Director of Research for a month before reporting to the newly hired Director of Market Research, who reported to the Senior Director of Research. The Senior Director of Research reported to Vice President of Product and later to the Global Head of Design and Research. Both the Vice President of Product and the Global Head of Design and Research reported to Chief Operating Officer Asha Sharma ("Sharma"), who reported to Simo.

59. CW3 was responsible for research around brand and advertising campaigns. He built out the Company's brand and campaigns arm, which included understanding Instacart's brand equity and the means for growing brand equity over time. He also researched marketing campaigns that Instacart planned to run, particularly mass media campaigns.

60. CW4 was a senior manager on Instacart's marketing team from Sept. 2021 to May 2023. He reported to Senior Director of Financial Systems, who reported to Defendant Ramsay. Defendant Ramsay reported to Defendant Giovanni.

61.     CW4 led a team of analytic engineers to build out analytic models in preparation for the IPO and financial reporting. When he joined Instacart, the finance group was working to automate accounting processes and improve data quality. CW4 worked with Instacart's financial data repository, which included all financial data. "Every way you can slice and dice financial data," he said. "We were working to pull this data into our repository and build the data models that we fed into our accounting and financial processes. It was for GAAP accounting purposes. It was for forecasting. Everything dollars related." CW4 recently spoke with a colleague who continues to work at Instacart who told him that the data repository and associated program work is still unfinished and will not be completed until 2026.

## IV.    UNDERWRITER DEFENDANTS' LIABILITY ALLEGATIONS FOR SECURITIES ACT CLAIMS

### A.  Goldman

62.     Pursuant to the Securities Act, Goldman is liable for the false and misleading statements in the Registration Statement.

63.     Goldman is an investment banking house that specializes in, among other things, underwriting public offerings of securities. It served as an underwriter of the IPO and earned substantial fees thereon.

64.     Goldman also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold Goldman harmless from any liability under the federal securities laws.

65.     Representatives of Goldman also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Goldman to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Goldman had access to internal, confidential, current corporate information concerning Instacart's business.

66.     In addition to availing themselves of access to internal corporate documents, agents of Goldman met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Goldman and Instacart's management and top executives, Goldman knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

**B.  JPM**

67.     Pursuant to the Securities Act, JPM is liable for the false and misleading statements in the Registration Statement.

68.     JPM is an investment banking house that specializes in, among other things, underwriting public offerings of securities. It served as an underwriter of the IPO and earned substantial fees thereon.

69.     JPM also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

70.     Representatives of JPM also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as JPM to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," JPM had access to internal, confidential, current corporate information concerning Instacart's business.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

71.     In addition to availing themselves of access to internal corporate documents, agents of JPM met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between JPM and Instacart's management and top executives, JPM knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

**C.  BofA**

72.     Pursuant to the Securities Act, BofA is liable for the false and misleading statements in the Registration Statement.

73.     BofA is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

74.     BofA also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

75.     Representatives of BofA also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as BofA to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," BofA had access to internal, confidential, current corporate information concerning Instacart's business.

76.     In addition to availing themselves of access to internal corporate documents, agents of BofA met with Instacart's lawyers, management and top executives and engaged in "drafting sessions."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between BofA and Instacart's management and top executives, BofA knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

**D. Barclays**

77.     Pursuant to the Securities Act, Barclays is liable for the false and misleading statements in the Registration Statement.

78.     Barclays is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

79.     Barclays also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

80.     Representatives of Barclays also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Barclays to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Barclays had access to internal, confidential, current corporate information concerning Instacart's business.

81.     In addition to availing themselves of access to internal corporate documents, agents of Barclays met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish

16

the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Barclays and Instacart's management and top executives, Barclays knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

### E. Citigroup

82.     Pursuant to the Securities Act, Citigroup is liable for the false and misleading statements in the Registration Statement.

83.     Citigroup is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

84.     Citigroup also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

85.     Representatives of Citigroup also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Citigroup to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Citigroup had access to internal, confidential, current corporate information concerning Instacart's business.

86.     In addition to availing themselves of access to internal corporate documents, agents of Citigroup met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish

the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Citigroup and Instacart's management and top executives, Citigroup knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

**F.  RWB**

87.    Pursuant to the Securities Act, RWB is liable for the false and misleading statements in the Registration Statement.

88.    RWB is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

89.    RWB also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

90.    Representatives of RWB also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as RWB to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," RWB had access to internal, confidential, current corporate information concerning Instacart's business.

91.    In addition to availing themselves of access to internal corporate documents, agents of RWB met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between RWB and Instacart's management and top executives, RWB knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

**G. CJMP**

92.    Pursuant to the Securities Act, CJMP is liable for the false and misleading statements in the Registration Statement.

93.    CJMP is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

94.    CJMP also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

95.    Representatives of CJMP also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as CJMP to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," CJMP had access to internal, confidential, current corporate information concerning Instacart's business.

96.    In addition to availing themselves of access to internal corporate documents, agents of CJMP met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would

be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between CJMP and Instacart's management and top executives, CJMP knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

### H. LionTree

97.    Pursuant to the Securities Act, LionTree is liable for the false and misleading statements in the Registration Statement.

98.    LionTree is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

99.    LionTree also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

100.    Representatives of LionTree also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as LionTree to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," LionTree had access to internal, confidential, current corporate information concerning Instacart's business.

101.    In addition to availing themselves of access to internal corporate documents, agents of LionTree met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between LionTree and Instacart's management and top executives, LionTree knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

### I.   Oppenheimer

102.    Pursuant to the Securities Act, Oppenheimer is liable for the false and misleading statements in the Registration Statement.

103.    Oppenheimer is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

104.    Oppenheimer also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

105.    Representatives of Oppenheimer also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Oppenheimer to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Oppenheimer had access to internal, confidential, current corporate information concerning Instacart's business.

106.    In addition to availing themselves of access to internal corporate documents, agents of Oppenheimer met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the

SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Oppenheimer and Instacart's management and top executives, Oppenheimer knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

**J. Piper**

107.    Pursuant to the Securities Act, Piper is liable for the false and misleading statements in the Registration Statement.

108.    Piper is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

109.    Piper also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

110.    Representatives of Piper also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Piper to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Piper had access to internal, confidential, current corporate information concerning Instacart's business.

111.    In addition to availing themselves of access to internal corporate documents, agents of Piper met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications

between Piper and Instacart's management and top executives, Piper knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

**K. SoFi**

112.    Pursuant to the Securities Act, SoFi is liable for the false and misleading statements in the Registration Statement.

113.    SoFi is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

114.    SoFi also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

115.    Representatives of SoFi also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as SoFi to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," SoFi had access to internal, confidential, current corporate information concerning Instacart's business.

116.    In addition to availing themselves of access to internal corporate documents, agents of SoFi met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between SoFi and Instacart's management and top executives, SoFi knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

L. **Stifel**

117.    Pursuant to the Securities Act, Stifel is liable for the false and misleading statements in the Registration Statement.

118.    Stifel is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

119.    Stifel also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

120.    Representatives of Stifel also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Stifel to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Stifel had access to internal, confidential, current corporate information concerning Instacart's business.

121.    In addition to availing themselves of access to internal corporate documents, agents of Stifel met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Stifel and Instacart's management and top executives, Stifel knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

## M. Nicolaus

122.    Pursuant to the Securities Act, Nicolaus is liable for the false and misleading statements in the Registration Statement.

123.    Nicolaus is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

124.    Nicolaus also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

125.    Representatives of Nicolaus also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Nicolaus to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Nicolaus had access to internal, confidential, current corporate information concerning Instacart's business.

126.    In addition to availing themselves of access to internal corporate documents, agents of Nicolaus met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Nicolaus and Instacart's management and top executives, Nicolaus knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

N.  **Blaylock**

127.    Pursuant to the Securities Act, Blaylock is liable for the false and misleading statements in the Registration Statement.

128.    Blaylock is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

129.    Blaylock also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

130.    Representatives of Blaylock also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Blaylock to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Blaylock had access to internal, confidential, current corporate information concerning Instacart's business.

131.    In addition to availing themselves of access to internal corporate documents, agents of Blaylock met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Blaylock and Instacart's management and top executives, Blaylock knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**O.  Drexel**

132.    Pursuant to the Securities Act, Drexel is liable for the false and misleading statements in the Registration Statement.

133.    Drexel is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

134.    Drexel also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

135.    Representatives of Drexel also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Drexel to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Drexel had access to internal, confidential, current corporate information concerning Instacart's business.

136.    In addition to availing themselves of access to internal corporate documents, agents of Drexel met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Drexel and Instacart's management and top executives, Drexel knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

### P. Loop

2    137.    Pursuant to the Securities Act, Loop is liable for the false and misleading statements in

3    the Registration Statement.

4    138.    Loop is an investment banking house that specializes in, among other things, underwriting

5
6    public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

7    139.    Loop also demanded and obtained an agreement from Instacart that Instacart would

8    indemnify and hold JPM harmless from any liability under the federal securities laws.

9    140.    Representatives of Loop also assisted Instacart and the Individual Securities Act

10
11   Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into

12   the business and operations of Instacart, an undertaking known as a "due diligence" investigation.

13   Securities regulations require underwriters such as Loop to engage in a fulsome due diligence

14   investigation when underwriting and selling shares in an IPO. During this "due diligence," Loop had

15   access to internal, confidential, current corporate information concerning Instacart's business.

16   141.    In addition to availing themselves of access to internal corporate documents, agents of

17
18   Loop met with Instacart's lawyers, management and top executives and engaged in "drafting sessions."

19   During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii)

20   the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be

21   used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would

22   be made in the Registration Statement; and (v) what responses would be made to the SEC in connection

23   with its review of the Registration Statement. As a result of those constant contacts and communications

24
25   between Loop and Instacart's management and top executives, Loop knew of, or in the exercise of

26   reasonable care should have known of, Instacart's existing problems as detailed herein.

27
28

## Q. RSC

142.    Pursuant to the Securities Act, RSC is liable for the false and misleading statements in the Registration Statement.

143.    RSC is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

144.    RSC also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

145.    Representatives of RSC also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as RSC to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," RSC had access to internal, confidential, current corporate information concerning Instacart's business.

146.    In addition to availing themselves of access to internal corporate documents, agents of RSC met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between RSC and Instacart's management and top executives, RSC knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

R.  **SARC**

147.    Pursuant to the Securities Act, SARC is liable for the false and misleading statements in the Registration Statement.

148.    SARC is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

149.    SARC also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

150.    Representatives of SARC also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as SARC to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," SARC had access to internal, confidential, current corporate information concerning Instacart's business.

151.    In addition to availing themselves of access to internal corporate documents, agents of SARC met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between SARC and Instacart's management and top executives, SARC knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

## S. SBC

152.    Pursuant to the Securities Act, SBC is liable for the false and misleading statements in the Registration Statement.

153.    SBC is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

154.    SBC also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

155.    Representatives of SBC also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as SBC to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," SBC had access to internal, confidential, current corporate information concerning Instacart's business.

156.    In addition to availing themselves of access to internal corporate documents, agents of SBC met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between SBC and Instacart's management and top executives, SBC knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**T. Tigress**

157.    Pursuant to the Securities Act, Tigress is liable for the false and misleading statements in the Registration Statement.

158.    Tigress is an investment banking house that specializes in, among other things, underwriting public offerings of securities.  It served as an underwriter of the IPO and earned substantial fees thereon.

159.    Tigress also demanded and obtained an agreement from Instacart that Instacart would indemnify and hold JPM harmless from any liability under the federal securities laws.

160.    Representatives of Tigress also assisted Instacart and the Individual Securities Act Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Instacart, an undertaking known as a "due diligence" investigation. Securities regulations require underwriters such as Tigress to engage in a fulsome due diligence investigation when underwriting and selling shares in an IPO. During this "due diligence," Tigress had access to internal, confidential, current corporate information concerning Instacart's business.

161.    In addition to availing themselves of access to internal corporate documents, agents of Tigress met with Instacart's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Instacart's stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Instacart's business and operations would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between Tigress and Instacart's management and top executives, Tigress knew of, or in the exercise of reasonable care should have known of, Instacart's existing problems as detailed herein.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## V.    SUBSTANTIVE ALLEGATIONS OF FALSE AND MISLEADING STATEMETNS IN INSTACART'S REGISTRATION STATEMENT

### A.  Background of Instacart

162.    Instacart was incorporated in Delaware and founded as "Maplebear Inc." in 2012 by Defendant Mehta, Max Mullen, and Brandon Leonardo. Among Instacart's initial investors were private equity and venture capital firms like Sequoia Capital Partners ("Sequoia"), Canaan Partners, Khosla Ventures, and Y Combinator. The Company is best known as a provider of online grocery shopping services to households in North America. Through its "Instacart Marketplace" mobile application and website, Instacart sells and delivers a variety of products, including food, alcohol, consumer health, pet care, and ready-made meals.

163.    Practically speaking, Instacart is an intermediary between customers and grocery stores. Customers use the Company's mobile app or website to select a grocery store at which they would like to shop and the items they would like to purchase from that store. Instacart employs "shoppers" as independent contractors. The shoppers gather the items the customer ordered and check with the customer if substitutions are necessary. If the customer selected a "pick-up" option, the shopper makes the order available for the customer to pick up. If the customer chooses home delivery, a driver (who may also be the shopper) delivers the groceries to the customer's home. Customers pay for this service via delivery fees and service charges, which vary depending on the store and the number of items purchased. Customers can also "subscribe" to Instacart, pay an annual or monthly fee, and get free deliveries. Instacart generates revenues from the fees paid on each order by "retail partners" (*i.e.*, stores) and customers.

164.    In addition to its Instacart Marketplace for grocery shopping, the Company also generates revenue through its "Instacart Enterprise Platform" and "Instacart Ads." The Instacart Enterprise Platform provides backend software that enables retailers (*e.g.*, local grocery stores) to allow customers to shop

online at the specific retailer's own website, rather than through the Company's website or app. Instacart Ads allow consumer packaged goods brands to advertise directly on Instacart's website or app, either through display ads or through favorable positioning on screen.

165.    Instacart grew slowly at first. At the start of 2020, it had approximately $215 million in annual revenues from 50 million customers and a "gross transaction value" or "GTV" of $5.1 billion. The $5.1 billion in groceries represented only a fraction of the $800 billion U.S. grocery market.

166.    Instacart experienced a once-in-a-lifetime reversal of fortune in 2020, however, in the wake of federal, state, and local lockdowns in response to the COVID-19 pandemic. The Company's GTV quadrupled from $5.1 billion in 2019 to $20.7 billion in 2020. The Company's revenues also skyrocketed from $215 million in 2019 to approximately $1.5 billion in 2020.

167.    Investment firms' desire to give Instacart money **exploded** during the pandemic. For example, while Instacart's last round of funding prior to the pandemic set a valuation for the Company of $7.6 billion, on June 11, 2020, Instacart engaged in other round of fundraising led by investment firms DST Global and General Catalyst that nearly doubled the company's valuation to $13.7 billion. Less than a month later, on July 3, 2020, it raised additional funds that pushed the Company's valuation to $13.8 billion. Further, after another capital raise in October 2020, the Company was valued at $17.7 billion.

168.    The 2020 fundraising rounds were only the tip of the iceberg, however. On March 7, 2021, the Company raised another $265 million which quintupled Instacart's pre-pandemic valuation to a staggering **$39 billion**. This funding round was mostly the result of existing Instacart investors increasing their holdings, including Sequoia, by far the Company's largest investor.

169.    Instacart's growth slowed dramatically from 2021 to 2023 as the pandemic waned and customers returned to pre-pandemic shopping habits. GTV, which had quadrupled to $20.7 billion in 2020, grew only 20% in 2021, as lockdowns were lifted. As growth slumped in 2021, Defendant Mehta

entered merger talks with DoorDash, one of Instacart's main competitors.[1] After the merger fell through, media website "The Information" disclosed the discussions and markets began to doubt the Company's post-pandemic viability.[2] In July 2021, Instacart's venture capital investors, through the Company's board of directors, pushed Defendant Mehta out as CEO and replaced him with Defendant Simo, for the express purpose of taking Instacart public—fearing that the Company's valuation would plummet unless it went public soon.[3]

170.    Instacart's GTV grew only 15% in 2022, as Defendant Simo attempted to take the Company public. As GTV stagnated, the Company filed a confidential draft registration statement on Form S-1 with the SEC that, when it became effective, would allow Instacart to go public via an IPO. Shockingly, the registration statement slashed the Company's valuation by 40% to only $24 billion, Defendant Simo tried to make the Company more attractive for investors by laying off staff, pausing hiring, and capping spending.[4] Instacart's announcement of a potential IPO took pains to assure the market that the reason for the IPO was not capital for the Company. Instead, the Company insisted it was

---

[1] Maria Aspan, *Can new CEO Fidji Simo Turn Instacart Into More than Just a Delivery Company?*, *Fortune*, Oct. 4, 2021, https://fortune.com/longform/instacart-ceo-fidji-simo-facebook-retail-delivery-company/.

[2] *Id.*

[3] *See* Kellen Browning & Erin Griffith, *Instacart Searches for a Direction as Its Pandemic Boom Fades*, N.Y. Times, Apr. 22, 2022, https://www.nytimes.com/2022/04/29/technology/instacart-valuation-pandemic.html; Mike Isaac, *Instacart Hires a Top Facebook Executive as Its New Chief*, NYTimes.com, July 8, 2021, https://www.nytimes.com/2021/07/08/technology/fidji-simo-instacart.html.

[4] *Instacart Cuts Saff, Curbs Hiring Before IPO,* The Information *Reports*, Reuters, Sep. 25, 2022, https://www.reuters.com/business/retail-consumer/instacart-cuts-staff-curbs-hiring-before-ipo-the-information-2022-09-25/.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to allow employees to cash in their stock options.[5] An IPO, of course, would also allow the Company's private equity and venture capital investors to cash out before the valuation declined further.

171.    As IPO preparations intensified, however, the Instacart's valuation continued to plummet. In October 2022 The Information revealed that Instacart had conducted a 409A evaluation, which resulted in a new valuation of $13 billion – a 67% reduction from the $39 billion peak valuation.[6] The Company ultimately delayed its IPO in late October 2022 because of "unfavorable market conditions," *i.e.*, Instacart's cratering valuation.[7] Market conditions did not improve over the fourth quarter, and in December 2022 the Company reduced its valuation yet again in December 2022 to $10 billion, according to internal sources.[8]

172.    The odds of a successful IPO got worse in the first half of 2023, as Instacart's growth effectively ceased. The Company's GTV for the first six months of 2023 was $14,937, an improvement of only 4% over the same period in 2022. The number of total orders over the first half of 2023 grew less than one half of one percent, from 132.3 million to 132.9 million, and Instacart's cost of goods sold rose to $729 million, an increase of 214% from its pre-pandemic cost of goods sold. This performance was devastating for the private equity and venture capital investors that had poured money into Instacart during the pandemic, as the Company's valuation had nowhere to go but down.

---

[5] Berber Jin & Corrie Driebusch, *Instacart Plans to Focus IPO on Selling Employee Shares*, Wall St. J., Sept. 19, 2022, https://www.wsj.com/articles/instacart-plans-to-focus-ipo-on-selling-employee-shares-11663591602.

[6] Erin Woo, *Instacart Cuts Internal Valuation Third Time, to $13 Billion*, The Information, Oct. 14, 2022, https://www.theinformation.com/articles/instacart-cuts-internal-valuation-third-time-to-13-billion.

[7] Anirban Sen & Krystal Hu, *Instacart Pulls IPO on Volatile Market Conditions – Sources*, Reuters, Oct. 20, 2022, https://www.reuters.com/business/retail-consumer/instacart-pulls-ipo-volatile-market-conditions-sources-2022-10-21/.

[8] Erin Woo, *Instacart Cuts Internal Valuation by Another 20% to $10 Billion*, The Information, Dec. 27, 2022, https://www.theinformation.com/articles/instacart-cuts-internal-valuation-by-another-20-to-10-billion.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

173.    Despite the Company's flattening performance, its private equity and venture capital investors had had enough and in August 2023 Instacart announced that it would go public via an IPO the following month.

174.    The Securities Act Defendants began promoting the Company's IPO on September 11, 2023, with a targeted valuation of $8.6 billion to $9.3 billion – less than *one quarter* its valuation during the pandemic. In fact, according to estimates from Forbes, the firms who led the 2021 funding round – Andreessen Horowitz, D1 Capital, Fidelity, Sequoia Capital, and T. Rowe Price – would suffer unrealized losses of roughly **_73%_** from the funds they invested at that time, if they retained the stake in the company.[9]

175.    Forbes noted that the Instacart offering was a rare "down round" IPO, the term given to public offerings at lower valuations than during private financing. According to analysis from the Wall Street Journal, any investor who invested in the company since 2015 would have received stronger returns by investing in the Nasdaq Composite Index.[10] In short, the Company's private equity investors had had enough and decided to cut their losses. Indeed, Defendant Mehta confirmed as much in an interview four months after the IPO, stating, "The primary reason to go public was to make sure that employees **_and early investors receive liquidity_**."[11]

---

[9] Derek Forbes, *Here Are The Big Investor Winners In Instacart's $11 Billion IPO Debut – And The Losers*, Forbes, Sept. 19, 2023, https://www.forbes.com/sites/dereksaul/2023/09/19/here-are-the-big-investor-winners-in-instacarts-11-billion-ipo-debut-and-the-losers/.

[10] Berber Jin, *Instacart IPO Is an Expensive Lesson for Venture Firms*, Wall St. J. (Sep. 16, 2023), https://www.wsj.com/finance/investing/instacart-ipo-is-an-expensive-lesson-for-venture-firms-af82064.

[11] Samidha Sharma, *Didn't Want My Legacy to be Defined by One Company: Instacart Founder Apoorva Mehta*, The Economic Times, Jan. 5, 2024, https://economictimes.indiatimes.com/tech/technology/didnt-want-my-legacy-to-be-defined-by-one-company-instacart-founder-apoorva-mehta/articleshow/105883572.cms?utm_source=contentofinterest&utm_medium=text&utm_campaign=cppst.

176.    The gambit worked. As set forth in more detail below, Defendant Mehta, Instacart's founder, profited handsomely by selling in the IPO, leading Silicon Valley online news outlet SFGate to observe that he "*is making off like a bandit. The 37-year-old owns 10% of Instacart, even after cashing out almost $20 million worth of shares in the initial public offering*."[12]

**B.    The Registration Statement Relies Instacart's Purportedly Strong Brand and Positive Forecasts to Tout the Company to Investors**

177.    On August 25, 2023, Instacart filed a Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on September 18, 2023. On September 20, 2023, Instacart filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (together, the "Offering Documents").

178.    Although the Company's growth had flatlined, and its valuation had fallen to nearly pre-pandemic levels, the Offering Documents touted Instacart to investors based on its brand and forecasts of its future success.

179.    For example, the Offering Documents began with a letter from Defendant Simo (the "IPO Letter"). In that letter, Defendant Simo touted to investors that Instacart "power[s] tens of billions of dollars in annual sales for retailers, which makes Instacart *the leading grocery technology company* in North America."

180.    The Offering Documents further stated that Instacart had "*an efficient sales and marketing engine to support our organic motion and drive growth*" and "*a broader set of marketing strategies to attract customers to, and increase their engagement with, Instacart*." In all, Instacart's "*marketing efforts drive sales for our retail and brand partners*."

---

[12] Stephen Council, *Former Instacart CEO jumps from newly public SF firm with $850 million stake*, SFGate, Sept. 20, 2023, https://www.sfgate.com/tech/article/instacart-ceo-ipo-stock-mehta-18378600.php.

181. Finally, the Offering Documents positioned the Instacart's brand identity as a key element of the Company's growth strategy, stating, "***We believe we have a significant opportunity to increase our brand awareness to fuel new customer acquisition***," "we believe that we can continue growing average monthly GTV and orders per monthly active orderer for these cohorts over time ***due to our ability to drive customer engagement through product enhancements and continued marketing investment***," and finally, "***We plan to invest in incentives, performance and brand marketing, and partnerships to grow our customer base and expand the online grocery market***."

182. These statements communicated to investors that customers viewed the Company as leading the online grocery shopping industry and that Instacart's marketing and brand awareness efforts increased customer awareness and interactions with the Company. As set forth below, however, these statements were misleading because awareness of Instacart's brand recognition was ***declining*** while competitors' brand recognition was increasing. Indeed, these trends—declining Instacart brand recognition and increasing competitor brand recognition—had accelerated the prior year in the immediate aftermath of the Company spending tens of millions of dollars on a brand awareness campaign the prior year.

183. The Offering Documents also assured investors that, even though growth had stalled, Instacart's forecasts pointed toward future growth. For example, in the IPO letter stated that "Our GTV, representing the online sales we power for all of our retail partners, grew at a compound annual growth rate of 80% between 2018 and 2022, compared to 50% for the overall online grocery market and 1% for offline grocery. ***We have demonstrated our ability to help our retail partners drive strong growth and stay competitive in a complex and increasingly digital industry***."

184. Likewise, the Offering Documents assured investors that "***[s]atisfied customers will continue to order on Instacart***" and that "***[l]ower fees make ordering online more appealing for customers, resulting in a higher frequency of usage***."

39

185.    Further, the Offering Documents stated that "***While we do not expect our pandemic-accelerated growth rates to recur in future periods, our growth during this period helped establish a business with much greater scale and much higher gross profit***."

186.    Finally, the Offering Documents stated that "We typically see lower levels of order volume growth in the second quarter and a portion of the third quarter resulting from lower usage of our offerings during the spring and summer months, ***followed by higher levels of order volume growth in the second half of the year during the back-to-school period and holiday season***. Our rapid growth and the impact of the COVID-19 pandemic have made, and may in the future make, seasonal fluctuations difficult to detect, and future public health outbreaks may obscure future seasonality trends."

187.    These statements communicated to investors that Instacart had a reasonable process for understanding and forecasting its potential future performance. These statements were misleading, however, because Instacart's forecasting process consisted of simply taking historical performance and projecting it into the future, which created the material undisclosed risk that analysts would create materially lower forecasts of future performance when applying traditional forecasting methods to the Company's financial and operations data.

### C.  Instacart's Brand Declines in Advance of the IPO

188.    As set forth above, while the Offering Documents communicated to investors that Instacart's brand recognition and awareness were reasons to participate in the Company's IPO, Instacart's brand recognition was declining while competitors' brand recognition was increasing.

189.    CW3, the Company's Manager of Market Research for Brand, Campaigns, & Sentiment from May 2021 to March 2023, stated that, shortly after he was hired in May 2021, the Company was nearing the end of the pandemic and consumer behavior that drove Instacart growth was reverting to pre-Covid habits. In other words, Instacart app users were returning to grocery stores to shop in person. CW3 recognized that competition for ownership of "Instant Delivery" positioning in customers' minds was

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

heating up, especially with regard to Instacart competitors like Amazon, Walmart, Uber, Door Dash, Shipt, and GoPuff. CW3 communicated this to the Company's Director of Market Research and Senior Director of Research.

190.    CW3 stated that in late-August 2022, Instacart launched a $22 million six-week advertising campaign with Lizzo,[13] a popular Grammy-winning singer, hip-hop artist, and classically trained flutist. Instacart hoped to increase its "brand awareness metrics," or quantitative and qualitative measurements assessing how well a target audience recognizes, remembers, and engages with a brand.

191.    CW3 stated that the Lizzo campaign's launch was timed with the MTV Video Music Awards and ran for six weeks. The campaign ran on a variety of media channels, including television, social media, streaming, and involved a 60-second ad with Lizzo that was edited to various lengths. CW3 stated that the purpose of the campaign was to improve Instacart's brand recognition and awareness in the run-up to the Company going public. Instacart had filed a confidential registration statement with the SEC in May 2022, and was preparing to go public. The Company ultimately delayed the IPO because of poor market conditions in October 2022.[14]

192.    CW3 was tasked with analyzing the effect the campaign had on Instacart brand awareness. The results of the analysis would be presented to the Company's Board of Directors and be factored into the decision of timing when to go public.

193.    CW3 created three studies to measure brand awareness: a "Brand Tracker" study; a Campaign Awareness Research Study ("CARS"), which was specific to the campaign and tracked brand awareness; and a "Platform Brand Lift Study" conducted by the Marketing Team.

---

[13]    Biography.com Editors & Colin McEvoy, Lizzo, Biography.com, www.biography.com/musicians/lizzo.

[14]    Dan Primack, Instacart postpones its IPO, Axios (Oct. 20, 2022) https://www.axios.com/2022/10/21/instacart-postpones-ipo

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

194.    The Brand Tracker was an online tracking study with a random sample of the U.S. general population with a margin of error of plus or minus 2 percent and was executed by Kantar, Instacart's research partner. CW3 stated that the Brand Tracker study was the key source of information about Instacart's future growth potential. It was a macro study that looked at the general population and measured whether the Company's brand was growing in people's minds, and whether people were considering Instacart brand when it came to grocery shopping.

195.    The tracker involved sending email surveys to study subjects to understand consumers' perception of Instacart relative to other competitors like Door Dash. CW3 said that the Company ran the study every week, resulting in a data sample of approximately 1,000 surveys per month, which were analyzed quarterly.

196.    CW3 initiated the Brand Tracker in Q3 of 2021, and thus Instacart had data for a least a full year in advance of the Lizzo campaign. In Q3 of 2022, however, in the wake of the Campaign, he started to see a *decline* in brand awareness for the first time. Although he normally presented quarterly tracking figures, he knew the leadership at Instacart was keenly interested in how the Lizzo campaign affected brand awareness. CW3 thus analyzed the data for each month in Q3 2022, and the Brand Tracker analysis showed an unmistakable *decline* in brand awareness in the wake of the Lizzo ad campaign. Incredibly, this decline was most severe among families with children, which was the Company's core customer segment. In fact, according to CW3, families with kids were the awareness segment that had declined the fastest. To make matters worse, CW3's research showed that awareness of Instacart competitors Amazon and Wal-Mart had increased over this period.

197.    These results were corroborated by a Campaign Awareness Research Study ("CARS") CW3 conducted as well. CARS measured the impact of the Lizzo ad campaign in August and September of 2022 via new surveys of 1,000 people. CW3 stated that it was test and control experiments with people who saw the campaign compared to similar people who had not seen the campaign. CARS ran for four

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

weeks, from August 28, 2022 through September 24, 2022, during the Lizzo campaign. According to CW3, the study showed brand awareness *decreased* during the ad campaign.

198.    The Brand Tracker and CARS results were terrible for the Company because the Lizzo campaign was not effective. CW3 stated that the campaign "didn't make the impact we needed it to make." In addition, "[b]eyond that there's this declining trend that's even bigger than the campaign."

199.    CW3 and an Instacart market research colleague presented the results of the Brand Tracker and CARS in the form of a Google Slides presentation to members of the marketing team in October 2022. After that meeting, CW3 and his colleague began presenting the report up the management chain in virtual presentations. In November 2022, he presented the results to the Senior Director of Growth Marketing Michael Polin ("Polin"), the Vice President of Marketing under the Chief Marketing Officer, and Senior Director of Strategic Finance Joe Ingraham ("Ingraham"). He also presented his findings to Chief Marketing Officer Laura Jones ("Jones") and Chief Operating Officer Sherma in November 2022. The attendees at these presentations refused to believe the results.

200.    In late November 2022, CW3 and his market research colleague presented the findings to Defendant Simo, Polin, Ingraham, Sherma; Director and Head of Research Prakriti Parijat ("Parijat"), with Vice President of Data Science Anahita Tafvizi ("Tafvizi") attending as well. Simo flatly refused to believe the results and instructed CW3 to dig into the data. Other responses at the meeting were similarly negative. The response was so negative, in fact, that CW3 described his head as "spinning" and was afraid he would lose his job.

201.    A follow-up presentation was scheduled with Simo and the other attendees in December 2022. When CW3 appeared for the presentation, neither Simo, nor anyone else, even showed up.

202.    CW3 and his team then began looking at Q4 of 2022 brand tracking data to see if the downward decline in brand awareness continued. CW4 described the efforts as "looking at data weekly and monthly." His team "did a lot more work over the [holiday] break and felt a lot more confident. We

43

pulled in some external sources. We didn't know if there was a misunderstanding. We didn't know if they didn't understand the metrics so we tried to break down the metrics and explain them." The results again showed Instacart's brand awareness declining and competitors' staying flat or rising.

203.    They again presented the data to the marketing team and senior directors, including Polin in January 2023. The reactions to this presentation were not as negative, and the attendees appeared to understand that the data was supported and reliable. CW3 said that Polin and Jones were working on assembling materials to be shared with the Company's Board of Directors "help us decide if we were going to go public or not." CW3 was given specific dates to deliver data to Polin so that his Brand Tracker reports could be shown to the Board. CW3 stated that Polin and Jones were going to present the Brand Tracker reports and reports concerning the Lizzo campaign in early December 2022.

204.    In addition, Austin Hollan ("Hollan"), who worked in Corporate Finance and Special Projects and was the day-to-day contact for the upcoming IPO, requested and received CW3's quarterly Brand Tracking Research reports. Defendant Giovanni was on the IPO team as well. CW3 said that Hollan told him that the reports were made part of the Company's "IPO readiness materials." "There was a special team working on getting us ready for the IPO, so they requested the report on a quarterly basis," CW3 said.

205.    Another presentation by CW3 and his team was scheduled for March 2023. That presentation never happened, however, as in early March CW3 and his team were fired and locked out of Instacart's systems. CW3 noticed that his Brand Tracker Report concerning Q4 2022, which showed Instacart's continued brand awareness decline, had vanished from the internal folder where the Brand Tracker studies were kept.

206.    In July 2023, CW3 learned from a colleague who remains with Instacart that the Company had discontinued using Kantar for brand tracking research. Kantar is a very well-known market research

company, according to CW3, that specializes specifically in brand building, The new research company, Yougov is focused on polling research and is not as in-depth in understanding brands, according to CW3.

### D.  Instacart's Nonexistent Forecasting Process

207.    As set forth above, Instacart's Offering Documents communicated to investors that Instacart had a process for understanding and forecasting the Company's future performance. In reality, however, Instacart's forecasting process consisted of simply taking historical performance and projecting it into the future.

208.    For example, CW1 stated that Instacart set revenue goals based on its historical, astronomical growth, and not on the reality of the existing demand. For example, Instacart continued to project 20 percent growth quarter after quarter based on its history with no plan for how to achieve that growth and no data to support those projections other than historical data, which did not reflect current sales trends.

209.    CW1 also stated that normal advertising forecasting would involve looking at the sales pipeline, revenue associated with that pipeline, the customer orders pipeline, and whether those customers were likely to return. CW said Instacart executive "don't look at that. They look at it as historicals. I think it was, 'We've done this before, we're going to do it again.'"

210.    To that end, CW1 stated that Instacart did not have a plan for delivering revenue and would simply set a revenue figure and reverse engineer a forecast. He said that historically the Company had 15% to 20% year to year growth and wanted to grow an additional approximately 20% annually into the future, but there was no plan regarding the "new customer groups we're going to go after to get that" and no examination of what large customers were "overinvested" and could not be a source of any more revenue."

211.    CW1 stated that he spoke to then-VP of Commercial Excellence Josh Rider about forecasting when he joined Instacart in April 2023, who stated that historical performance is the best

indicator of future results because one could not predict advertiser demand. CW1 explained that it was possible, and Rider brushed him off, telling him to write a whitepaper. CW1 created a whitepaper, explaining how to use information gathered from Instacart sales personnel from interactions directly with advertising customers. Despite the whitepaper, the Company continued to forecast solely based on prior quarter performance, which was still the process when CW1 left Instacart.

212.     CW1 further stated that he worked at Instacart for five quarters and there was a "gap to goal" going into every single quarter. In other words, Instacart would set a forecast, then enter the quarter, and try to figure out how to meet that forecast.

213.     CW1 stated that he attended weekly finance meetings put together by the Data Science team, which gathered the data inputs, *e.g.*, performance results, for the meetings. Chief Business Officer Chris Rogers; then-VP of Commercial Excellence Josh Rider; Rider's report, the product person that led advertising, and members of the Strategic Finance team attended the meetings, where they would review the forecast for the week. The meeting would begin with a review of actual results, then historical results, then projections based on those historical results. CW1 stated that all attendees at the meetings knew the projections were solely based on historical figures. CW1 stated that "The Strategic Finance Team was very clear about that," and "This is based on historicals and using historicals for a future predictive model and that model took things into account like historical seasonality; historical platform growth; all the historical things that operate our business." CW1 stated that "It's very basic numbers that are being put together and dragged to the right. Let's assume this run rate continues. Let's assume seasonality is the same way it has been. Let's assume all stays the same. I'm just dragging [numbers] to the right in an Excel file."

214.     CW1 stated that projections were then reported up the chain of command to Defendant Simo, where they would be increased. The Strategic Finance Team would speak with Chief Business

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Office Chris Rogers and Simo, who would say "We're going to go higher," even if the Strategic Finance Team was advocating for a lower number and stating that the higher forecast was not realistic.

215.    CW2 corroborated CW1's description of the forecasting process at Instacart. CW2 stated that Instacart changed the revenue forecasts because it wanted to see 20 percent, sometimes even 30 percent growth based solely on the Company's historical performance. CW2 stated that he and his colleagues were responsible for focusing specific parts of a forecast and trying to get the most realistic or most likely outcome. "If leadership has a different number in their head," however, "[they'd say] we need to hit this number." CW2 said that he specifically pushed back against Giovanni himself when Giovanni demanded revenue projections be increased, but to no avail.

216.    CW2 stated that he attended regular business review meetings with the leadership team, team heads, and department heads. The meetings were virtual, Happened at least once a month, and lasted 30 to 45 minutes depending on business needs. Anywhere between ten and 30 people, including Simo, attended these meetings which were run jointly by Finance and rotating division heads, like the Chief Operating Officer or the Head of Products. CW2 said that during these meetings, finance would present what they considered realistic forecasts and leadership would demand a higher number.

217.    CW4 corroborated CW1's description of how Instacart determined its revenue forecasts solely based on its historical, astronomical performance during COVID-19 pandemic. CW4 stated that he was in a unique position within Instacart to see the actual performance numbers because of his role.

**E.    Instacart's IPO**

218.    Pursuant to the Offering Documents, Instacart and other selling stockholders identified in the Prospectus sold 14.1 million and 7.9 million shares of the Company's common stock to the public, respectively, at the Offering price of $30.00 per share for total proceeds of approximately $400 million and $224 million to Instacart and the selling stockholders, respectively, after applicable underwriting discounts and commissions. On September 19, 2023, Instacart's common stock began publicly trading

on the NASDAQ under the ticker symbol "CART." Instacart went public at a value of $30 per share, and closed at $33.70, resulting in a valuation at the end of the first day at just over $11 billion.

219.    Although the Company's share price closed at $33.70 immediately after the IPO, that share price quickly began to decline. In the afternoon of September 22, 2023, *Reuters* published an article during intraday trading hours, entitled "Arm and Instacart Add to Losses After Lukewarm Analyst Reports."[15] The article disclosed that "BTIG analyst Jake Fuller gave Instacart a "neutral" rating and warned that the company faces heavy competition from DoorDash (DASH.N) and Uber Technologies (UBER.N) in the slowly expanding market of grocery delivery." According to the BTIG analyst report, the "neutral" rating was due, in pertinent part, to Instacart facing "modest growth prospects and challenging competitive dynamics." The analyst report noted that "online penetration" for Instacart was relatively "low" with "competition rising" from companies like DoorDash and Uber (that provide similar services) who have the benefit of being able to "cross-promote to massive user bases." The most significant downside concern identified in the analyst report was Instacart's ability to grow and increase its market share, noting that "[i]f adoption is less of a grind than we expect, we could see upward pressure on estimates." BTIG was not the only analyst to report concerns over Instacart's growth. On September 22, 2023, *Barron's* published an article noting that Instacart's stock price had fallen "as early investors take profits and analysts fret about competition and slow growth." The *Barron's* article referenced analyst reports from Needham in addition to BTIG. Similar to BTIG, Needham initiated coverage at "Hold" over "structural headwinds against adoption," "[c]ompetition . . . on the rise," and "[i]ndustry penetration gains slowing." On September 22, 2023, Instacart's stock price opened at $31.56 per share. Following the *Reuters* and *Barron's* articles referenced above (which were published during market hours), Instacart's

---

[15] Noah Randewich, *Arm and Instacart Add to Losses After Lukewarm Analyst Report*, Reuters, Sept. 22, 2023, https://www.reuters.com/markets/deals/arm-instacart-add-losses-after-lukewarm-analyst-reports-2023-09-22/

stock price closed at $30.00 per share, a decline of 4.9%. On this news, Instacart's stock price fell $0.65 per share, or 2.12%, to close at $30.00 per share on September 22, 2023.

220.    On October 2, 2023, before the market opened, Cory Weinberg, deputy bureau chief of "The Information," a subscription-based news website covering the technology industry reported that "private forecasts from the banks that ran [Instacart's] IPO" stated that "[r]evenue growth at Instacart is expected to be much lower in the second half [of 2023] than the first" ("Weinburg Article"). Specifically, "analysts at Goldman Sachs and other banks expect Instacart to report between 7% and 8% revenue growth in the second half" of 2023, down from "growth of 31% in the first half [of 2023], and 50% growth from the second half of 2022. In addition, the article stated that Instacart's adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") was expected to "fall by between 5% and 6% in the period compared to the first half of 2023," which "would be a notable drop *considering Instacart said in its IPO filing that its business is typically stronger in the second half of the year during the back-to-school period and holiday season*."

221.    To make matters worse, that same day, October 2, 2023, investment research firm Gordon Haskett initiated coverage of Instacart with a "hold" rating. In an article entitled "Instacart Falls; Gordon Haskett Cites Headwinds for Hold Rating", *Bloomberg* reported, in relevant part:

> Grocery-delivery giant Instacart falls as much as 7.9% Monday to its lowest level since going public after Gordon Haskett initiated coverage of the stock with a hold rating and $31 price target, *citing headwinds ahead*.

> The firm sees limited multiple expansion opportunity as Instacart's margin projections — which are slightly better than peers — won't be enough to offset concerns in the industry[.]

> We "have doubts that online grocery delivery adoption will continue to materially increase at a time when consumers are becoming increasingly cautious about spending," analyst Robert Mollins wrote[.]

> *Says competitive encroachment* is also a concern for Instacart . . . .

222.    On this news, Instacart's stock price fell $2.73 per share, or 9.2%, to close at $26.96 per share on October 2, 2023.

223.    As of the time the initial complaint was filed in this action, Instacart's common stock traded below the $30.00 per share Offering price, damaging investors.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED IN INSTACART'S OFFERING DOCUMENTS

224.    The Offering Documents were negligently prepared. They contained a series of false and misleading statements about the Company's brand recognition and awareness and ability to forecast future performance. The Securities Act Defendants are liable for those false and misleading statements either because they are strictly liable or because the statements were made negligently.

### A.  False and Misleading Statements Concerning Branding and Competition

225.    The Offering Documents began with the IPO Letter from Defendant Simo, which indicated to investors that Instacart was positioned to capitalize on the accelerating online grocery order and delivery business. In that letter, Defendant Simo touted to investors that Instacart "power[s] tens of billions of dollars in annual sales for retailers, which makes ***Instacart the leading grocery technology company in North America***."

226.    The Offering Documents also touted to investors, "While our business has scaled significantly, we continue to believe we are early in our opportunity. ***We believe the strength of our brand enables us to attract customers to Instacart on an organic basis***," and "while increases in customer acquisition costs that have longer time horizons, such as incentives and promotions as well as brand marketing campaigns, may initially have a negative impact on our profitability, ***we believe that these investments will drive increased engagement from existing customers and enable us to attract new customers to Instacart***."

227.    Later, in a discussion of the "Core Principles of Instacart's Financial Model," the Offering Documents stated that "Prior to 2021, we did not spend significantly on sales and marketing since the majority of our growth in our new customers was organic. ***Beginning in 2021, after we achieved meaningful improvement in unit economics, we began to significantly increase consumer marketing. We believe we have a significant opportunity to increase our brand awareness to fuel new customer acquisition***."

228.    The Offering Documents continued, "we believe that we can continue growing average monthly GTV and orders per monthly active orderer for these cohorts over time ***due to our ability to drive customer engagement through product enhancements and continued marketing investment***."

229.    The Offering Documents also touted Instacart's branding efforts, stating that:

> In the second half of 2022 and continuing in the first half of 2023, ***we began to optimize our sales and marketing expense across a variety of channels intended to focus on customer acquisition spend where we believe we can earn positive return on investment across categories, including performance marketing, demand generation partnerships, and brand development to attract new customers, reengage customers that have stopped using Instacart, and increase customer engagement***. However, we are still early in our opportunity and intend to continue to increase our customer acquisition spend across categories.

230.    The Offering Documents also touted the Company's "Growth Strategies." Chief among these "Growth Strategies" was:

> ***Attract New Customers and Expand Use Cases***. We will continue to help retail partners capture new customers as consumer behaviors and preferences shift. We are focused on the following avenues to achieve this:
>
> ***Grow Online Penetration. We plan to invest in incentives, performance and brand marketing,*** and partnerships to grow our customer base ***and expand the online grocery market***.

(First emphasis in original.)

231.     Further, the Offering Documents touted that, "***While our brand and leading market position enable us to benefit from organic, word-of-mouth growth***, we use sales and marketing to attract customers, retailers, brands, and shoppers and grow the pie for all of our constituents."

232.     The Offering Documents further stated that "***We have built an efficient sales and marketing engine to support our organic motion and drive growth.*** As we have continued to grow, *we have developed a broader set of marketing strategies to attract customers to, and increase their engagement with, Instacart*.*" To that end, the Registration Statement stated that "***Our marketing efforts drive sales for our retail and brand partners***."

233.     The statements referenced in ¶¶ 225-32 above were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents communicated to investors that Instacart's marketing, brand recognition, and customer awareness of Instacart's brand were strong and thus that Instacart was uniquely positioned to capitalize on the rapidly expanding online grocery business, while downplaying the Company's competition in the online grocery shopping and delivery market. These statements were made false and/or misleading and/or failed to disclose that: (i) Instacart's marketing efforts had been entirely ineffective; (ii) Instacart's brand recognition and awareness was declining; (iii) Instacart's competitors' brand recognition was increasing; (iv) accordingly, the Securities Act Defendants overstated the Company's post-IPO growth, business, and financial prospects; and (v) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

**B.  False and Misleading Statements Concerning Forecasting**

234.     The Offering Documents also assured investors that, even though growth had stalled, Instacart's forecasts pointed toward future growth. For example, in the IPO letter stated that "Our GTV,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

representing the online sales we power for all of our retail partners, grew at a compound annual growth rate of 80% between 2018 and 2022, compared to 50% for the overall online grocery market and 1% for offline grocery. ***We have demonstrated our ability to help our retail partners drive strong growth and stay competitive in a complex and increasingly digital industry***."

235.    Likewise, the Offering Documents assured investors that "***[s]atisfied customers will continue to order on Instacart***" and that "***[l]ower fees make ordering online more appealing for customers, resulting in a higher frequency of usage***."

236.    Further, the Offering Documents stated that "***While we do not expect our pandemic-accelerated growth rates to recur in future periods, our growth during this period helped establish a business with much greater scale and much higher gross profit***."

237.    The Offering Documents also represented that:

> This prospectus contains estimates and information concerning our industry, including market size and growth of the market in which we participate, that are based on industry publications, reports, and other sources, including Yipit, LLC, and its affiliates, collectively referred to as YipitData. ***Some data and other information contained in this prospectus are also based on management's estimates and calculations, which are derived from our review and interpretation of independent sources, including YipitData. This information involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates***.

238.    Finally, the Offering Documents stated that "We typically see lower levels of order volume growth in the second quarter and a portion of the third quarter resulting from lower usage of our offerings during the spring and summer months, ***followed by higher levels of order volume growth in the second half of the year during the back-to-school period and holiday season***. Our rapid growth and the impact of the COVID-19 pandemic have made, and may in the future make, seasonal fluctuations difficult to detect, and future public health outbreaks may obscure future seasonality trends."

239.    The statements referenced in ¶¶ 234-38 above were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, these statements in the Offering Documents communicated to investors that Instacart had a reasonable process for understanding and forecasting Instacart's potential future performance, and thus that Instacart was uniquely positioned to capitalize on the rapidly expanding online grocery business, while downplaying the Company's competition in the online grocery shopping and delivery market. These statements were made false and/or misleading and/or failed to disclose that: (i) Instacart's forecasting process consisted solely of looking at historical performance, insisting that performance would continue in the future and did not take into account Instacart's competition; (ii) Instacart's forecasts were elevated to 20%-30% at management's direction, not based on any research or data; (iii) accordingly, the Securities Act Defendants overstated the Company's post-IPO growth, business, and financial prospects; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

240.    The Offering Documents' warnings about risks were also misleading. For example, the Offering Documents contained a generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to increase customer engagement, stating, *inter alia*:

> ***If we fail to cost-effectively acquire new customers or increase the engagement of our existing customers, including through effective marketing strategies, our business would be harmed.***
>
> The growth of our business is dependent upon our ability to continue to grow our offerings by cost-effectively increasing our engagement with existing customers and acquiring new customers. ***If we fail to do so, the value of our offerings will be diminished, and we may have difficulty attracting and engaging retailers and brands***.

(First emphasis in original.)

241.    Similarly, the Registration Statement contained a second generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to increase customer engagement, stating, *inter alia*:

> ***The failure to achieve increased market acceptance of online grocery shopping and our offerings*** could ***seriously harm our business.***
>
> * * *
>
> In particular, shopping habits and preferences vary between younger and older consumers, consumers across different income groups, and among other demographic characteristics, and ***to be successful, we need to effectively increase market acceptance across all age, income, and other demographically different groups by increasing brand awareness*** and focusing marketing efforts on relevant habits and preferences.

(First emphasis in original.)

242.    Further, the Registration Statement contained a third generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to maintain or enhance its brand, stating, *inter alia*:

> ***If we fail to maintain and enhance our brand, our ability to engage or expand our base of customers, retailers, brands, and shoppers will be impaired and our business, financial condition, and results of operations may suffer.***
>
> Maintaining and enhancing our reputation as a differentiated and category-defining company is critical to attracting and expanding our relationships with customers, retailers, brands, and shoppers. The successful promotion of our brand and the market's awareness of our offerings will depend on a number of factors, including our marketing efforts, ability to continue to develop our offerings, and ability to successfully differentiate our offerings from competitive offerings.

(First emphasis in original.)

243.    Further, the Registration Statement contained a generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to forecast its future performance, stating, *inter alia*:

55

*The estimates of market opportunity and forecasts of market growth included in this prospectus may prove to be inaccurate, and even if the market in which we compete achieves the forecasted growth, our business could fail to grow at a similar rate, if at all.*

The estimates of market opportunity and forecasts of market growth included in this prospectus may prove to be inaccurate. Market opportunity estimates and growth forecasts included in this prospectus are subject to significant uncertainty and are based on assumptions and estimates that *may* not prove to be accurate, including the risks described herein. Even if the market in which we compete achieves the forecasted growth, our business could fail to grow at a similar rate, if at all.

The variables that go into the calculation of our market opportunity are subject to change over time, and *there is no guarantee that any particular number or percentage of addressable consumers, retailers, or brands covered by our market opportunity estimates will purchase our offerings at all or generate any particular level of revenue for us*. Any *expansion in our market depends on a number of factors, including the cost, performance, and perceived value associated with our offerings and those of our competitors*. Accordingly, the forecasts of market growth included in this prospectus should not be taken as indicative of our future growth.

(First emphasis in original.)

244.    Similarly, the Registration Statement contained a second generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to forecast the future performance of its advertising division, stating, *inter alia*:

> *We are still in the early stages of building our Instacart Ads offerings. If we fail to grow our advertising revenue, our business, financial condition, and results of operations would be negatively impacted.*
>
> * * *
>
> In addition, expenditures by brands tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Adverse macroeconomic conditions, including as a result of the COVID-19 pandemic, have also adversely affected the demand for advertising and caused brands to reduce the amounts they spend on advertising. For example, we have seen and may continue to see reduced demand for advertising from brands that are exercising caution with their spending budgets and either slowing or reducing their campaigns due to, among other things, macroeconomic uncertainty, including from inflation, rising interest rates, global supply chain disruptions, labor shortages, geopolitical events including the war in Ukraine, and reduced consumer confidence. *These factors had a negative impact on our advertising revenue in 2022 and the first half of 2023, and such impact may continue in future periods.* These

> factors may also negatively impact our ability to forecast our advertising revenue as the extent of the ongoing impact of these macroeconomic factors on our business and on global economic activity generally is uncertain and may continue to adversely affect our business, operations, and financial results.

(First emphasis in original.)

245.     The risk warnings statements referenced in ¶¶ 240-44 above were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents failed to disclose that these risks had already materialized, and/or failed to communicate to investors the severity or imminence of the risks, and as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

246.     Finally, Item 11 of Form S-1 requires SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). Among other things, Item 303 of Regulation S-K required that Instacart's Form S-1 Registration Statement disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

247.     Accordingly, the MD&A disclosures in the Offering Documents were materially false and misleading because the Securities Act Defendants failed to disclose the known uncertainties associated with the Company's measurable decline in brand awareness and recognition and increases in competitors' brand awareness and recognition over the latter half of 2022. This decline was material to investors because it occurred after Instacart's $22 million marketing campaign featuring Lizzo and was most pronounced in the Company's more important demographic: families with children. Since CW3's reports

demonstrated a decline in the Company's brand awareness, these were known trends and uncertainties that were reasonably likely to adversely affect Instacart's financial condition and results. The omission of this information violated the disclosure obligation imposed by Item 303, and, as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

## VII.    CLASS ACTION ALLEGATIONS

248.    With respect to the Securities Act Claims, Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following proposed Class:

> All persons and entities that purchased or otherwise acquired common stock issued by Instacart pursuant and/or traceable to the Registration Statement issued in connection with Instacart's September 2023 initial public offering, and were damaged thereby.

249.    Excluded from the Class are: (i) the Securities Act Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Instacart and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) the Securities Act Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Securities Act Defendant had or has had a controlling interest; (v) Instacart's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

250.    The members of the Class are so numerous that joinder of all members is impracticable. Plaintiffs believe that the Class members number at least in the thousands. Instacart sold 22,000,000 shares of common stock in the IPO and, as of September 31, 2023, had over 260,804,661 shares of common stock outstanding. Instacart common stock traded actively on the NASDAQ during the relevant period.

251.    Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class are similarly situated in that they acquired Instacart Class A ordinary shares pursuant and/or traceable to the Registration Statement, which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

252.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

253.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Securities Act Defendants' acts violated the federal securities laws as alleged herein;
- whether the Registration Statement contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;
- whether the Individual Securities Act Defendants were controlling persons under Section 15 of the Securities Act; and
- Whether any of the Individual Securities Act Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act.

254.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

255.    There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other

59

means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## VIII.    SECURITIES ACT COUNTS

### COUNT I

**Violations of Section 11 of the Securities Act
Against the Securities Act Defendants**

256.    Lead Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 8-255 above as if fully set forth herein, except to the extent they sound in fraud.

257.    This Count does not sound in fraud. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 11 claim, and any implication of fraud or scienter is disclaimed. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the IPO. Lead Plaintiffs do not allege that any Securities Act Defendant acted with intentional, reckless, or otherwise fraudulent intent with respect to the alleged misstatements in the Registration Statement. The Securities Act allegations herein are based in strict liability and negligence.

258.    The Registration Statement, at the time when it became effective, was inaccurate and misleading, contained untrue statements of material facts, omitted to state material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

259.    The Securities Act Defendants were responsible for the content and dissemination of the Registration Statement.

260.    Instacart is the issuer and registrant for the IPO. As issuer, Instacart is strictly liable for any material misstatements and omissions in the Registration Statement.

261.    The other Securities Act Defendants acted negligently in that none of them made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and not misleading, and that the Registration Statement did not omit any material facts required to be stated therein or necessary to make the statements made therein not misleading.

262.    Plaintiffs and the Class acquired Instacart common stock pursuant and/or traceable to the Registration Statement.

263.    When they acquired Instacart common stock pursuant and/or traceable to the Registration Statement, Plaintiffs and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths and omissions contained (and/or incorporated by reference) in the Registration Statement.

264.    Plaintiffs and the Class have sustained damages. The value of Instacart common stock has declined substantially subsequent to and due to the Securities Act Defendants' violations.

## COUNT II

### For Violation of Section 15 of the Securities Act
### Against the Individual Securities Act Defendants

265.    Plaintiffs repeat and re-allege each and every allegation contained in foregoing paragraphs 8-264 as if fully set forth herein.

266.    This Count does not sound in fraud. This Count does not allege, and does not intend to allege, fraud or scienter, which are not elements of a Section 15 claim, and any implication of fraud or scienter is disclaimed. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the IPO. Plaintiffs do not allege that any Securities Act Defendant acted with intentional, reckless, or

otherwise fraudulent intent with respect to the alleged misstatements in the Registration Statement. The Securities Act allegations herein are based in strict liability and negligence.

267.     During their tenures as officers and/or directors of Instacart, including at the time of the IPO and when the Registration Statement became effective, the Individual Securities Act Defendants acted as controlling persons of Instacart within the meaning of § 15 of the Securities Act.

268.     By virtue of their positions of control and authority and their direct participation in and/or awareness of Instacart's operations and finances, the Individual Securities Act Defendants had the power to, and did, direct or cause the direction of the management, policies, and actions of Instacart and its employees, and caused Instacart to issue, offer, and sell Class A ordinary shares pursuant to the defective Registration Statement.

269.     The Individual Securities Act Defendants had the power to, and did, control the decision-making of Instacart, including the content and issuance of the statements contained (and/or incorporated by reference) in the Registration Statement; they were provided with or had unlimited access to copies of the Registration Statement (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they signed the Registration Statement and were directly involved in or responsible for providing false or misleading information contained in the Registration Statement (and/or documents incorporated by reference therein) and/or certifying and approving that information.

270.     The Individual Securities Act Defendants acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Registration Statement was true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

271.    Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of Instacart common stock pursuant and/or traceable to the Registration Statement.

272.    By reason of such conduct, the Individual Securities Act Defendants are liable pursuant to § 15 of the Securities Act.

## **EXCHANGE ACT CLAIMS**

## **I.    INTRODUCTION**

273.    The allegations in this Exchange Act Claims section of this complaint apply only to Plaintiffs' claims under the Exchange Act and are not alleged in respect of any of Plaintiffs' Securities Act Claims. These Exchange Act Claims are based on reckless or intentionally fraudulent conduct by or on behalf of the Exchange Act Defendants (defined below) during the period September 19, 2023 and October 1, 2023, both dates inclusive (the "Class Period").

274.    Instacart purports to be "***the leading grocery technology company in North America***." The Company's core business is acting as an intermediary between customers and grocery stores. Customers use Instacart's mobile app or website to select a grocery store at which they would like to shop, including, for example, Safeway, Publix, Super Fresh, Harris Teeter, Shaw's, Mariano's, Jewel-Osco, Stanley's, and Costco, and the items they would like to purchase from that store, and Instacart's personal "shoppers" gather the items the customer ordered and make them available for "pick-up," personally deliver them to customers, provide them to individuals who deliver them to customers.

275.    Instacart's business skyrocketed during the COVID-19 pandemic. In the wake of the pandemic, the Company achieved a valuation of over ***$39 billion***. In the years after the pandemic ebbed, however, Instacart's growth stagnated and the valuation fell back to essentially its pre-pandemic level, creating potentially large losses for the Company's private equity and venture capital investors. As it became clear that Instacart's position in the online grocery industry would not improve, the Company's investors decided to cut their losses and arranged for the Company to go public at a much smaller

63

valuation. Defendants Simo and Giovanni also prepared to sell shares in connection with the IPO, to cash in before the Company's valuation fell further.

276.    Instacart's Offering Documents thus needed to convince the market that despite its stagnant growth and plummeting valuation, it was still a worthwhile investment. To that end, the Offering Documents touted that Instacart had "***an efficient sales and marketing engine to support our organic motion and drive growth***," "***a broader set of marketing strategies to attract customers to, and increase their engagement with, Instacart***," and the "***ability to drive customer engagement through product enhancements and continued marketing investment***." The Offering Documents failed to disclose, however, that the Company's massive marketing and brand awareness campaign the prior year had been an utter failure. In fact, Instacart's brand recognition was ***declining***, while competitors' brand recognition was increasing.

277.    In addition, the Offering Documents assured investors that, even though growth had stalled, Instacart's forecasts pointed toward future growth. For example, in the IPO letter stated that "***We have demonstrated our ability to help our retail partners drive strong growth and stay competitive in a complex and increasingly digital industry***," and, while growth had been flat in the first half of 2023, there are "***higher levels of order volume growth in the second half of the year during the back-to-school period and holiday season***." While these statements communicated to investors that Instacart had a reasonable process for understanding and forecasting Instacart's potential future performance, they failed to disclose that the Company's forecasting process consisted of simply taking historical performance and projecting it into the future and did not consider Instacart's competitors. Further, as set forth above, Instacart's brand recognition and awareness was declining as its competitors' brand awareness was increasing, which made any reliance on historical performance all the more unreasonable.

278.    The Exchange Act Defendants knew or recklessly disregarded these false and/or misleading statements because they had seen data demonstrating the Company's failed marketing

campaign and declining brand recognition and had been confronted about Instacart's forecasting process. They also had a motive for their fraud because they sold shares in connection with the IPO and, along with the Company's founder and private equity and venture capital investors, reaped millions in gains at the expense of investors. ***Defendant Simo, for example, reaped proceeds of $9,635,430***, and ***Defendant Giovanni raked in $5,730,180***. In fact, the day after the IPO, Silicon Valley online news outlet SFGate observed that Instacart's Founder, Mehta,[16] "***is making off like a bandit***. The 37-year-old owns 10% of Instacart, even after ***cashing out almost $20 million worth of shares*** in the initial public offering."

## II.    PARTIES

279.    Lead Plaintiff Cheng purchased the Company's common stock in the IPO as set forth in his previously filed Certification (ECF No. 28-3).

280.    Named Plaintiff Viscusi purchased the Company's common stock in the IPO as set forth in his previously filed Certification (ECF Nos. 34-3).

281.    Defendant Instacart is a Delaware corporation with principal executive offices located at all relevant times at 50 Beale Street, Suite 600, San Francisco, California 94105. The Company's common stock trades in an efficient market on the NASDAQ under the trading symbol "CART".

282.    Defendant Simo has served as Instacart's Chief Executive Officer and a Director of the Company at all relevant times. Defendant Simo has also served as the Chairperson of the Company's Board of Directors since September 2023. Defendant Simo signed or authorized the signing of the Registration Statement filed with the SEC.

283.    Defendant Giovanni has served as Instacart's Chief Financial Officer at all relevant times. Defendant Giovanni signed or authorized the signing of the Registration Statement filed with the SEC.

---

[16] For the avoidance of doubt, Mehta is a Securities Act Defendant, not an Exchange Act Defendant.

284. Defendants Simo and Giovanni possessed the power and authority to control the contents of Instacart's SEC filings, press releases, and other market communications. Defendants Simo and Giovanni were provided with copies of Instacart's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Instacart, and their access to material information available to her but not to the public, Defendants Simo and Giovanni knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. Defendants Simo and Giovanni are liable for the false statements and omissions pleaded herein.

285. Defendants Simo and Giovanni are referred to collectively as the "Individual Exchange Act Defendants." Instacart and the Individual Exchange Act Defendants are referred to collectively as the Exchange Act Defendants.

### III.    CONFIDENTIAL WITNESSES

286. CW1 worked in Instacart's advertising business at Instacart from April 2023 to July 2024. He was based in Ohio and reported to the Senior Director Sales Capability and Strategy, who reported to then-VP of Commercial Excellence and Current Vice President of Brand Partnerships Josh Rider, who reported to Chief Business Officer Chris Rogers, who reported to Simo.

287. CW1's duties included reviewing the Company's advertising business, identifying areas that were driving advertising revenue and creating a revenue plan. This included analyzing the sales team's approach to revenue creation and conversations with customers. CW's revenue planning forecasts covered all accounts, "essentially just how we set up the business logistically and operationally and how we view that data."

288. CW2 worked in finance at Instacart until four months before the IPO. CW2 reported up to the Vice President of Finance who reported to Giovanni, who reported to Simo. CW2's responsibilities

included revenue forecasting, planning, and growth. CW2 focused on forecasting in paid marketing and brand marketing.

289.    CW3 was the Manager of Market Research for Brand, Campaigns, & Sentiment from May 2021 to March 2023. When CW3 joined Instacart, he reported to the Senior Director of Research for a month before reporting to the newly hired Director of Market Research, who reported to the Senior Director of Research. The Senior Director of Research reported to Vice President of Product and later to the Global Head of Design and Research. Both the Vice President of Product and the Global Head of Design and Research reported to Chief Operating Officer Asha Sharma, who reported to Simo.

290.    CW3 was responsible for research around brand and advertising campaigns. He built out the Company's brand and campaigns arm, which included understanding Instacart's brand equity and the means for growing brand equity over time. He also researched marketing campaigns that Instacart planned to run, particularly mass media campaigns.

291.    CW4 was a senior manager on Instacart's marketing team from Sept. 2021 to May 2023. He reported to Senior Director of Financial Systems, who reported to Ramsay.[17] Ramsay reported to Defendant Giovanni.

292.    CW4 led a team of analytic engineers to build out analytic models in preparation for the IPO and financial reporting. When he joined Instacart, the finance group was working to automate accounting processes and improve data quality. CW4 worked with Instacart's financial data repository, which included all financial data. "Every way you can slice and dice financial data," he said. "We were working to pull this data into our repository and build the data models that we fed into our accounting and financial processes. It was for GAAP accounting purposes. It was for forecasting. Everything dollars

---

[17] For the avoidance of doubt, Ramsay is a Securities Act Defendant, not an Exchange Act Defendant.

related." CW4 recently spoke with a colleague who continues to work at Instacart who told him that the data repository and associated program work is still unfinished and will not be completed until 2026.

## IV.    SUBSTANTIVE ALLEGATIONS OF FALSE AND MISLEADING STATEMENTS IN VIOLATION OF THE EXCHANGE ACT

### A.    Background of Instacart

293.    Instacart was incorporated in Delaware and founded as "Maplebear Inc." in 2012 by Mehta, Max Mullen, and Brandon Leonardo. Among Instacart's initial investors were private equity and venture capital firms like Sequoia Capital Partners ("Sequoia"), Canaan Partners, Khosla Ventures, and Y Combinator. The Company is best known as a provider of online grocery shopping services to households in North America. Through its "Instacart Marketplace" mobile application and website, Instacart sells and delivers a variety of products, including food, alcohol, consumer health, pet care, and ready-made meals.

294.    Practically speaking, Instacart is an intermediary between customers and grocery stores. Customers use the Company's mobile app or website to select a grocery store at which they would like to shop and the items they would like to purchase from that store. Instacart employs "shoppers" as independent contractors. The shoppers gather the items the customer ordered and check with the customer if substitutions are necessary. If the customer selected a "pick-up" option, the shopper makes the order available for the customer to pick up at the store. If the customer chooses home delivery, a driver (who may also be the shopper) delivers the groceries to the customer's home. Customers pay for this service via delivery fees and service charges, which vary depending on the store and the number of items purchased. Customers can also "subscribe" to Instacart, pay an annual or monthly fee, and get free deliveries. Instacart generates revenues from the fees paid on each order by "retail partners" (*i.e.*, stores) and customers.

295.    In addition to its Instacart Marketplace for grocery shopping, the Company also generates revenue through its "Instacart Enterprise Platform" and "Instacart Ads." The Instacart Enterprise Platform provides backend software that enables retailers (*e.g.*, local grocery stores) to allow customers to shop online at the specific retailer's own website, rather than through the Company's website or app. Instacart Ads allow consumer packaged goods brands to advertise directly on Instacart's website or app, either through display ads or through favorable positioning on screen.

296.    Instacart grew slowly at first. At the start of 2020, it had approximately $215 million in annual revenues from 50 million customers and a "gross transaction value" or "GTV" of $5.1 billion. The $5.1 billion in groceries represented only a fraction of the $800 billion U.S. grocery market.

297.    Instacart experienced a once-in-a-lifetime reversal of fortune in 2020, however, in the wake of federal, state, and local lockdowns in response to the COVID-19 pandemic. The Company's GTV quadrupled from $5.1 billion in 2019 to $20.7 billion in 2020. The Company's revenues also skyrocketed from $215 million in 2019 to approximately $1.5 billion in 2020.

298.    Investment firms' desire to give Instacart money ***exploded*** during the pandemic. For example, while Instacart's last round of funding prior to the pandemic set a valuation for the Company of $7.6 billion, on June 11, 2020, Instacart engaged in other round of fundraising led by investment firms DST Global and General Catalyst that nearly doubled the company's valuation to $13.7 billion. Less than a month later, on July 3, 2020, it raised additional funds that pushed the Company's valuation to $13.8 billion. Further, after another capital raise in October 2020, the Company was valued at $17.7 billion.

299.    The 2020 fundraising rounds were only the tip of the iceberg, however. On March 7, 2021, the Company raised another $265 million which quintupled Instacart's pre-pandemic valuation to a staggering ***$39 billion***. This funding round was mostly the result of existing Instacart investors increasing their holdings, including Sequoia, by far the Company's largest investor.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

300.     Instacart's growth slowed dramatically from 2021 to 2023 as the pandemic waned and customers returned to pre-pandemic shopping habits. GTV, which had quadrupled to $20.7 billion in 2020, grew only 20% in 2021, as lockdowns were lifted. As growth slumped in 2021, Mehta entered merger talks with DoorDash, one of Instacart's main competitors.[18] After the merger fell through, media website "The Information" disclosed the discussions and markets began to doubt the Company's post-pandemic viability.[19] In July 2021, Instacart's venture capital investors, through the Company's board of directors, pushed Mehta out as CEO and replaced him with Defendant Simo, for the express purpose of taking Instacart public—fearing that the Company's valuation would plummet unless it went public soon.[20]

301.     Instacart's GTV grew only 15% in 2022, as Defendant Simo attempted to take the Company public. As GTV stagnated, the Company filed a confidential draft registration statement on Form S-1 with the SEC that, when it became effective, would allow Instacart to go public via an IPO. Shockingly, the registration statement slashed the Company's valuation by 40% to only $24 billion, Defendant Simo tried to make the Company more attractive for investors by laying off staff, pausing hiring, and capping spending.[21] Instacart's announcement of a potential IPO took pains to assure the market that the reason for the IPO was not capital for the Company. Instead, the Company insisted it was

---

[18] Maria Aspan, *Can new CEO Fidji Simo Turn Instacart Into More than Just a Delivery Company?*, *Fortune*, Oct. 4, 2021, https://fortune.com/longform/instacart-ceo-fidji-simo-facebook-retail-delivery-company/.

[19] *Id.*

[20] *See* Kellen Browning & Erin Griffith, *Instacart Searches for a Direction as Its Pandemic Boom Fades*, N.Y. Times, Apr. 22, 2022, https://www.nytimes.com/2022/04/29/technology/instacart-valuation-pandemic.html; Mike Isaac, *Instacart Hires a Top Facebook Executive as Its New Chief*, NYTimes.com, July 8, 2021, https://www.nytimes.com/2021/07/08/technology/fidji-simo-instacart.html.

[21] *Instacart Cuts Saff, Curbs Hiring Before IPO,* The Information *Reports*, Reuters, Sep. 25, 2022, https://www.reuters.com/business/retail-consumer/instacart-cuts-staff-curbs-hiring-before-ipo-the-information-2022-09-25/.

to allow employees to cash in their stock options.[22] An IPO, of course, would also allow the Company's private equity and venture capital investors to cash out while the valuation was still high.

302.    As IPO preparations intensified, however, the Instacart's valuation continued to plummet. In October 2022 The Information revealed that Instacart had conducted a 409A evaluation, which resulted in a new valuation of $13 billion – a 67% reduction from the $39 billion peak valuation.[23] The Company ultimately delayed its IPO in late October 2022 because of "unfavorable market conditions," *i.e.*, Instacart's cratering valuation.[24] Market conditions did not improve over the fourth quarter, and in December 2022 the Company reduced its valuation yet again in December 2022 to $10 billion, according to internal sources.[25]

303.    The odds of a successful IPO effectively vaporized in the first half of 2023, as Instacart's growth effectively ceased. The Company's GTV for the first six months of 2023 was $14,937, an improvement of only 4% over the same period in 2022. The number of total orders over the first half of 2023 grew less than one half of one percent, from 132.3 million to 132.9 million, and Instacart's cost of goods sold rose to $729 million, an increase of 214% from its pre-pandemic cost of goods sold. This performance was devastating for the private equity and venture capital investors that had poured money into Instacart during the pandemic, as the Company's valuation had nowhere to go but down.

---

[22] Berber Jin & Corrie Driebusch, *Instacart Plans to Focus IPO on Selling Employee Shares*, Wall St. J., Sept. 19, 2022, https://www.wsj.com/articles/instacart-plans-to-focus-ipo-on-selling-employee-shares-11663581602.

[23] Erin Woo, *Instacart Cuts Internal Valuation Third Time, to $13 Billion*, The Information, Oct. 14, 2022, https://www.theinformation.com/articles/instacart-cuts-internal-valuation-third-time-to-13-billion.

[24] Anirban Sen & Krystal Hu, *Instacart Pulls IPO on Volatile Market Conditions – Sources*, Reuters, Oct. 20, 2022, https://www.reuters.com/business/retail-consumer/instacart-pulls-ipo-volatile-market-conditions-sources-2022-10-21/.

[25] Erin Woo, *Instacart Cuts Internal Valuation by Another 20% to $10 Billion*, The Information, Dec. 27, 2022, https://www.theinformation.com/articles/instacart-cuts-internal-valuation-by-another-20-to-10-billion.

304.    Despite the Company's flattening performance, its private equity and venture capital investors had had enough and in August 2023 Instacart announced that it would go public via an IPO the following month.

305.    The Exchange Act Defendants began promoting the Company's IPO on September 11, 2023, with a targeted valuation of $8.6 billion to $9.3 billion – less than *one quarter* its valuation during the pandemic. In fact, according to estimates from Forbes, the firms who led the 2021 funding round – Andreessen Horowitz, D1 Capital, Fidelity, Sequoia Capital, and T. Rowe Price – would suffer unrealized losses of roughly ***73%*** from the funds they invested at that time, if they retained the stake in the company.[26]

306.    Forbes noted that the Instacart offering was a rare "down round" IPO, the term given to public offerings at lower valuations than during private financing. According to analysis from the Wall Street Journal, any investor who invested in the company since 2015 would have received stronger returns by investing in the Nasdaq Composite Index.[27] In short, the Company's private equity investors had had enough and decided to cut their losses. Indeed, Mehta confirmed as much in an interview four months after the IPO, stating, "The primary reason to go public was to make sure that employees ***and early investors receive liquidity***."[28]

---

[26] Derek Forbes, *Here Are The Big Investor Winners In Instacart's $11 Billion IPO Debut – And The Losers*, Forbes, Sept. 19, 2023, https://www.forbes.com/sites/dereksaul/2023/09/19/here-are-the-big-investor-winners-in-instacarts-11-billion-ipo-debut-and-the-losers/.

[27] Berber Jin, *Instacart IPO Is an Expensive Lesson for Venture Firms*, Wall St. J. (Sep. 16, 2023), https://www.wsj.com/finance/investing/instacart-ipo-is-an-expensive-lesson-for-venture-firms-af82064.

[28] *See* Samidha Sharma, *Didn't Want My Legacy to be Defined by One Company: Instacart Founder Apoorva Mehta*, The Economic Times, Jan. 5, 2024, https://economictimes.indiatimes.com/tech/technology/didnt-want-my-legacy-to-be-defined-by-one-company-instacart-founder-apoorva-mehta/articleshow/105883572.cms?utm_source=contentofinterest&utm_medium=text&utm_campaign=cppst.

### B. The Registration Statement Relies Instacart's Purportedly Strong Brand and Positive Forecasts to Tout the Company to Investors

307. On August 25, 2023, Instacart filed a Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on September 18, 2023. On September 20, 2023, Instacart filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (together, the "Offering Documents").

308. Although the Company's growth had flatlined and its valuation had fallen to nearly pre-pandemic levels, the Offering Documents touted Instacart to investors based on its brand and forecasts of its future success.

309. For example, the Offering Documents began with a letter from Defendant Simo (the "IPO Letter"). In that letter, Defendant Simo touted to investors that Instacart "power[s] tens of billions of dollars in annual sales for retailers, which makes Instacart *the leading grocery technology company* in North America."

310. The Offering Documents further stated that Instacart had "*an efficient sales and marketing engine to support our organic motion and drive growth*" and "*a broader set of marketing strategies to attract customers to, and increase their engagement with, Instacart.*" In all, Instacart's "*marketing efforts drive sales for our retail and brand partners*."

311. Finally, the Offering Documents positioned the Instacart's brand identity as a key element of the Company's growth strategy, stating, "*We believe we have a significant opportunity to increase our brand awareness to fuel new customer acquisition*," "we believe that we can continue growing average monthly GTV and orders per monthly active orderer for these cohorts over time *due to our ability to drive customer engagement through product enhancements and continued marketing investment*,"

and finally, "***We plan to invest in incentives, performance and brand marketing, and partnerships to grow our customer base and expand the online grocery market***."

312.    These statements communicated to investors that customers viewed the Company as leading the online grocery shopping industry and that Instacart's marketing and brand awareness efforts increased customer awareness and interactions with the Company. As set forth below, however, these statements were misleading because awareness of Instacart's brand recognition was ***declining*** while competitors' brand recognition was increasing. Indeed, these trends—declining Instacart brand recognition and increasing competitor brand recognition—had accelerated the prior year in the immediate aftermath of the Company spending tens of millions of dollars on a brand awareness campaign the prior year.

313.    The Offering Documents also assured investors that, even though growth had stalled, Instacart's forecasts pointed toward future growth. For example, in the IPO letter stated that "Our GTV, representing the online sales we power for all of our retail partners, grew at a compound annual growth rate of 80% between 2018 and 2022, compared to 50% for the overall online grocery market and 1% for offline grocery. ***We have demonstrated our ability to help our retail partners drive strong growth and stay competitive in a complex and increasingly digital industry***."

314.    Likewise, the Offering Documents assured investors that "***[s]atisfied customers will continue to order on Instacart***" and that "***[l]ower fees make ordering online more appealing for customers, resulting in a higher frequency of usage***."

315.    Further, the Offering Documents stated that "***While we do not expect our pandemic-accelerated growth rates to recur in future periods, our growth during this period helped establish a business with much greater scale and much higher gross profit***."

316.    Finally, the Offering Documents stated that "We typically see lower levels of order volume growth in the second quarter and a portion of the third quarter resulting from lower usage of our

74

offerings during the spring and summer months, ***followed by higher levels of order volume growth in the second half of the year during the back-to-school period and holiday season***. Our rapid growth and the impact of the COVID-19 pandemic have made, and may in the future make, seasonal fluctuations difficult to detect, and future public health outbreaks may obscure future seasonality trends."

317.    These statements communicated to investors that Instacart had a reasonable process for understanding and forecasting Instacart's potential future performance. These statements were misleading, however, because Instacart's forecasting process consisted of simply taking historical performance and projecting it into the future, which created the material undisclosed risk that analysts would create materially lower forecasts of future performance when applying traditional forecasting methods to the Company's financial and operations data.

### C.  Instacart's Brand Declines in Advance of the IPO

318.    As set forth above, while the Offering Documents communicated to investors that Instacart's brand recognition and awareness were reasons to participate in the Company's IPO, Instacart's brand recognition was declining while competitors' brand recognition was increasing.

319.    CW3, the Company's Manager of Market Research for Brand, Campaigns, & Sentiment from May 2021 to March 2023, stated that, shortly after he was hired in May 2021, the Company was nearing the end of the pandemic and consumer behavior that drove Instacart growth was reverting to pre-Covid habits. In other words, Instacart app users were returning to grocery stores to shop in person. CW3 recognized that competition for ownership of "Instant Delivery" positioning in customers' minds was heating up, especially with regard to Instacart competitors like Amazon, Walmart, Uber, Door Dash, Shipt, and GoPuff. CW3 communicated this to the Company's Director of Market Research and Senior Director of Research.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

320.    CW3 stated that in late-August 2022, Instacart launched a $22 million six-week advertising campaign with Lizzo,[29] a popular Grammy-winning singer, hip-hop artist, and classically trained flutist. Instacart hoped to increase its "brand awareness metrics," or quantitative and qualitative measurements assessing how well a target audience recognizes, remembers, and engages with a brand.

321.    CW3 stated that the Lizzo campaign's launch was timed with the MTV Video Music Awards and ran for six weeks. The campaign ran on a variety of media channels, including television, social media, streaming, and involved a 60-second ad with Lizzo that was edited to various lengths. CW3 stated that the purpose of the campaign was to improve Instacart's brand recognition and awareness in the run-up to the Company going public. Instacart had filed a confidential registration statement with the SEC in May 2022, and was preparing to go public. The Company ultimately delayed the IPO because of poor market conditions in October 2022.[30]

322.    CW3 was tasked with analyzing the effect the campaign had on Instacart brand awareness. The results of the analysis would be presented to the Company's Board of Directors and be factored into the decision of timing when to go public.

323.    CW3 created three studies to measure brand awareness: a "Brand Tracker" study; a Campaign Awareness Research Study ("CARS"), which was specific to the campaign and tracked brand awareness; and a "Platform Brand Lift Study" conducted by the Marketing Team.

324.    The Brand Tracker was an online tracking study with a random sample of the U.S. general population with a margin of error of plus or minus 2 percent and was executed by Kantar, Instacart's research partner. CW3 stated that the Brand Tracker study was the key source of information about

---

[29]    Biography.com    Editors    &    Colin    McEvoy,    Lizzo,    Biography.com, www.biography.com/musicians/lizzo.

[30]    Dan    Primack,    Instacart    postpones    its    IPO,    Axios    (Oct.    20,    2022) https://www.axios.com/2022/10/21/instacart-postpones-ipo

Instacart's future growth potential. It was a macro study that looked at the general population and measured whether the Company's brand was growing in people's minds, and whether people were considering Instacart brand when it came to grocery shopping.

325.    The tracker involved sending email surveys to study subjects to understand consumers' perception of Instacart relative to other competitors like Door Dash. CW3 said that the Company ran the study every week, resulting in a data sample of approximately 1,000 surveys per month, which were analyzed quarterly.

326.    CW3 initiated the Brand Tracker in Q3 of 2021, and thus Instacart had data for a least a full year in advance of the Lizzo campaign. In Q3 of 2022, however, in the wake of the Campaign, he started to see a *decline* in brand awareness for the first time. Although he normally presented quarterly tracking figures, he knew the leadership at Instacart was keenly interested in how the Lizzo campaign affected brand awareness. CW3 thus analyzed the data for each month in Q3 2022, and the Brand Tracker analysis showed an unmistakable *decline* in brand awareness in the wake of the Lizzo ad campaign. Incredibly, this decline was most severe among families with children, which was the Company's core customer segment. In fact, according to CW3, families with kids was the awareness segment that had declined the fastest. To make matters worse, CW3's research showed that awareness of Instacart competitors Amazon and Wal-Mart had increased over this period.

327.    These results were corroborated by a Campaign Awareness Research Study ("CARS") CW3 conducted as well. CARS measured the impact of the Lizzo ad campaign in August and September of 2022 via new surveys of 1,000 people. CW3 stated that it was test and control experiments with people who saw the campaign compared to similar people who had not seen the campaign. CARS ran for four weeks, from August 28, 2022 through September 24, 2022, during the Lizzo campaign. According to CW3, the study showed brand awareness *decreased* during the ad campaign.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

328.    The Brand Tracker and CARS results were terrible for the Company because the Lizzo campaign was not effective. CW3 stated that the campaign "didn't make the impact we needed it to make." In addition, "[b]eyond that there's this declining trend that's even bigger than the campaign."

329.    CW3 and an Instacart market research colleague presented the results of the Brand Tracker and CARS in the form of a Google Slides presentation to members of the marketing team in October 2022. After that meeting, CW3 and his colleague began presenting the report up the management chain in virtual presentations. In November 2022, he presented the results to the Polin, the Vice President of Marketing under the Chief Marketing Officer, and Ingraham. He also presented his findings to Jones and Sherma in November 2022. The attendees at these presentations refused to believe the results.

330.    In late November 2022, CW3 and his market research colleague presented the findings to Defendant Simo, Polin, Ingraham, Sherma; and Parijat, with Tafvizi attending as well. Simo flatly refused to believe the results and instructed CW3 to dig into the data. Other responses at the meeting were similarly negative. The response was so negative, in fact, that CW3 described his head as "spinning" and was afraid he would lose his job.

331.    A follow-up presentation was scheduled with Simo and the other attendees in December 2022. When CW3 appeared for the presentation, neither Simo, nor anyone else, even showed up.

332.    CW3 and his team then began looking at Q4 of 2022 brand tracking data to see if the downward decline in brand awareness continued. CW4 described the efforts as "looking at data weekly and monthly." His team "did a lot more work over the [holiday] break and felt a lot more confident. We pulled in some external sources. We didn't know if there was a misunderstanding. We didn't know if they didn't understand the metrics so we tried to break down the metrics and explain them." The results again showed Instacart's brand awareness declining and competitors' staying flat or rising.

333.    They again presented the data to the marketing team and senior directors, including Polin in January 2023. The reactions to this presentation were not as negative, and the attendees appeared to

78

understand that the data was supported and reliable. CW3 said that Polin and Jones were working on assembling materials to be shared with the Company's Board of Directors "help us decide if we were going to go public or not." CW3 was given specific dates to deliver data to Polin so that his Brand Tracker reports could be shown to the Board. CW3 stated that Polin and Jones were going to present the Brand Tracker reports and reports concerning the Lizzo campaign in early December 2022.

334.   In addition, Hollan, who worked in Corporate Finance and Special Projects and was the day-to-day contact for the upcoming IPO, requested and received CW3's quarterly Brand Tracking Research reports. Defendant Giovanni was on the IPO team as well. CW3 said that Hollan told him that the reports were made part of the Company's "IPO readiness materials." "There was a special team working on getting us ready for the IPO, so they requested the report on a quarterly basis," CW3 said.

335.   Another presentation by CW3 and his team was scheduled for March 2023. That presentation never happened, however, as in early March CW3 and his team were fired and locked out of Instacart's systems. CW3 noticed that his Brand Tracker Report concerning Q4 2022, which showed Instacart's continued brand awareness decline, had vanished from the internal folder where the Brand Tracker studies were kept.

336.   In July 2023, CW3 learned from a colleague who remains with Instacart that the Company had discontinued using Kantar for brand tracking research. Kantar is a very well-known market research company, according to CW3, that specializes specifically in brand building, The new research company, Yougov is focused on polling research and is not as in-depth in understanding brands, according to CW3.

### D.  Instacart's Nonexistent Forecasting Process

337.   As set forth above, Instacart's Offering Documents communicated to investors that Instacart had a process for understanding and forecasting Instacart's future performance. In reality, however, Instacart's forecasting process consisted of simply taking historical performance and projecting it into the future.

338.    For example, CW1 stated that Instacart set revenue goals based on its historical, astronomical growth, and not on the reality of the existing demand. For example, Instacart continued to project 20 percent growth quarter after quarter based on its history with no plan for how to achieve that growth and no data to support those projections other than historical data, which did not reflect current sales trends.

339.    CW1 further stated that normal advertising forecasting would involve looking at the sales pipeline, revenue associated with that pipeline, the customer orders pipeline, and whether those customers were likely to return. CW said Instacart executive "don't look at that. They look at it as historicals. I think it was, 'We've done this before, we're going to do it again.'"

340.    To that end, CW1 stated that Instacart did not have a plan for delivering revenue and would simply set a revenue figure and reverse engineer a forecast. He said that historically the Company had 15 to 20 percent year to year growth with advertising growth and wanted to grow an additional approximately 20% annually into the future, but there was no plan regarding the "new customer groups we're going to go after to get that" and no examination of what large customers were "overinvested" and could not be a source of any more revenue."

341.    CW1 stated that he spoke to then-VP of Commercial Excellence Josh Rider about forecasting when he joined Instacart in April 2023, who stated that historical performance is the best indicator of future results because one could not predict advertiser demand. CW1 explained that it was possible, and Rider brushed him off, telling him to write a whitepaper. CW1 created a whitepaper, explaining how to use information gathered from Instacart sales personnel from interactions directly with advertising customers. Despite the whitepaper, the Company continued to forecast solely based on prior quarter performance, which was still the process when CW1 left Instacart.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

342.    CW1 further stated that he worked at Instacart for five quarters and there was a "gap to goal" going into every single quarter. In other words, Instacart would set a forecast, then enter the quarter, and try to figure out how to meet that forecast.

343.    CW1 stated that he attended weekly finance meetings put together by the Data Science team, which gathered the data inputs, *e.g.*, performance results, for the meetings. Chief Business Officer Chris Rogers; then-VP of Commercial Excellence Josh Rider; Rider's report, the product person that led advertising, and members of the Strategic Finance team attended the meetings, where they would review the forecast for the week. The meeting would begin with a review of actual results, then historical results, then projections based on those historical results. CW1 stated that all attendees at the meetings knew the projections were solely based on historical figures. CW1 stated that "The Strategic Finance Team was very clear about that," and "This is based on historicals and using historicals for a future predictive model and that model took things into account like historical seasonality; historical platform growth; all the historical things that operate our business." CW1 stated that "It's very basic numbers that are being put together and dragged to the right. Let's assume this run rate continues. Let's assume seasonality is the same way it has been. Let's assume all stays the same. I'm just dragging [numbers] to the right in an Excel file."

344.    CW1 stated that projections were then reported up the chain of command to Defendant Simo, where they would be increased. The Strategic Finance Team would speak with Chief Business Office Chris Rogers and Simo, who would say "We're going to go higher," even if the Strategic Finance Team was advocating for a lower number and stating that the higher forecast was not realistic.

345.    CW2 corroborated CW1's description of the forecasting process at Instacart. CW2 stated that Instacart changed the revenue forecasts because it wanted to see 20 percent, sometimes even 30 percent growth based solely on the Company's historical performance. CW2 stated that he and his colleagues were responsible for focusing specific parts of a forecast and trying to get the most realistic or

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

most likely outcome. "If leadership has a different number in their head," however, "[they'd say] we need to hit this number." CW2 said that he specifically pushed back against Giovanni himself when Giovanni demanded revenue projections be increased, but to no avail.

346.   CW2 stated that he attended regular business review meetings with the leadership team, team heads, and department heads. The meetings were virtual, happened at least once a month, and lasted 30 to 45 minutes depending on business needs. Anywhere between ten and 30 people, including Simo, attended these meetings which were run jointly by Finance and rotating division heads, like the Chief Operating Officer or the Head of Products. CW2 said that during these meetings, finance would present what they considered realistic forecasts and leadership would demand a higher number.

347.   CW4 corroborated CW1's description of how Instacart determined its revenue forecasts solely based on its historical, astronomical performance during COVID-19 pandemic. CW4 stated that he was in a unique position within Instacart to see the actual performance numbers because of his role.

### E.  Insiders Reap Millions in Connection with Instacart's IPO

348.   Pursuant to the Offering Documents, Instacart and other selling stockholders identified in the Prospectus sold 14.1 million and 7.9 million shares of the Company's common stock to the public, respectively, at the Offering price of $30.00 per share for total proceeds of approximately $400 million and $224 million to Instacart and the selling stockholders, respectively, after applicable underwriting discounts and commissions. On September 19, 2023, Instacart's common stock began publicly trading on the NASDAQ under the ticker symbol "CART." Instacart went public at a value of $30 per share, and closed at $33.70, resulting in a valuation at the end of the first day at just over $11 billion.

349.   Exchange Act Defendant insiders reaped massive returns by selling shares into the IPO. Defendant Simo also moved 321,181 shares off-market for proceeds of $9,635,430, retaining 939,163 shares. The Offering Documents had declared that Defendant Simo would not offer any shares *during* the IPO, and thus investors would not learn of the transaction until after the IPO. Likewise, on September

19, 2023, Defendant Giovanni sold 191,006 shares for proceeds of $5,730,180, retaining 572,885 shares. The prospectus declared that Defendant Giovanni would not offer any shares **during** the IPO, and thus investors would not learn of the transaction until after the IPO.

350.    Non-Defendant insiders also profited. For example, Board Member Ravi Gupta, a partner at private equity firm Sequoia Capital, unloaded 740,000 shares in the IPO for total proceeds of $22,200,000. Similarly, Instacart's Founder, Mehta, sold 700,000 shares for total proceeds of $21,000,000, retaining 28,280,667 shares. Instacart Chief Technology Officer Mark Schaaf sold nearly half his company stake, 299,142 shares, for proceeds of $8,974,260, retaining 338,925 shares. On September 19, 2023, Ramsey sold 47,044 shares off-market for total proceeds of $1,411,320, retaining 97,138 shares.

351.    On September 19, 2023, Instacart Chief Operating Officer Asha Sharma sold 272,883 shares off-market for total proceeds of $8,186,490, retaining 1,145,638 shares. The prospectus declared that Sharma would not offer any shares during the IPO, and thus investors would not learn of the transaction until after the IPO. On September 21, 2023, Instacart General Counsel Morgan Fong sold 62,741 shares for total proceeds of $1,882,230, retaining 301,782 shares. The prospectus declared that Fong would not offer any shares during the IPO, and thus investors would not learn of the transaction until after the IPO.

352.    In total, through the IPO, thirteen executives, directors, and nominees sold 1,440,000 shares of stock for total proceeds of $43,200,000. In addition, without disclosure in the prospectus, insiders sold another 894,855 shares off-market in the days after the IPO for additional total proceeds of $21,115,470.

353.    Thus, the IPO provided an instant payday of millions for insiders, who were knowingly trading on false and misleading statements made about the Company.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

354.    The Class Period begins on September 19, 2023, when Instacart's common stock began publicly trading on the NASDAQ pursuant to the following materially false or misleading statements or omissions in the Offering Documents. Further, the Exchange Act Defendants made additional false and misleading statements after the IPO concluded but before the end of the Class Period.

### A.  False and Misleading Statements Concerning Branding and Competition

355.    The Offering Documents began with the IPO Letter from Defendant Simo, which indicated to investors that Instacart was positioned to capitalize on the accelerating online grocery order and delivery business. In that letter, Defendant Simo touted to investors that Instacart "power[s] tens of billions of dollars in annual sales for retailers, which makes ***Instacart the leading grocery technology company in North America***."

356.    The Offering Documents also touted to investors, "While our business has scaled significantly, we continue to believe we are early in our opportunity. ***We believe the strength of our brand enables us to attract customers to Instacart on an organic basis***," and "while increases in customer acquisition costs that have longer time horizons, such as incentives and promotions as well as brand marketing campaigns, may initially have a negative impact on our profitability, ***we believe that these investments will drive increased engagement from existing customers and enable us to attract new customers to Instacart***."

357.    Later, in a discussion of the "Core Principles of Instacart's Financial Model," the Offering Documents stated that "Prior to 2021, we did not spend significantly on sales and marketing since the majority of our growth in our new customers was organic. ***Beginning in 2021, after we achieved meaningful improvement in unit economics, we began to significantly increase consumer marketing.***

*We believe we have a significant opportunity to increase our brand awareness to fuel new customer acquisition*."

358.    The Offering Documents continued, "we believe that we can continue growing average monthly GTV and orders per monthly active orderer for these cohorts over time *due to our ability to drive customer engagement through product enhancements and continued marketing investment*."

359.    The Offering Documents also touted Instacart's branding efforts, stating that:

> In the second half of 2022 and continuing in the first half of 2023, *we began to optimize our sales and marketing expense across a variety of channels intended to focus on customer acquisition spend where we believe we can earn positive return on investment across categories, including performance marketing, demand generation partnerships, and brand development to attract new customers, reengage customers that have stopped using Instacart, and increase customer engagement*. However, we are still early in our opportunity and intend to continue to increase our customer acquisition spend across categories.

360.    The Offering Documents also touted the Company's "Growth Strategies." Chief among these "Growth Strategies" was:

> *Attract New Customers and Expand Use Cases*. We will continue to help retail partners capture new customers as consumer behaviors and preferences shift. We are focused on the following avenues to achieve this:
>
> *Grow Online Penetration. We plan to invest in incentives, performance and brand marketing,* and partnerships to grow our customer base *and expand the online grocery market*.

(First emphasis in original.)

361.    Further, the Offering Documents touted that, "*While our brand and leading market position enable us to benefit from organic, word-of-mouth growth*, we use sales and marketing to attract customers, retailers, brands, and shoppers and grow the pie for all of our constituents."

362.    The Offering Documents further stated that "*We have built an efficient sales and marketing engine to support our organic motion and drive growth. As we have continued to grow, we have developed a broader set of marketing strategies to attract customers to, and increase their*

*engagement with, Instacart*." To that end, the Registration Statement stated that "***Our marketing efforts drive sales for our retail and brand partners***."

363.    Further, on September 22, 2023, Defendant Simo told the Financial Times, "***There's no doubt we are a much stronger company now than in 2021*** . . . . When I took over, our gross transaction volume was actually shrinking and people believed that Instacart might just be a pandemic fad."

364.    The statements referenced in ¶¶ 355-63 above were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents communicated to investors that Instacart's marketing, brand recognition, and customer awareness of Instacart's brand were strong and thus that Instacart was uniquely positioned to capitalize on the rapidly expanding online grocery business, while downplaying the Company's competition in the online grocery shopping and delivery market. These statements were made false and/or misleading and/or failed to disclose that: (i) Instacart's marketing efforts had been entirely ineffective; (ii) Instacart's brand recognition and awareness was declining; (iii) Instacart's competitors' brand recognition was increasing; (iv) accordingly, Defendants overstated the Company's post-IPO growth, business, and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**B.  False and Misleading Statements Concerning Forecasting**

365.    The Offering Documents also assured investors that, even though growth had stalled, Instacart's forecasts pointed toward future growth. For example, in the IPO letter stated that "Our GTV, representing the online sales we power for all of our retail partners, grew at a compound annual growth rate of 80% between 2018 and 2022, compared to 50% for the overall online grocery market and 1% for

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

offline grocery. *We have demonstrated our ability to help our retail partners drive strong growth and stay competitive in a complex and increasingly digital industry*."

366.    Likewise, the Offering Documents assured investors that "*[s]atisfied customers will continue to order on Instacart*" and that "*[l]ower fees make ordering online more appealing for customers, resulting in a higher frequency of usage*."

367.    Further, the Offering Documents stated that "*While we do not expect our pandemic-accelerated growth rates to recur in future periods, our growth during this period helped establish a business with much greater scale and much higher gross profit*."

368.    The Offering Documents also represented that:

> This prospectus contains estimates and information concerning our industry, including market size and growth of the market in which we participate, that are based on industry publications, reports, and other sources, including Yipit, LLC, and its affiliates, collectively referred to as YipitData. *Some data and other information contained in this prospectus are also based on management's estimates and calculations, which are derived from our review and interpretation of independent sources, including YipitData. This information involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates*.

369.    In addition, the Offering Documents stated that "We typically see lower levels of order volume growth in the second quarter and a portion of the third quarter resulting from lower usage of our offerings during the spring and summer months, *followed by higher levels of order volume growth in the second half of the year during the back-to-school period and holiday season*. Our rapid growth and the impact of the COVID-19 pandemic have made, and may in the future make, seasonal fluctuations difficult to detect, and future public health outbreaks may obscure future seasonality trends."

370.    Further, during a series of "roadshow" presentations from September 11-18, 2023, *i.e.*, the week before the IPO, the Exchange Act Defendants solicited investors to participate in Instacart's IPO by forecasting the penetration of online grocery shopping was to grow at a "compound annual growth

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

rate" of "**10-18%**" for the next several years. This representation was reprinted in September 22, 2019 analyst report by BTIG analyst Jake Fuller.

371.    The statements referenced in ¶¶365-71 above were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, these statements in the Offering Documents communicated to investors that Instacart had a reasonable process for understanding and forecasting Instacart's potential future performance, and thus that Instacart was uniquely positioned to capitalize on the rapidly expanding online grocery business, while downplaying the Company's competition in the online grocery shopping and delivery market. These statements were made false and/or misleading and/or failed to disclose that: (i) Instacart's forecasting process consisted solely of looking at historical performance, insisting that performance would continue in the future and did not take into account Instacart's competition; (ii) Instacart's forecasts were elevated to 20%-30% at management's direction, not based on any research or data; (iii) accordingly, the Exchange Act Defendants overstated the Company's post-IPO growth, business, and financial prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

372.    The Offering Documents' warnings about risks were also misleading. For example, the Offering Documents contained a generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to increase customer engagement, stating, *inter alia*:

> **If we fail to cost-effectively acquire new customers or increase the engagement of our existing customers, including through effective marketing strategies, our business would be harmed.**
>
> The growth of our business is dependent upon our ability to continue to grow our offerings by cost-effectively increasing our engagement with existing customers and acquiring new customers. **If we fail to do so, the value of our offerings will be diminished, and we may have difficulty attracting and engaging retailers and brands**.

(First emphasis in original.)

373.    Similarly, the Registration Statement contained a second generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to increase customer engagement, stating, *inter alia*:

> ***The failure to achieve increased market acceptance of online grocery shopping and our offerings*** *could* ***seriously harm our business.***
>
> ***
>
> In particular, shopping habits and preferences vary between younger and older consumers, consumers across different income groups, and among other demographic characteristics, and ***to be successful, we need to effectively increase market acceptance across all age, income, and other demographically different groups by increasing brand awareness*** and focusing marketing efforts on relevant habits and preferences.

(First emphasis in original.)

374.    Further, the Registration Statement contained a third generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to maintain or enhance its brand, stating, *inter alia*:

> ***If we fail to maintain and enhance our brand, our ability to engage or expand our base of customers, retailers, brands, and shoppers will be impaired and our business, financial condition, and results of operations may suffer.***
>
> Maintaining and enhancing our reputation as a differentiated and category-defining company is critical to attracting and expanding our relationships with customers, retailers, brands, and shoppers. The successful promotion of our brand and the market's awareness of our offerings will depend on a number of factors, including our marketing efforts, ability to continue to develop our offerings, and ability to successfully differentiate our offerings from competitive offerings.

(First emphasis in original.)

375.    Further, the Registration Statement contained a generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to forecast its future performance, stating, *inter alia*:

89

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*The estimates of market opportunity and forecasts of market growth included in this prospectus may prove to be inaccurate, and even if the market in which we compete achieves the forecasted growth, our business could fail to grow at a similar rate, if at all.*

The estimates of market opportunity and forecasts of market growth included in this prospectus may prove to be inaccurate. Market opportunity estimates and growth forecasts included in this prospectus are subject to significant uncertainty and are based on assumptions and estimates that *may* not prove to be accurate, including the risks described herein. Even if the market in which we compete achieves the forecasted growth, our business could fail to grow at a similar rate, if at all.

The variables that go into the calculation of our market opportunity are subject to change over time, and *there is no guarantee that any particular number or percentage of addressable consumers, retailers, or brands covered by our market opportunity estimates will purchase our offerings at all or generate any particular level of revenue for us*. Any *expansion in our market depends on a number of factors, including the cost, performance, and perceived value associated with our offerings and those of our competitors*. Accordingly, the forecasts of market growth included in this prospectus should not be taken as indicative of our future growth.

(First emphasis in original.)

376.    Similarly, the Registration Statement contained a second generic, boilerplate risk warning that purported to warn investors about risks related to Instacart's ability to forecast the future performance of its advertising division, stating, *inter alia*:

> *We are still in the early stages of building our Instacart Ads offerings. If we fail to grow our advertising revenue, our business, financial condition, and results of operations would be negatively impacted.*
>
> ***
>
> In addition, expenditures by brands tend to be cyclical, reflecting overall economic conditions and budgeting and buying patterns. Adverse macroeconomic conditions, including as a result of the COVID-19 pandemic, have also adversely affected the demand for advertising and caused brands to reduce the amounts they spend on advertising. For example, we have seen and may continue to see reduced demand for advertising from brands that are exercising caution with their spending budgets and either slowing or reducing their campaigns due to, among other things, macroeconomic uncertainty, including from inflation, rising interest rates, global supply chain disruptions, labor shortages, geopolitical events including the war in Ukraine, and reduced consumer confidence. *These factors had a negative impact on our advertising revenue in 2022 and the first half of 2023, and such impact may continue in future periods.* These

90

factors may also negatively impact our ability to forecast our advertising revenue as the extent of the ongoing impact of these macroeconomic factors on our business and on global economic activity generally is uncertain and may continue to adversely affect our business, operations, and financial results.

(First emphasis in original.)

377. The risk warnings statements referenced in ¶¶ 372-76 above were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Specifically, the Offering Documents failed to disclose that these risks had already materialized, and/or failed to communicate to investors the severity or imminence of the risks, and as a result, the Company's public statements were materially false and misleading at all relevant times.

## VI. THE TRUTH EMERGES

378. The truth slowly began to emerge in the afternoon of September 22, 2023, *Reuters* published an article during intraday trading hours, entitled "Arm and Instacart Add to Losses After Lukewarm Analyst Reports."[31] In the afternoon of September 22, 2023, *Reuters* published an article during intraday trading hours, entitled "Arm and Instacart Add to Losses After Lukewarm Analyst Reports."[32] The article disclosed that "BTIG analyst Jake Fuller gave Instacart a "neutral" rating and warned that the company faces heavy competition from DoorDash (DASH.N) and Uber Technologies (UBER.N) in the slowly expanding market of grocery delivery." According to the BTIG analyst report, the "neutral" rating was due, in pertinent part, to Instacart facing "modest growth prospects and

---

[31] Noah Randewich, *Arm and Instacart Add to Losses After Lukewarm Analyst Report*, Reuters, Sept. 22, 2023, https://www.reuters.com/markets/deals/arm-instacart-add-losses-after-lukewarm-analyst-reports-2023-09-22/

[32] Noah Randewich, *Arm and Instacart Add to Losses After Lukewarm Analyst Report*, Reuters, Sept. 22, 2023, https://www.reuters.com/markets/deals/arm-instacart-add-losses-after-lukewarm-analyst-reports-2023-09-22/

challenging competitive dynamics." The analyst report noted that "online penetration" for Instacart was relatively "low" with "competition rising" from companies like DoorDash and Uber (that provide similar services) who have the benefit of being able to "cross-promote to massive user bases." The most significant downside concern identified in the analyst report was Instacart's ability to grow and increase its market share, noting that "[i]f adoption is less of a grind than we expect, we could see upward pressure on estimates." In addition, the BTIG analyst disclosed that "we expect adoption to be a grind at <1 pt annually to reach 15% in 2026 for *a high single-digit category CAGR vs. the 10-18% CAGR discussed on the roadshow*." The report continued "There are positives here with a strong market position, low category penetration, ancillary opportunities and healthy margins, *but modest growth, ramping competition* and valuation lead us to a Neutral rating." The BTIG analyst report further detailed that "We model CART GOV growth at mid single-digits (embed share loss) and revenue at high single-digits (ramping ad revenue), putting it well behind DASH-UBER.

379.    BTIG was not the only analyst to report concerns over Instacart's growth. On September 22, 2023, *Barron's* published an article noting that Instacart's stock price had fallen "as early investors take profits and analysts fret about competition and slow growth." The *Barron's* article referenced analyst reports from Needham in addition to BTIG. Similar to BTIG, Needham initiated coverage at "Hold" over "structural headwinds against adoption," "[c]ompetition . . . on the rise," and "[i]ndustry penetration gains slowing." On September 22, 2023, Instacart's stock price opened at $31.56 per share. Following the *Reuters* and *Barron's* articles referenced above (which were published during market hours), Instacart's stock price closed at $30.00 per share, a decline of 4.9%.

380.    The articles' disclosure of dramatically reduced forecasts was a materialization of the concealed risks created by Instacart's ineffective marketing, declining brand awareness, and increasing competitors' brand recognition. The report was also a materialization of the risk created by Instacart's forecasting process, which solely relied on prior performance, ignored competitors, and were

intentionally inflated. Investors were unaware that the Company's ineffective marketing, declining brand recognition, and nonexistent forecasting process, as well as competitors' rising brand recognition, and thus experienced losses when the risks materialized.

381.    On this news, Instacart's stock price fell $0.65 per share, or 2.12%, to close at $30.00 per share on September 22, 2023.

382.    Then, on October 2, 2023, before the market opened, Cory Weinberg, deputy bureau chief of "The Information," a subscription-based news website covering the technology industry reported that "private forecasts from the banks that ran [Instacart's] IPO" stated that "[r]evenue growth at Instacart is expected to be much lower in the second half [of 2023] than the first" ("Weinburg Article"). Specifically, "analysts at Goldman Sachs and other banks expect Instacart to report between 7% and 8% revenue growth in the second half" of 2023, down from "growth of 31% in the first half [of 2023], and 50% growth from the second half of 2022. In addition, the article stated that Instacart's adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") was expected to "fall by between 5% and 6% in the period compared to the first half of 2023," which "would be a notable drop considering Instacart said in its IPO filing that its business is typically stronger in the second half of the year during the back-to-school period and holiday season."

383.    To make matters worse, that same day, October 2, 2023, investment research firm Gordon Haskett initiated coverage of Instacart with a "hold" rating. In an article entitled "Instacart Falls; Gordon Haskett Cites Headwinds for Hold Rating", *Bloomberg* reported, in relevant part:

> Grocery-delivery giant Instacart falls as much as 7.9% Monday to its lowest level since going public after Gordon Haskett initiated coverage of the stock with a hold rating and $31 price target, citing headwinds ahead.
>
> The firm sees limited multiple expansion opportunity as Instacart's margin projections — which are slightly better than peers — won't be enough to offset concerns in the industry[.]

We "have doubts that online grocery delivery adoption will continue to materially increase at a time when consumers are becoming increasingly cautious about spending," analyst Robert Mollins wrote[.]

Says competitive encroachment is also a concern for Instacart . . . .

Sees potential risk of Instacart+ members leaving for programs that offer "more services and better value"[.]

Says that there are too many risks and not enough catalysts to get investors excited about Instacart[.]

384.    On this news, Instacart's stock price fell $2.73 per share, or 9.2%, to close at $26.96 per share on October 2, 2023.

385.    The disclosures in the Weinburg Article and Gordon Haskett report were the first time investors learned the extent of the competition Instacart faced and the Company's inability to meet it. The article and report were also a materialization of the concealed risks created by Instacart's ineffective marketing, declining brand awareness, and increasing competitors' brand recognition. The report was also a materialization of the risk created by Instacart's forecasting process, which solely relied on prior performance, ignored competitors, and was purposefully inflated per management's directives. Investors were unaware that the Company's ineffective marketing, declining brand recognition, and nonexistent forecasting process, as well as competitors' rising brand recognition, and thus experienced losses when the risks materialized.

386.    As of the time this Complaint was filed, Instacart's common stock continues to trade below the $30.00 per share Offering price, damaging investors.

387.    As a result of the Exchange Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Instacart's securities, Plaintiff and other members of the Exchange Act Class have suffered significant losses and damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## VII.    ADDITIONAL SCIENTER ALLEGATIONS ONLY FOR EXCHANGE ACT CLAIMS

388.    As set forth above, the Exchange Act Defendants each had scienter as to the false and misleading nature of their statements because, among other things, they each knew or, at a minimum, recklessly disregarded the facts described above and were motivated by a desire to sell shares at inflated levels in connection with the IPO. In addition:

- CW3 presented the results of the Brand Tracker and CARS directly to Defendant Simo.

- CW2 said that he specifically pushed back against Giovanni himself when Giovanni demanded revenue projections be increased, but to no avail.

389.    In addition to the above allegations, which on their own create a strong inference of scienter, additional factors support a strong inference of the Exchange Act Defendants' scienter. Defendants Simo and Giovanni each knew of the false and misleading nature of the statements discussed above, or at a minimum were reckless for not knowing these matters.

390.    Defendant Simo was Instacart's CEO throughout the Class Period, and the Company identified him as an "Executive Officer" during the Class Period. As Instacart's CEO, Defendant Simo was privy to all material information concerning the Company's inventory, its channel inventory, and the demand for its products.

391.    Giovanni was Instacart's CFO throughout the Class Period, and the Company identified him as an "Executive Officer" during the Class Period. As Instacart's CFO, Giovanni was privy to all material information concerning the Company's inventory, its channel inventory, and the demand for its products.

392.    The fraud alleged herein relates to the core business and operations of Instacart, so knowledge of the fraud may be imputed to the Exchange Act Defendants. Instacart's marketing and brand recognition were key factors in its success and the Exchange Act Defendants' ability to distinguish the Company from competitors.

393.    Further, by virtue of their receipt of information reflecting the true facts regarding Instacart's operations and its marketplace, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Instacart, the Exchange Act Defendants were active and culpable participants in the fraudulent scheme alleged herein. The Exchange Act Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Exchange Act Defendants.

## VIII.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

394.    With respect to the Exchange Act Claims, Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following proposed "Exchange Act Class."

> All persons and entities that purchased or otherwise acquired Instacart Common Stock during the Class Period, and were damaged thereby.

395.    Excluded from the Exchange Act Class are: (i) the Exchange Act Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Instacart and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) the Exchange Act Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Exchange Act Defendant had or has had a controlling interest; (v) Instacart's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

396.    The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. Plaintiffs believe that Exchange Act Class members number at least in the thousands. Instacart sold 22,000,000 shares of common stock in the IPO and, as of July 31, 2024, had 260,804,661 shares of common stock outstanding. Instacart common stock traded actively on the NASDAQ during the Class Period.

397.    Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class. All members of the Exchange Act Class are similarly situated in that they acquired shares of Instacart common stock and were similarly affected by the Exchange Act Defendants' wrongful conduct in violation of federal law that is complained of herein.

398.    Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Exchange Act Class.

399.    Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

- whether the Exchange Act Defendants' acts violated the federal securities laws as alleged herein;

- whether the Exchange Act Defendants made materially false or misleading statements to the investing public during the Class Period;

- whether the Individual Exchange Act Defendants were controlling persons under Section 20(a) of the Exchange Act; and

- whether the Individual Exchange Act Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Instacart shares of common stock were artificially inflated during the Class Period because of the Individual Exchange Act Defendants' conduct complained of herein; and

- whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

400.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them.

401.    There will be no difficulty in the management of this action as a class action. Exchange Act Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## IX.    APPLICABILITY OF PRESUMPTON OF RELIANCE: FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS

402.    For the Exchange Act Claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the Exchange Act Defendants' omissions and misrepresentations were material;

- Instacart shares of common stock traded in an efficient market;

- Instacart common stock was liquid and traded with moderate to heavy volume during the Class Period, with an average daily trading volume during the Class Period of over 8.4 million shares;

- Instacart common stock traded on the NASDAQ and was covered by multiple analysts during the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Instacart common stock; and

- Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold Instacart common stock between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts. the omitted or misrepresented facts.

403.    Based upon the foregoing, Plaintiff and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

404.    Alternatively, Plaintiff and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the Exchange Act Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

405.    The protections applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made. No cautionary language could, or did, protect the Exchange Act Defendants' material misstatements of present and historical fact.

406.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures Instacart or other Exchange Act Defendants made were not sufficient to shield Exchange Act Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Instacart who knew that the statement was untrue or misleading when made.

## XI.    EXCHANGE ACT COUNTS

### COUNT III

**Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Against the Exchange Act Defendants**

407.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 273-406 above as if fully set forth herein, with the exception of any disclaimers of fraud, recklessness, and intentional misconduct.

408.    This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

409.    This Count is asserted against the Exchange Act Defendants: Instacart, Simo, and Giovanni. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Exchange Act Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of Instacart's common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Instacart common stock; and (iii) cause Plaintiffs and other members of the Exchange Act Class to purchase or otherwise acquire Instacart common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

410.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement, investor presentations, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Instacart common stock. Such reports, filings, releases and statements were materially false and

misleading in that they failed to disclose material adverse information and misrepresented the truth about Instacart's operations, brand, and future performance.

411.    By virtue of their positions at Instacart, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Exchange Act Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each Exchange Act Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

412.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of Instacart, Defendants Simo and Giovanni had knowledge of the details of Instacart's internal affairs.

413.    Defendants Simo and Giovanni are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants Simo and Giovanni were able to and did, directly or indirectly, control the content of the statements of Instacart. As the CEO and CFO, respectively, of a publicly-held company, Defendants Simo and Giovanni had a duty to disseminate timely, accurate, and truthful information with respect to Instacart's businesses, operations, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Instacart's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Instacart's operations, branding, and future performance which were concealed by the Exchange Act Defendants, Plaintiffs and the other

members of the Exchange Act Class purchased or otherwise acquired Instacart's common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants and were damaged thereby.

414.    During the Class Period, Instacart's ordinary shares were traded on an active and efficient market. Plaintiffs and the other members of the Exchange Act Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Instacart's common stock at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other members of the Exchange Act Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired Instacart's common stock at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Exchange Act Class, the true value of Instacart's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Instacart's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Exchange Act Class members.

415.    By reason of the conduct alleged herein, Defendants Simo and Giovanni, and thereby Instacart, knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

416.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their respective purchases, acquisitions and sales of Instacart's ordinary shares during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements to the investing public.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT IV

### Violations of Section 20(a) of the Securities Exchange Act of 1934
### Against the Simo and Giovanni

417.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 273-416 above as if fully set forth herein, with the exception of any disclaimers of fraud, recklessness, and intentional misconduct.

418.    This Count is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

419.    This Count is asserted against the 20(a) Defendants: Simo and Giovanni. During the Class Period, the 20(a) Defendants participated in the operation and management of Instacart, and conducted and participated, directly and indirectly, in the conduct of Instacart's business affairs. Because of their senior positions, they knew the adverse non-public information about management statements described above.

420.    As the CEO and CFO, respectively, of a publicly owned company, the Simo and Giovanni had a duty to disseminate timely, accurate, and truthful information with respect to Instacart's businesses, operations, and future prospects, and to correct promptly any public statements issued by Instacart which had become materially false or misleading.

421.    Because of their positions of control and authority as senior officers, Simo and Giovanni were able to, and did, control the contents of the various reports, press releases, presentations and public filings which Instacart disseminated in the marketplace during the Class Period concerning Instacart's businesses, operations, and future prospects. Throughout the Class Period, the Simo and Giovanni exercised their power and authority to cause Instacart to engage in the wrongful acts complained of herein. Simo and Giovanni therefore, were "controlling persons" of Instacart within the meaning of Section 20(a) of the Exchange Act. In this capacity, the Simo and Giovanni engaged in the unlawful conduct alleged which artificially inflated the market price of Instacart's common stock.

103

422.    Each of Simo and Giovanni, therefore, acted as a controlling person of Instacart. By reason of their senior management positions and/or being directors of Instacart, each of Simo and Giovanni had the power to direct the actions of, and exercised the same to cause, Instacart to engage in the unlawful acts and conduct complained of herein. Each of Simo and Giovanni exercised control over the general operations of Instacart and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Exchange Act Class complain.

423.    By reason of the above conduct, Simo and Giovanni are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Instacart.

424.    In addition, Defendant Simo, by virtue of his position as the CEO of Instacart, had the power to direct the actions of, and exercised the same to cause, Defendant Giovanni to engage in the unlawful acts and conduct complained of herein. Defendant Simo had a duty to correct promptly any public statements issued by Defendant Giovanni which were materially false or misleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Securities Act Defendants and the Exchange Act Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.    Requiring the Securities Act Defendants and the Exchange Act Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2024                    Respectfully submitted,

                                            By:    */s/ Adam M. Apton*
                                                      Adam M. Apton

                                            LEVI & KORSINSKY, LLP
                                            Adam M. Apton (SBN# 316506)
                                            1160 Battery Street East, Suite 100
                                            San Francisco, CA 94111
                                            Telephone: 415-373-1671
                                            aapton@zlk.com

                                            *Attorneys for Lead Plaintiff James Cheng,*
                                            *Named Plaintiff Carlo Viscusi and Lead*
                                            *Counsel for the Class*

                                            POMERANTZ LLP
                                            Jennifer Pafiti (SBN 282790)
                                            1100 Glendon Avenue, 15th Floor
                                            Los Angeles, CA 90024
                                            Tel: (310) 405-7190
                                            Email: jpafiti@pomlaw.com

                                            POMERANTZ LLP
                                            Jeremy A. Lieberman
                                            (*pro hac vice* application forthcoming)
                                            Brian Calandra
                                            (*pro hac vice* application forthcoming)
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (917) 463-1044
                                            jalieberman@pomlaw.com
                                            bcalandra@pomlaw.com

                                            *Additional Counsel for Lead Plaintiff James*
                                            *Cheng, Named Plaintiff Carlo Viscusi, and*
                                            *the Class*

---

105

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of September, 2024, I caused a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS, to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Adam M. Apton*
Adam M. Apton