Adam M. Apton (SBN 316506)
**LEVI & KORSINSKY, LLP**
aapton@zlk.com
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANDY DEAN STEPHENS, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MAPLEBEAR INC. d/b/a INSTACART, FIDJI SIMO, NICK GIOVANNI, ALAN RAMSAY, APOORVA MEHTA, JEFFREY JORDAN, MEREDITH KOPIT LEVIEN, BARRY MCCARTHY, MICHAEL MORITZ, LILY SARAFAN, FRANK SLOOTMAN, DANIEL SUNDHEIM, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., BARCLAYS CAPITAL INC., CITIGROUP GLOBAL MARKETS INC., ROBERT W. BAIRD & CO., INCORPORATED, CITIZENS JMP SECURITIES, LLC, LIONTREE ADVISORS LLC, OPPENHEIMER & CO. INC., PIPER SANDLER & CO., SOFI SECURITIES LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, WEDBUSH SECURITIES INC., BLAYLOCK VAN, LLC, DREXEL HAMILTON, LLC, LOOP CAPITAL MARKETS LLC, R. SEELAUS & CO., LLC, SAMUEL A. RAMIREZ & COMPANY, INC., STERN BROTHERS & CO., and TIGRESS FINANCIAL PARTNERS LLC, <br><br> Defendants. | Case No. 5:24-cv-00465-EJD <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Hearing:  January 30, 2025 <br> Time:  9:00 a.m. <br> Location:  Courtroom 4 – 5th Floor <br> Judge:  Hon. Edward J. Davila |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................... ii

ISSUES TO BE DECIDED ....................................................................................................... 1

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 3

     I.      Instacart IPOs Amidst a Declining Valuation and Loss of Market Share. ................ 3

     II.     Defendants Hid the Negative Market Research from Investors during the IPO. ...... 4

     III.    Investors Who Bought Shares in the IPO Sustained Significant Losses. .................. 6

LEGAL STANDARD ................................................................................................................. 6

ARGUMENT .............................................................................................................................. 7

     I.      Plaintiffs Adequately Pleaded Material Misrepresentations in the Registration Statement to State Claims under Sections 11 and 15 of the Securities Act. ............. 7

            A.     The Registration Statement Concealed Instacart's Declining "Brand Awareness" and Trending Market Share Loss. ............................................ 8

            B.     Statements about Instacart's Growth and Ability to Retain Customers Were Materially Misleading. ................................................................................ 14

            C.     Regulation S-K Required Additional Disclosures that Instacart Failed to Provide in the Registration Statement. ........................................................ 16

            D.     The Individual Securities Act Defendants Are Liable for Instacart's Primary Violations. ..................................................................................................... 18

            E.     The Underwriter Defendants Are Liable for Instacart's False and/or Misleading Registration Statement. ........................................................... 18

     II.     Plaintiffs Adequately Pleaded Fraud Claims under Sections 10(b) and 20(a) of the Exchange Act. ........................................................................................................ 19

            A.     Defendants Made False and/or Materially Misleading Statements in the Registration Statement. .............................................................................. 19

            B.     Defendants' Knowledge of the Adverse Marketing Study Results and Significant Insider Stock Sales Give Rise to a Strong Inference of Scienter. ...................................................................................................................... 19

            C.     Analyst Reports and News Articles Support Plaintiffs' Theory of Loss Causation. ................................................................................................... 22

i

D.    The Individual Exchange Act Defendants Are Liable for Instacart's Primary Violations. ...................................................................................................... 24

CONCLUSION ............................................................................................................................. 24

ii

# TABLE OF AUTHORITIES

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021).................................................................................................. passim

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................... 7

*Azar v. Yelp, Inc.*,
  No. 18-cv-00400-EMC, 2018 U.S. Dist. LEXIS 200769 (N.D. Cal. Nov. 27, 2018)................ 16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................................. 12

*In re Blue Apron Holdings, Inc.*,
  No. 17-CV-4846 (WFK), 2020 U.S. Dist. LEXIS 71807 (E.D.N.Y. Apr. 22, 2020) ................ 17

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020)............................................................................................... 23, 24

*Borteanu v. Nikola Corp.*,
  No. CV-20-01797-PHX-SPL, 2023 U.S. Dist. LEXIS 237035 (D. Ariz. Dec. 8, 2023) ............ 21

*Brown v. China Integrated Energy, Inc.*,
  No. CV 11-02559 MMM (PLAx), 2012 U.S. Dist. LEXIS 47019 (C.D. Cal. Apr. 2, 2012) ....... 8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017)..................................................................................................... 19

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...................................................................................................... 19

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)....................................................................................... 8

*In re Daou Sys.*,
  411 F.3d 1006 (9th Cir. 2005).................................................................................................. 2, 7

*E. Ohman J v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023)...................................................................................................... 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................................................................. 19

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023)...................................................................................................... 17

*Flynn v. Sientra, Inc.*,
  No. CV 15-07548 SJO (RAOx), 2016 U.S. Dist. LEXIS 83409 (C.D. Cal. June 9, 2016) .......... 8

*In re Genius Brands Int'l, Inc.*,
  97 F.4th 1171 (9th Cir. 2024)........................................................................... 1, 2, 22, 23, 24

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)...................................................................................................... 7

*Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*,
  63 F.4th 747 (9th Cir. 2023)............................................................................... 1, 9, 15, 16

*Hammer v. Frontier Fin. Corp.*,
  No. C10-0643, 2011 U.S. Dist. LEXIS 169245 (W.D. Wash. Sep. 7, 2011) ............................ 15

Opposition to Motion to Dismiss                                                    No. 5:24-cv-00465-EJD

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ............................................................................................................ 7, 12

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) ...................................................................................................... 7

*Hollin v. Scholastic Corp.*,
  252 F.3d 63 (2d Cir. 2001) ........................................................................................................ 10

*In re Honest Co. Sec. Litig.*,
  615 F. Supp. 3d 1149 (C.D. Cal. July 18, 2022) ............................................................... 9, 14, 16

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .................................................................................................. 18

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ................................................................................................. 22

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ....................................................................................................... 22

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988, 1010 (9th Cir. 2018) ............................................................................... 9, 14, 19, 24

*Lako v. Loandepot, Inc.*,
  No. 8:21-cv-01449-JLS-JDE, 2023 U.S. Dist. LEXIS 13086 (C.D. Cal. Jan. 24, 2023) ........... 17

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) .................................................................................................... 14

*In re Lyft Inc. Sec. Litig.*,
  484 F.Supp.3d 758 (N.D. Cal. 2020) ........................................................................................ 16

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .................................................................................................... 22

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ..................................................................................................................... 7

*In re Medicis Pharm. Corp. Sec. Litig.*,
  689 F. Supp. 2d 1192 (D. Ariz. 2009) ...................................................................................... 21

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ...................................................................................... 15

*Mulligan v. Impax Labs, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................................ 13

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) .................................................................................................. 23

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .................................................................................................. 17

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 Fed. Appx. 480 (9th Cir. 2019) ......................................................................................... 14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................................................................. 13

*In re On24, Inc. Securities Litigation*,
  No. 4:21-cv-8578-YGR, 2023 U.S. Dist. LEXIS 203132 (N.D. Cal. July 7, 2023) ................... 11

*Pappas v. Qutoutiao Inc.*,
  No. 23-1233, 2024 U.S. App. LEXIS 27250 (2d Cir. Oct. 28, 2024) ......................................... 8

Opposition to Motion to Dismiss                                    No. 5:23-cv-03518-EJD

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)................................................................................... 9, 12, 13, 14, 15

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) ................................................................................ 15

*S. Ferry LP v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)............................................................................................ 20, 21

*S.E.C. v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010)................................................................................................. 21

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016).......................................................................................... 8, 9, 19

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963) ................................................................................................................ 12

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................................. 9

*Steckman v. Hart Brewing*,
  143 F.3d 1293 (9th Cir. 1998)................................................................................................ 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..................................................................................................... 6, 20, 21

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
  319 F. Supp. 2d 152 (D. Mass. 2004) ..................................................................................... 13

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
  669 F. App'x 878 (9th Cir. 2016)............................................................................................. 7

*United States v. Romm*,
  455 F.3d 990 (9th Cir. 2006)............................................................................................ 18, 24

*In re Violin Memory Sec. Litig.*,
  No. 13-CV-5486 YGR, 2014 U.S. Dist. LEXIS 155428 (N.D. Cal. Oct. 31, 2014) .................... 7

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996).................................................................................................... 14

*In re Washington Mut., Inc. Sec. Deriv. & ERISA Litig.*,
  259 F.R.D. 490 (W.D. Wash. 2009)........................................................................................ 18

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018).................................................................................................. 10

**Statutes**

15 U.S.C. 77z-2 ......................................................................................................................... 14

**Regulations**

17 C.F.R. §229.303 .................................................................................................................... 16

17 C.F.R. §229.105 .................................................................................................................... 17

iv

**ISSUES TO BE DECIDED**

1.      Do Plaintiffs' confidential witness allegations sufficiently establish "falsity" in accordance with *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023), for the purposes of stating a claim for relief under Section 11 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934?

2.      If CEO Fidji Simo and CFO Nick Giovanni received the marketing study results showing that Instacart's "brand awareness" was trending downward, have Plaintiffs adequately established "scienter" under *In re Alphabet, Inc. Securities Litigation*, 1 F.4th 687, 705-06 (9th Cir. 2021), for their Section 10(b) claim?

3.      Can analyst reports and articles from third-parties describing loss of market share and increased competition support Plaintiffs' theory of loss causation at the pleading stage pursuant to *In re Genius Brands International, Inc. Securities Litigation*, 97 F.4th 1171, 1183 (9th Cir. 2024)?

**INTRODUCTION**

Defendants held Instacart's IPO in September 2023 on the heels of record-breaking sales and revenue. When the Covid-19 pandemic emerged, millions of individuals around the country altered their shopping habits by flocking to "Instant Delivery" businesses. Instacart benefitted immensely from this change and, in 2021, reached an enterprise value of $39 billion. As the pandemic waned, however, shoppers reverted to their normal routines leaving Instacart and the rest of the "Instant Delivery" market with fewer customers. Growth slowed and within a year Instacart's value fell to roughly a quarter of what it once was. Instacart knew business was trending downward yet said nothing and proceeded with the IPO notwithstanding.

Plaintiffs' case turns on Defendants' failure to disclose this trend in Instacart's IPO documents, *i.e.*, the Registration Statement. While Defendants were preparing these documents, Instacart internally was conducting marketing analyses to evaluate the success of their August/September 2022 advertising campaign featuring the popstar "Lizzo". The results of the marketing study roiled Instacart's top leadership. The study showed that Instacart's brand was declining among potential customers while the brands of their competitors were increasing. These

1

results were shared with executive management, including CEO Fidji Simo, over the course of three meetings between late-2022 and early-2023. Other attendees at the meetings included Instacart's Vice President of Marketing and Senior Director of Strategic Finance (Joe Ingraham), Director and Head of Research (Prakriti Parijat), Vice President of Data Science (Anahita Tafvizi), Instacart's Chief Marketing Officer (Laura Jones), and Instacart's Chief Operating Officer (Asha Sharma).

The marketing study showed that Instacart's brand was declining and losing market share to its competitors. Instead of disclosing this fact to Plaintiffs, Defendants repeatedly emphasized the strength of Instacart's brand and in several different ways. The Registration Statement read as if the marketing study never happened, that Instacart's brand was not declining, and that the company was not losing market share to the competition. Thus, when analysts started reporting otherwise in the days and weeks following the IPO, Instacart's stock price started to decline as the market reevaluated the risks associated with investing in the company. For Plaintiffs and other shareholders who bought in during the hype of the IPO, they lost a substantial amount of money in an extremely short period of time. Plaintiffs bring this action in hopes of recovering those losses.

Defendants' motion to dismiss focuses primarily on whether Plaintiffs provide enough facts to support a claim under the federal securities laws. Specifically, Defendants take aim at Confidential Witness 3 (or CW3) who conducted the marketing study at issue in this case and then presented the results to various members of executive management. Although Plaintiffs provide the detail necessary to show that CW3 in fact "possess[ed] the information alleged," *see In re Daou Sys.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005), Defendants argue otherwise. Second to that, Defendants claim in conclusory fashion that the analysts who reported on Instacart's worsening competition in the days and weeks following the IPO cannot support a claim for "loss causation." Defendants' argument on this point runs contrary to Ninth Circuit law which makes clear that any sort of disclosure, no matter the source, can substantiate a claim so long as the disclosure touches upon the information allegedly omitted or misrepresented. *See In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1183 (9th Cir. 2024).

For the reasons stated below, Plaintiffs respectfully request that Defendants' motion to dismiss (including the "joinder" filed by the Underwriter Defendants) be denied in its entirety.

2

Opposition to Motion to Dismiss                                                  No. 5:24-cv-00465-EJD

## STATEMENT OF FACTS

### I.    Instacart IPOs Amidst a Declining Valuation and Loss of Market Share.

The Covid-19 pandemic was extremely profitable for Instacart as millions of individuals changed the way they shopped for groceries. Lockdowns led online shopping which, in turn, translated into exponential revenue growth for Instacart as its "gross transaction value" or "GTV" quadrupled from $5.1 billion in 2019 to $20.7 billion in 2020. ¶166.[1] Instacart's growth slowed dramatically, however, as the pandemic waned and customers returned to their pre-pandemic shopping habits. GTV grew by only 20% in 2021 followed by 15% in 2022 and then 4% for the first six months of 2023. ¶¶169-70, 72. Instacart's enterprise valuation fell in tandem. From a high of $39 billion during the height of the pandemic in 2021, the company's valuation fell to $10 billion the following year. ¶¶168-71. By the time of the IPO in September 2023, Instacart's valuation had fallen to $9 billion – less than one quarter of its valuation during the pandemic. ¶174.

Instacart's weakening brand helped drive down its valuation. As more shoppers returned to their pre-pandemic shopping habits (*i.e.*, in-store purchases), fewer customers were left for "Instant Delivery" businesses (*e.g.*, Instacart). This left Instacart vulnerable to competition from other companies (*e.g.*, Amazon, Uber, Walmart) competing for the remaining pool of potential customers. In mid-2021, CW3, Instacart's Manager of Market Research for Brand, Campaigns & Sentiment, reported this to the company's Director of Market Research and Senior Director of Research. ¶189. The following year in late-August 2022, Instacart tried to address its competition problem by launching a $22 million advertising campaign starring Lizzo (a popular Grammy-winning singer) aimed at improving its "brand awareness" relative to other "Instant Delivery" companies. ¶¶190-91.

The Lizzo advertising campaign was not successful. CW3 analyzed the success of the campaign and presented the results to senior management. ¶192. According to CW3's analysis, Instacart's brand awareness *declined* following the Lizzo campaign while brand awareness for competitors *increased* (specifically, Amazon and Walmart). ¶¶193-97. These results were evidenced by two independent evaluations—one being a "brand tracker" that operated like a longitudinal study

---

[1] Citations to "¶__" refer to paragraphs in the Amended Class Action Complaint (ECF No. 55).

3

across different cohorts, such as families with children, and the other being a "campaign awareness research study" that focused on consumer reaction during the course of the advertising campaign only. ¶¶194-95, 197. The Lizzo campaign not only failed to make the impact Instacart wanted but also gave way to a declining trend for the company within the market. ¶198. CW3 presented these results to the marketing team and then senior management, including the Senior Director of Growth Marketing (Michael Polin), the Vice President of Marketing and Senior Director of Strategic Finance (Joe Ingraham), Director and Head of Research (Prakriti Parijat), Vice President of Data Science (Anahita Tafvizi), Instacart's Chief Marketing Officer (Laura Jones), and Instacart's Chief Operating Officer (Asha Sharma). ¶¶199-200. CW3's presentations culminated with a meeting in November 2022 attended by the above-named individuals and Instacart's CEO, Fidji Simo. ¶200.

Simo and the other attendees at the November 2022 meeting reacted extremely negative to CW3's findings and instructed him to double-check his data. ¶200. CW3 and other team members, including CW4 (a senior manager on the marketing team) reevaluated the data. ¶202. The additional review confirmed CW3's findings showing that Instacart's brand awareness was declining while brand awareness for competitors had increased. ¶202. In January 2023, CW3 presented these conclusions again to senior management. ¶203. Following the meeting, the marketing study results were included in various materials given to Instacart's Board of Directors (as well as certain members of senior management, including CFO Nick Giovanni) to aid in deciding if and when the company should proceed with its IPO. ¶¶203-04.

The Lizzo campaign was initially timed to improve market conditions for Instacart's IPO (by improving brand recognition and awareness). ¶¶190-91. However, given the results of the campaign, Instacart delayed the offering until September 2023 and only after firing CW3 and his team and replacing the market research firm responsible for the negative market research. ¶¶205-06.

## II.     Defendants Hid the Negative Market Research from Investors during the IPO.

Instacart ultimately went forward with its IPO in September 2023 at a valuation equal to about one quarter of what it was during the pandemic. ¶¶168-71, 218. The Registration Statement used by Defendants made no mention of Instacart's declining brand awareness, loss of market share,

4

Opposition to Motion to Dismiss                                           No. 5:24-cv-00465-EJD

vulnerability to the competition, the failure of the Lizzo campaign, or the fact that internal market research studies showed its competitors were gaining market share. ¶¶177-78. Instead, the Registration Statement provided investors with an impression of a state of affairs that differed in a material way from the one that actually existed. For example, the Registration Statement emphasized "the strength of [Instacart's] brand" and represented that "brand marketing campaigns" were "driv[ing] increased engagement from existing customers and enabl[ing] [the company] to attract new customers." ¶226. Similar statements appeared throughout the Registration Statement indicating to investors that Instacart's "consumer marketing" and "marketing investment" was successfully "increas[ing] brand awareness" and "driv[ing] customer engagement." ¶¶227-32. The Registration Statement also included cautionary language that discussed the risks of declining brand awareness and loss of market share but concealed that these risks had already come to pass and, in fact, had been trending adversely to the company's operations in the months and years leading up to the IPO. ¶¶240-42, 246-47.

The Registration Statement also contained statements about Instacart's prospects for growth, revenue, and ability to retain customers. ¶¶234-38. These statements were misleading because they did not account for the company's declining brand and loss of market share; instead, Instacart projected future performance based simply on historical performance while assuming market conditions would remain constant. ¶207. CW1, CW2, and CW4, who worked in Instacart's advertising, marketing, and finance departments, explained that executive management set annual growth targets of between 15% and 20% and then reverse engineered a forecast that would meet the target. ¶¶208-17.

By way of the Registration Statement, Instacart successfully sold 22 million shares to the public during the IPO. ¶218. These sales included 7.9 million shares sold by company insiders and early investors who collectively received nearly $225 million in exchange. ¶348. Defendants Simo and Giovanni (Instacart's CEO and CFO, respectively) also sold $9.6 million and $5.7 million in stock. ¶349. Other insider sellers included members of the board as well as Instacart's COO Asha Sharma, CTO Mark Schaaf, and GC Morgan Fong. ¶¶350-51. In total, 13 executives, directors and

5

nominees sold 1.4 million shares for total proceeds of $43.2 million in the IPO followed by additional sales of nearly 900,000 shares in the days after the IPO for proceeds of over $21.1 million. ¶352.

### III.   Investors Who Bought Shares in the IPO Sustained Significant Losses.

On September 19, 2023, the day of the IPO, Instacart's stock price opened at $30 per share and closed at $33.70. ¶218. Within just a few days, however, news reports emerged concerning Instacart's vulnerability to the competition and loss of market share. On September 22, 2023, *Reuters* published an article highlighting analyst reports discussing the heavy competition Instacart faced from DoorDash and Uber. ¶219. *Barron's* also published an article on September 22, 2023, noting that Instacart's stock price had fallen since the IPO over concerns about "competition and slow growth." ¶219.

On October 2, 2023, on the heels of the *Reuters* and *Barron's* reports, Cory Weinberg (deputy bureau chief of *The Information*) published another article reporting that "private forecasts from the banks that ran [Instacart's] IPO" showed "[r]evenue growth at Instacart [was] expected to be much lower in the second half [of 2023] than the first," which contradicted what Instacart said in its Registration Statement about business "typically" being "stronger in the second half of the year." ¶220. That same day, *Bloomberg* reported that analysts were initiating coverage of Instacart with "hold" ratings due to concerns over competition and the company's ability to grow. ¶221.

Within just days of its IPO, Instacart's stock price fell from $33.70 per share on September 19, 2023 to $26.96 per share on October 2, 2023. ¶222. Investors who purchased Instacart's stock in the interim sustained losses on their investment as the market discovered new information about the company's prospects for growth and overall value (that should have been disclosed initially in the Registration Statement).

### LEGAL STANDARD

In assessing a Rule 12(b)(6) motion, courts consider the complaint in its entirety, "accept all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is

6

Opposition to Motion to Dismiss                                    No. 5:24-cv-00465-EJD

plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In making this determination, a court must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact . . . . A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

## **ARGUMENT**

### I.    **Plaintiffs Adequately Pleaded Material Misrepresentations in the Registration Statement to State Claims under Sections 11 and 15 of the Securities Act.**

To allege a claim under Section 11, a plaintiff must plead "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citation omitted); *see also In re Ubiquiti Networks, Inc. Sec. Litig.*, 669 F. App'x 878, 879-80 (9th Cir. 2016). A fact is material when a "reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 44, 47 (2011). Once a material misstatement is shown "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013). Because scienter is not an element of a Section 11 claim, it is subject to the permissive notice pleading standards of Federal Rule of Civil Procedure 8(a). *See In re Violin Memory Sec. Litig.*, No. 13-CV-5486 YGR, 2014 U.S. Dist. LEXIS 155428, at *27 (N.D. Cal. Oct. 31, 2014) (analyzing Section 11 claim under Rule 8(a) where, as here, "Plaintiffs have not expressly pleaded fraud, and have pleaded non-fraud bases for liability.").

Defendants attempt to hold Plaintiffs' Securities Act claims to Rule 9's pleading standard. Defs. Br. at 6. But Plaintiffs' Section 11 claim does not sound in fraud and, in fact, alleges violations against multiple individuals and entities who are not named as defendants in the Section 10(b) claim. *Compare* ¶¶16-51 (Securities Act defendants) *with* ¶¶281-83 (Exchange Act defendants). Although the statements at issue in the Section 11 allegations also appear in the Section 10(b) allegations, the

7

different sets of defendants had different states of mind when making the statements. Thus, there is no identity between the two sets of claims and, therefore, no basis to apply Rule 9 to the Section 11 claim. *See Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 U.S. App. LEXIS 27250, at *7 (2d Cir. Oct. 28, 2024) ("Plaintiff made more than nominal efforts to distinguish the negligence-based claims from the fraud-based claims."); *Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 U.S. Dist. LEXIS 83409, at *54-55 (C.D. Cal. June 9, 2016) (Rule 8 applied where, as here, plaintiff only "levie[d] fraud allegations against a select few defendants" based upon "specifie[d] unique, particularized facts as to those defendants"); *Brown v. China Integrated Energy, Inc.*, No. CV 11-02559 MMM (PLAx), 2012 U.S. Dist. LEXIS 47019, at *13-14 (C.D. Cal. Apr. 2, 2012) (applying Rule 8 where fraud alleged against different defendants); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008) (holding it would "eviscerate[] §11" to give Rule 9(b) protection to defendants against whom no fraud has been alleged).

### A. The Registration Statement Concealed Instacart's Declining "Brand Awareness" and Trending Market Share Loss.

A statement or omission "is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotations omitted). Critically, "once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that [will not] mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (quoting *Berson*, 527 F.3d at 987). By this standard, the Registration Statement misled investors when portraying Instacart's brand and marketing strategy as strengths and reasons to invest in the company. *See* ¶¶226-32 (*e.g.*, the Registration Statement emphasized "the strength of [Instacart's] brand" and represented that "brand marketing campaigns" were "driv[ing] increased engagement from existing customers and enabl[ing] [the company] to attract new customers"). In truth, Instacart's brand was declining and the company was losing market share. *See* ¶233.

Plaintiffs' "falsity" allegations (under both Section 11 and Section 10(b)) are subject to "a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly*

8

and *Iqbal . . . ." Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Plaintiffs satisfy this standard because their confidential witness allegations (namely, CW3 with regard to the "brand awareness" and market share loss statements) provide a detailed version of events that contradict the Registration Statement. As alleged, CW3's in-depth analysis revealed *inter alia* that Instacart's brand awareness was declining and the company was losing market share. CW3 then presented these findings over the course of several different meetings to multiple members of senior management, including Defendant Simo. *See* ¶¶189-206. The discrepancy between what was said in the Registration Statement and the facts that existed on the ground is material enough to establish the element of "falsity." *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018) (statements about "positive 25 percent interim result" misleading in light of omission that results were "unreliable"); *Schueneman*, 840 F.3d at 705-06 (defendants required to disclose negative information about "Rat Study" once they told public that "animal studies supported [drug's] safety"); *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1156 (C.D. Cal. July 18, 2022) (statements actionable because defendants "touted increased consumer demand" without disclosing "product demand was declining"); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135-40 (N.D. Cal. 2017) (defendants materially misled investors by providing information about "monthly active users" while at the same time omitting adverse information about "daily active users").

Defendants discount Plaintiffs' allegations by casting CW3 as a "low-level confidential witness" with relatively unimportant results from "a single, six-week ad campaign." Defs. Br. at 6, 7-8. Defendants' argument should be rejected. Plaintiffs describe CW3 with "sufficient particularity" to show that he "possess[ed] the information alleged." *Forescout*, 63 F.4th at 766-67; *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144-45 (9th Cir. 2017) (plaintiffs had pleaded details "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). Plaintiffs describe the dates of his employment, title, supervisor, and responsibilities. ¶¶58-59. Plaintiffs also describe in detail the marketing studies he performed, the results he found, and the presentations he made to senior executives. ¶¶189-205. These allegations undermine Defendants' attempt to cast CW3 as an unimportant witness; indeed, if either

9

Opposition to Motion to Dismiss                                        No. 5:24-cv-00465-EJD

he or the marketing study results were so trivial, they would not have been featured in multiple meetings attended by numerous members of senior management (let alone Defendant Simo or used by the Board of Directors to determine the timing of Instacart's IPO). *See* ¶¶199-205. Consequently, it makes no difference that CW3 was "five levels removed" from the c-suite. Defs. Br. at 8. He was in the same room as Simo and reported his findings directly to her (with many others receiving them second hand vis-à-vis board packages). *See* ¶¶199, 203-04.

Defendants also attack CW3's allegations by claiming he left Instacart too early to have any relevant information and that the marketing study he conducted took place too far in advance of the IPO. Defs. Br. at 8. But the fact that CW3 was employed prior to the IPO (while the company was preparing the Registration Statement) only strengthens (not weakens) the allegations. *See Webb v. SolarCity Corp.*, 884 F.3d 844, 851 n.1 (9th Cir. 2018) (pre-class period statements from confidential witnesses can confirm class period events); *Hollin v. Scholastic Corp.*, 252 F.3d 63, 72 (2d Cir. 2001) (holding "[p]re-class data is relevant . . . to establish that at the start of the class period, defendants had a basis for knowing" falsity of statements). Had CW3 started working at Instacart in September 2023 at the time of the IPO, Defendants would surely argue that he had no insight into how the Registration Statement was created or what information it was based upon in light of the fact that it was developed over the course of several months (if not years) prior to the IPO itself.

Defendants further argue that CW3's allegations are too vague because he does not specify "what exactly the studies measured and how they did so." Defs. Br. at 8. This argument lacks merit in light of the allegations. Plaintiffs describe with "particularity" the marketing studies conducted by CW3. *See* ¶¶193-97 (describing "Brand Tracker" study and "Campaign Awareness Research Study" by *inter alia* explaining objectives and methodologies of studies). The "Brand Tracker" study used a random sample of the U.S. general population with a margin of error of plus or minus two percent. ¶194. The study utilized email surveys on a weekly basis collecting data samples of approximately 1,000 results every month. ¶195. According to CW3, it was a macro study that measured whether Instacart's brand was growing in people's minds and how often people were considering using Instacart when shopping for groceries online. ¶194. Plaintiffs described the "Campaign Awareness

Opposition to Motion to Dismiss                                      No. 5:24-cv-00465-EJD

Research Study" in similar fashion. It was conducted during the Lizzo campaign in August and September 2022 and also utilized surveys across control and experimental groups (*i.e.*, groups of people who had seen the Lizzo advertisement and those who had not). ¶197. Short of producing the study results themselves (which is not necessary), Plaintiffs have provided enough information to substantiate their allegations at this stage of the litigation. *See E. Ohman J v. NVIDIA Corp.*, 81 F.4th 918, 930-31 (9th Cir. 2023) (crediting at pleading sales estimate allegations from third-party expert analysis).

Despite the detail alleged by CW3 about the studies, how they worked, and what they revealed, Defendants claim that still more must be provided to satisfy the relevant "particularity" standard. Defs. Br. at 8. For support, they rely on *In re On24, Inc. Securities Litigation*, No. 4:21-cv-8578-YGR, 2023 U.S. Dist. LEXIS 203132 (N.D. Cal. July 7, 2023), but the plaintiff in that case failed to demonstrate the materiality of the defendants' "product[] decline" in advance of the IPO. *See id*. at *27-28. Plaintiffs in the case at bar, meanwhile, allege a decline in brand awareness and market share with a corresponding increase in favor of Instacart's competitors. *See* ¶¶196-97. Moreover, the materiality of these findings are underscored by the number of meetings at which these results were presented, the attendees of those meetings, the extreme negative reactions from those attendees, and the ultimate use of the results by Instacart's board in conjunction with the timing of its IPO. *See* ¶¶199-206. Presumably, had the results of CW3's studies been limited to just a narrow slice of Instacart's business, the study results would never have received as much airtime as they did. *Compare* ¶¶199-205 (describing numerous meetings with high-level executives, including Defendant Simo) *with On24*, 2023 U.S. Dist. LEXIS 203132, at *28-29 (allegations from one confidential witness concerning "churn" among only his customers and not companywide).

Defendants raise one final argument with respect to CW3, which is that the results of the "Brand Tracker" study and "Campaign Awareness Research Study" should be disregarded in favor of "Instacart's concrete performance." Defs. Br. at 9. Defendants' reference to "Instacart's concrete performance" consists of, according to their brief, a year-over-year percentage increase in GTV (gross transaction value) in 4Q23 and 1Q24. *Id*. Companies cannot cherry-pick the information they give to

Opposition to Motion to Dismiss                                              No. 5:24-cv-00465-EJD

investors on a particular subject, especially in the context of an initial public offering. Congress designed the Securities Act "to assure compliance with the disclosure provisions . . . by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean*, 459 U.S. at 381-82. The Supreme Court "[has] recognized time and again, a 'fundamental purpose' of the various securities acts, 'was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963)). Consequently, even if Instacart's GTV on those two particular quarters exhibited year-over-year increases, it did not absolve Defendants of their disclosure obligations concerning the company's brand and market share problems heading into the IPO. The latter was obviously a pressing concern among investors and clearly outweighed anything to be taken from the GTV during those quarters, as evidenced by analyst reaction and commentary to Instacart's competition struggles. *See* ¶¶219-22 (describing analyst reports following IPO).

Moving past CW3, Defendants argue that the challenged statements are inactionable either because they are opinion statements, puffery, or subject to the PSLRA's statutory safe harbor (or "bespeaks caution" doctrine in the context of Section 11 because the safe harbor does not apply to IPOs). Defs. Br. at 10-11 & n.5. None of these arguments has merit. Chief among Defendants' materially misleading statements were positive representations about "the strength of [Instacart's] brand" and that its "brand marketing campaigns" would "drive increased engagement from existing customers and enable [the company] to attract new customers" (¶226) when, in fact, data in their possession at that time showed the opposite (¶233). Other statements furthered the false and materially misleading perception that Instacart's "marketing investment" had been and was continuing to be successful, such as that "[Instacart] can continue growing average monthly GTV and orders per monthly active orderer . . . due to our ability to drive customer engagement through product enhancements and continued marketing investment." ¶228.

Even if Defendants' statements were "puffing" (which they are not), they are still actionable because they materially contradicted and concealed the underlying facts. *See In re Quality Sys., Inc.*

12

*Sec. Lit.*, 865 F.3d at 1143 (even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021) (statements actionable where they "affirmatively create a plausibly misleading impression of a state of affairs that differed in a material way [from] what actually existed"). Being "premised on facts," as well as having been plainly used to "create a plausibly misleading impression of a state of affairs that differed in a material way [from] what actually existed," Defendants' puffery arguments should be rejected. *See also Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 963-65 (N.D. Cal. 2014) (dismissal on puffery grounds requires a finding that a given statement is immaterial as a matter of law, and typically entails fact-intensive, context-based assessments that are more properly left to a jury) (citations omitted).

Similarly, Defendants' "opinion" argument fares no better. A statement that begins with the phrase "we believe" can be misleading where, as here, it "omit[s] material facts about the [defendants'] inquiry into or knowledge concerning a statement of opinion." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Under the correct standard, the statements positively characterizing Instacart's marketing and brand awareness are actionable because they failed to disclose known adverse material facts concerning the recent marketing study showing a declining trend in Instacart's brand awareness and loss of market share. These statements, even if construed as "opinions," were clearly intended to, and did, reinforce for investors Instacart's supposed market dominance and prospects for continued growth. *See also MannKind*, 835 F. Supp. 2d at 811 ("natural effect" of "statements concerning 'approval' and 'blessing' by the FDA" is "the impression for investors that . . . 'it was in the bag'"); *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 160-162 (D. Mass. 2004) ("statements of present belief that are material and are conceivably in direct contradiction to known facts about the FDA's position with respect to TKT's data and application for marketing approval" are "inappropriate to dispose of . . . on a motion to dismiss").

13

Defendants' omission of existing facts also prevents them from relying on the "bespeaks caution" doctrine (and/or the PSLRA's statutory safe harbor which does not apply to IPOs, *see* 15 U.S.C. 77z-2(b)(2)(D)). The "bespeaks caution" doctrine does not apply to misrepresentations of past or current fact or omissions of existing fact. *See, e.g.*, *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). Further, the "bespeaks caution" doctrine can never be applied where, as here, a defendant recasts "then-existing material events and adverse trends or uncertainties that [Defendants] had already been facing . . . as potential risks." *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d at 1155-56. As the Ninth Circuit has repeatedly emphasized, a "warning . . . of risks that 'could' or 'may' occur is misleading to a reasonable investor when [defendant] knew that those risks had materialized." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 703-04; *Khoja*, 899 F.3d at 1015-16 (same). Here, the Complaint unquestionably pleads that the "potential risks" concerning Instacart's loss of market and decline in brand awareness had already materialized. *See* ¶¶189-98.

**B.    Statements about Instacart's Growth and Ability to Retain Customers Were Materially Misleading.**

The Registration Statement also contained statements about Instacart's prospects for growth, revenue, and ability to retain customers. ¶¶234-38. These statements were misleading because they did not account for the company's declining brand and loss of market share; instead, Instacart projected future performance based simply on historical performance while assuming market conditions would remain constant. ¶207. Once Defendants decided to discuss Instacart's prospects for growth (which were contingent on brand recognition and reputation), they assumed a duty to disclose material adverse information to the contrary. *See Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 Fed. Appx. 480, 483 (9th Cir. 2019) (statements about "'real-time' nature" of theft alerts misleading because they concealed the significant flaw of "stale" alerts); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1142-44 (finding statement about sales pipeline actionable where plaintiffs alleged sales opportunities were decreasing); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) (statement that "everything [was] going fine" with FDA approval misleading because it "contravened the unflattering facts in Xoma's possession" regarding "the possible hazards of E5 and the unlikelihood of FDA approval").

14

Defendants argue that their statements about future demand and forecasting are inactionable either because they are subjectively true opinions or amount to nothing more than corporate optimism. Defs. Br. at 12-14. But opinions and even corporate optimism can be misleading where, as here, the statements mislead investors by concealing materially adverse information. Puffery does not apply where "statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1143; *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1054-55 (N.D. Cal. 2018). "Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Hammer v. Frontier Fin. Corp.*, No. C10-0643, 2011 U.S. Dist. LEXIS 169245, at *27-28 (W.D. Wash. Sep. 7, 2011). Contrary to Defendants' assertions, the presence of words like "strong" and "significant" do not render a broader statement beyond the scope of securities laws, especially when they are used to describe specific areas of a business. *Id.* ("capital ratios remain strong" is actionable because it referred to a specific area of defendants' business and consumers were likely to rely on such a statement); *see also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1023-24 (N.D. Cal. 2020) (opinion actionable where defendants stated they were remediating disclosed accounting weaknesses when, in reality, those issues were getting worse); *Rodriguez*, 325 F. Supp. 3d at 1054-55 ("healthy" is an actionable statement because, like here, it were made specifically about defendants' backlog).

Defendants also attack Plaintiffs' factual support for these claims by once again challenging the reliability of Plaintiffs' confidential witnesses. Defs. Br. at 13-14. CW1, CW2, and CW4, who worked in Instacart's advertising, marketing, and finance departments, explained that executive management set annual growth targets of between 15% and 20% and then reverse engineered a forecast that would meet the target. ¶¶208-17. The fact that they did not have direct communication with Instacart's executive management does not invalidate their allegations when those allegations are being used only to establish a fact (as opposed to a mental state, *i.e.*, scienter). *See Forescout*, 63 F.4th at 766-67.

By failing to account for Instacart's declining brand awareness and loss of market share, the company's method for projecting growth was invalid and undermined the Registration Statement's

15

Opposition to Motion to Dismiss                                      No. 5:24-cv-00465-EJD

representations about future business. As such, Defendants' statements were false and/or materially misleading. *See Forescout*, 63 F.4th at 771 (concluding that "[w]hen Defendants 'repeatedly reassured investors during the class period that the number . . . of prospective sales in the pipeline was unchanged . . . and reassured them that the pipeline was full and growing,' they 'affirmatively create[d] an impression of a state of affairs.'"); *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d at 1156 (statements actionable because defendants "touted increased consumer demand" without disclosing "product demand was declining"); *In re Lyft Inc. Sec. Litig.*, 484 F.Supp.3d 758, 768-69 (N.D. Cal. 2020) (statements touting brand reputation were misleading based on omission of sexual assault incidents that had occurred before the IPO and jeopardized Lyft's brand reputation); *Azar v. Yelp, Inc.*, No. 18-cv-00400-EMC, 2018 U.S. Dist. LEXIS 200769, at *38-40 (N.D. Cal. Nov. 27, 2018) (defendants "chose to tout Yelp's local advertising model as 'fairly proven'" while "omitting any mention of the churn issues that would likely significantly and negatively impact revenue.").

### C.    Regulation S-K Required Additional Disclosures that Instacart Failed to Provide in the Registration Statement.

Item 303 mandates disclosure of any trend or uncertainty that is known by management and reasonably likely to have a material effect on the company's financial condition or operations. *See* 17 C.F.R. §229.303(a); *see also* Management's Discussion & Analysis of Financial Condition, Securities Act Release No. 6835, at 22429 (May 18, 1989), Fed. Sec. L. Rep. (CCH) ¶72,436. This includes "events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments)" and "descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations." 17 C.F.R. §229.303(a) & (b)(2)(ii). A "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing*, 143 F.3d 1293, 1296 (9th Cir. 1998). A "duty to disclose under Item 303 is much broader than what is required under

16

the standard [for securities fraud]." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055 (9th Cir. 2014).

Plaintiffs plausibly allege the existence of undisclosed trends—namely, that Defendants knew Instacart's "brand awareness" and market share were declining while that of its competitors were increasing. *See* ¶¶189-98. This information should have been disclosed because it was reasonably likely to have (and had) a material effect on the company's financial condition and operations. *See In re Blue Apron Holdings, Inc.*, No. 17-CV-4846 (WFK), 2020 U.S. Dist. LEXIS 71807, at *25-26 (E.D.N.Y. Apr. 22, 2020) (knowledge of ongoing delays in launching the Company's fulfillment center coupled with risk warnings about delays and post-IPO statements that delays adversely affected the Company's financial condition sufficient to infer defendants reasonably expected the delays to be material prior to IPO); *Lako v. Loandepot, Inc.*, No. 8:21-cv-01449-JLS-JDE, 2023 U.S. Dist. LEXIS 13086, at *35-36 (C.D. Cal. Jan. 24, 2023) (finding Item 303 violation where undisclosed loan practices "were unsustainable given the increased scrutiny [defendant] *would* face as a public company" and "their imminent cessation *would cause a decrease in future revenues*").

Regulation S-K also requires issuers to identify the "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105(a). While the Registration Statement contained cautionary language that discussed the risks of declining brand awareness and loss of market share, these disclosures concealed the fact that these risks had already come to pass and had been trending adversely to the company's operations in the months leading up to the IPO. ¶¶240-42, 246-47. "[A] company may make a materially misleading statement when it 'speaks entirely of as-yet-unrealized risks' when the risks have 'already come to fruition.'" *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023) (finding disclosure describing "third parties improperly accessing and using Facebook users' data as purely hypothetical" false and misleading in light of internal knowledge that it had already happened); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 702-05 (security or privacy risks that "could" or "may" happen were false in light of internal knowledge of the bug).

17

Opposition to Motion to Dismiss                                                                 No. 5:24-cv-00465-EJD

**D.** **The Individual Securities Act Defendants Are Liable for Instacart's Primary Violations.**

To allege control person liability under Section 15 of the Securities Act, a plaintiff needs to plead: (i) that there was a primary violation of federal securities laws; and (ii) that the defendant possessed actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Similar to the Section 11 claims, Section 15 allegations are subject to Rule 8 notice pleading. *See In re Washington Mut., Inc. Sec. Deriv. & ERISA Litig.*, 259 F.R.D. 490, 502-04 (W.D. Wash. 2009).

The Individual Securities Act Defendants (¶30) are liable as control persons because Plaintiffs have sufficiently alleged a primary violation under the Securities Act. They were members of Instacart's Board of Directors when the company filed the Registration Statement and/or executive officers who signed the Registration Statement. *See* ¶¶17-31. They also directly participated in the management of Instacart and possessed the power and authority to control the contents of its filings with the SEC. ¶¶268-69. The Individual Securities Act Defendants, therefore, are liable for disseminating materially false and/or untrue statements, or failing to disclose material adverse information, due to their negligence in preparing Instacart's Registration Statement. *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. at 555 ("Where a board member is alleged to have signed the registration statements at issue . . . courts have presumed that the director exercised actual authority and control, at least over the contents and/or release of those statements."). Further, given that Defendants' only basis for moving to dismiss Plaintiffs' Section 15 claim was that they fail to allege a primary violation (Defs. Br. at 23 n.10), they cannot now contest this point. *See United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("arguments not raised by a party in its opening brief are deemed waived").

**E.** **The Underwriter Defendants Are Liable for Instacart's False and/or Misleading Registration Statement.**

The Underwriter Defendants (¶53) filed a "joinder" in support of Defendants' motion. ECF No. 86. They do not allege any separate arguments and rest entirely on Defendants' points. If the Court denies Defendants' motion, Plaintiffs respectfully request that it also deny the Undewriter Defendants' "joinder."

18

Opposition to Motion to Dismiss                                    No. 5:24-cv-00465-EJD

## II. Plaintiffs Adequately Pleaded Fraud Claims under Sections 10(b) and 20(a) of the Exchange Act.

To state a claim under Section 10(b), Plaintiffs must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011). "Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory *Khoja*, 899 F.3d at 1008. Here, Defendants challenge falsity, scienter, and loss causation. Each is adequately pled.

### A. Defendants Made False and/or Materially Misleading Statements in the Registration Statement.

The "falsity" element is the same for claims under Section 11 of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934. Cases analyzing "falsity" in the context of a Section 10(b) claim are authoritative. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (collecting cases); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) ("[T]he definition of 'materiality' under § 11 of the Securities Act is the same as under § 10(b) of the Exchange Act."). Consequently, as explained above, Plaintiffs' allegations properly allege the element of falsity for both the Section 11 claims and Section 10(b) claims.

### B. Defendants' Knowledge of the Adverse Marketing Study Results and Significant Insider Stock Sales Give Rise to a Strong Inference of Scienter.

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. A "strong inference" "need not be irrefutable … or even the most plausible," and no "smoking-gun" is required. *Tellabs*, 551 U.S. at 324-326. The test is simply an inquiry into "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter," and is satisfied so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 322-324 (emphasis in original). Plaintiffs readily satisfy this standard.

Plaintiffs' allegations raise a strong inference that Defendants Simo and Giovanni, and

19

therefore Instacart, knew about the company's declining brand awareness and loss of market share and that Instacart did not disclose this information in its SEC filings, *i.e.*, the Registration Statement. The Ninth Circuit's decision in *Alphabet* is instructive. In that case, the plaintiff alleged that the defendants concealed a software bug from investors. The court held that "[t]he complaint's allegations, read as a whole, raise a strong inference that Alphabet [formerly Google] was aware of the information in the Privacy Bug Memo" because "Pichai and other Google senior executives read the Privacy Bug Memo, and so necessarily knew of the Three-Year Bug and other security vulnerabilities . . . The memo informed senior executive leadership at Google of the scope of the problem, warned of the consequences of disclosure, and presented Google leadership with a clear decision on whether to disclose those problems." *Alphabet*, 1 F.4th at 705-06 (citing *S. Ferry LP v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)). CW3 presented the marketing study results directly to Simo and several other members of senior management. ¶¶329-34. Thus, if just one "memo" was enough in *Alphabet*, Plaintiffs' allegations give rise to an even stronger inference of scienter. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (pleading standard met when "a reasonable person would deem the inference of scienter cogent and as least as compelling as any opposing inference one could draw from the facts alleged"); *see also Carbonite*, 22 F.4th at 9-10 (scienter alleged where defendants discussed product publicly thereby creating "very strong inference" that defendants "would have paid at least some attention to the product's status"); *LifeLock*, 780 Fed. Appx. at 484-85 (allegations "undercut" CEO's supposed ignorance of product defect).

Defendants strikingly do not deny the marketing study existed or that they knew the results. Instead, they minimize the study and CW3's presentation of the results as "nothing more than a disagreement with management." Defs. Br. at 20-21. Plaintiffs' allegations do not support Defendants' narrative. CW3 was the Manager of Market Research for Brand, Campaigns and Sentiment and was explicitly tasked with analyzing the effect of the Lizzo advertising campaign. ¶¶289, 320-22. This was a significant assignment that received significant attention from the most senior employees within the company, including Defendant Simo herself. ¶¶329-334. CW3's

20

Opposition to Motion to Dismiss                                    No. 5:24-cv-00465-EJD

marketing study report is more similar to the "Privacy Bug Memo" in *Alphabet* than the "disagreement[s]" with management discussed in the cases cited by Defendants. *See* Defs. Br. at 20-21 (citing, *e.g.*, *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192 (D. Ariz. 2009)).

"The flaw with [Defendants'] argument is that at the pleadings stage, Plaintiff does not need to present evidence of 'a smoking gun.' While Plaintiff does need to establish a 'strong inference' of scienter, this can be shown by demonstrating evidence of deliberate recklessness." *Borteanu v. Nikola Corp.*, No. CV-20-01797-PHX-SPL, 2023 U.S. Dist. LEXIS 237035, at *50 (D. Ariz. Dec. 8, 2023) (quoting *Tellabs*, 551 U.S. at 324). Similar to the plaintiffs in *Nikola* who alleged that the defendants had actual knowledge of the adverse information in that case based on their attendance at board meetings, Plaintiffs alleges that Simo and Giovanni received the marketing study results and therefore knew that Instacart's "brand awareness" was trending downward and that the company was losing market share to the competition. ¶¶329-34, 388. Despite these events, Defendants discussed Instacart's "brand awareness" and market share in a positive light. "All these allegations point to the conclusion that [Defendants] did not 'appreciate the gravity of the risk of misleading others.'" *Nikola*, 2023 U.S. Dist. LEXIS 237035, at *50-51 (quoting *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093-1094 (9th Cir. 2010)).

Actual knowledge or, as the Ninth Circuit has described it, "actual access to the disputed information" is sufficient to "independently satisfy the PSLRA." *S. Ferry*, 542 F.3d at 785-86. However, for good measure, Plaintiffs also alleges motive to bolster the inference of scienter. *Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference").

By way of the Registration Statement, company insiders sold 7.9 million shares of stock. ¶348. Defendant Simo sold 321,181 shares for proceeds of $9.6 million while Defendant Giovanni sold 191,006 shares for $5.7 million. ¶349. Simo and Giovanni sold these shares despite the Registration Statement claiming that they would not offer any shares for sale during the IPO. ¶349. Other insider sellers included members of the board as well as Instacart's COO Asha Sharma, CTO Mark Schaaf, and GC Morgan Fong. ¶¶350-51. In total, 13 executives, directors and nominees sold 1.4 million shares for total proceeds of $43.2 million in the IPO followed by additional sales of nearly

21

Case 5:24-cv-00465-EJD    Document 99    Filed 12/10/24    Page 28 of 31

900,000 shares in the days after the IPO for proceeds of over $21.1 million. ¶352. While it may be impossible to know if or how much these individuals would have received had the Registration Statement disclosed the results of the marketing study, these sums of money are evidence of sufficient motive to support an inference of intentional conduct (*i.e.*, concealing the fact that Instacart's "brand awareness" was trending downward). ¶353

Defendants argue that these stock sales do not give rise to an inference of scienter. Defs. Br. at 16-18. Defendants are mistaken for two reasons. First, the inference of scienter is based on Defendants' actual knowledge of the marketing study results and not exclusively motive allegations relating to their compensation. Thus, their scienter is **bolstered** by the motive allegations, and not **dependent** upon them. Plaintiffs also point to statements by corporate insiders, including Instacart's founder, that confirm (or at least corroborate) their motive allegations. *See* ¶306 (Instacart's founder, Apporva Mehta, confirmed in an interview that the "primary reason to go public was to make sure that employees and early investors receive liquidity"). Second, the motive allegations are firmly rooted in the case law; by concealing Instacart's declining "brand awareness" and market share losses, Defendants provided themselves with a favorable market into which they could launch the IPO and sell their shares. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (concealing role in scheme gave rise to inference of scienter because "'benefits of concealment might [have] exceed[ed] the costs'" (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008))); *see also Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1267 (10th Cir. 2022) ("Defendants profited greatly from their stock sales within the class period . . . . To be sure, Defendants have pointed to some allegations potentially mitigating the suspicion surrounding their trades, but not enough to undermine the reasonable inference, at the motion-to-dismiss stage . . . ").

**C.    Analyst Reports and News Articles Support Plaintiffs' Theory of Loss Causation.**

The Ninth Circuit's decision in *Genius Brands* (which defendants do not cite) is the controlling law on this point. In that case, the court confirmed that a plaintiff can plead the loss causation in a variety of ways and quite easily too. "[L]oss causation is simply a variant of proximate cause, [and] the ultimate issue is whether the defendant's misstatement, as opposed to some other

22

Opposition to Motion to Dismiss                                              No. 5:24-cv-00465-EJD

fact, foreseeably caused the plaintiff's loss. [P]laintiffs need only show a 'causal connection' between the fraud and the loss, and they can do so even when the alleged fraud is not necessarily revealed prior to the economic loss." *In re Genius Brands Int'l, Inc.*, 97 F.4th at 1183 (internal citations and quotations omitted). The Ninth Circuit "focus[es] on plausibility," namely "can we plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price?" *Id*. at 1184 (omitting internal quotations).

The answer to that question here is absolutely yes. Instacart's "brand awareness" and market share were declining leading up to the IPO yet Defendants concealed that information. *See* ¶¶355-64. This led analysts and investors to underestimate the risks associated with competition in the "Instant Delivery" market. *See* ¶312. As analysts and news articles started to report Instacart's declining growth rates due to increased competition, the market began to suspect that the Registration Statement did not properly disclose the company's true outlook. ¶385. Each negative report caused Instacart's stock price to decline as the artificial inflation caused by Defendants' false statements dissipated. *See* ¶¶380-81, 385-86. These allegations comprise "new facts that, taken as true, render some aspect of the defendant's prior statement false or misleading," especially when viewed under the "flexible approach" the Ninth Circuit requires when "evaluating whether some event or occurrence revealed fraud to the market." *Genius Brands*, 97 F.4th at 1184.

Defendants downplay Plaintiffs' alleged corrective disclosures as "lukewarm" analyst reports and attempt to separate them from the undisclosed adverse material information. Defs. Br. at 22-23. These arguments are unsupported by the facts. First, "[d]isclosure of the fraud is not a sine qua non of loss causation." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). Analyst reports, news articles, and other types of information can all constitute corrective disclosures and support a theory of loss causation. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794-95 (9th Cir. 2020). The determinative factor is whether the disclosure reveals information relating to the alleged fraud. *See Genius Brands*, 97 F.4th at 1184-89 (plaintiffs alleged loss causation based on different corrective disclosures, including short report providing analysis of public information and announcement that failed to provide update on possible buyout). While

23

Defendants do not think much of the analyst reports, they still revealed new material information to the market as evidenced by the declines in Instacart's stock that followed. *See* ¶¶380-81, 385-86. Moreover, although Defendants claim the subject of the reports were unrelated to the market study results at issue, that is not true and Defendants do not provide any facts to support that claim. Defendants can present that argument later in the case. *See Khoja*, 899 F.3d at 999. Importantly, a corrective disclosure need not "precisely mirror" the misrepresentation but instead "[i]t is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statement false or misleading." *Genius Brands*, 97 F.4th at 1184 (internal quotations omitted); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 790.[2]

### D.    The Individual Exchange Act Defendants Are Liable for Instacart's Primary Violations.

Plaintiffs adequately plead the Individual Exchange Act Defendants (¶285) are secondarily liable under Section 20(a) of the Exchange Act. *See Khoja*, 899 F.3d at 1018. Because the primary violation is adequately alleged, and Defendants challenge this claim only as to the underlying primary violation, *see* Defs. Br. at 23 n.10, Plaintiffs' Section 20(a) claim must be sustained. They cannot now contest this point. *See Romm*, 455 F.3d at 997.

### CONCLUSION

Plaintiffs adequately stated claims for relief under both the Securities Act and Exchange Act. Respectfully, Defendants' motion to dismiss (and the Underwriter Defendants' "joinder") should be denied in its entirety.

---

[2] Defendants attempt to buttress their loss causation argument with reference to extraneous exhibits. *See* Defs. Br. at 22 (citing Exs. 12, 13, and 21). Consideration of these materials is improper. They are not subject to Federal Rule of Evidence 201 or the doctrine of incorporation by reference. The materials express opinions that conflict with Plaintiffs' allegations and, if anything, demonstrate a question of fact as to the success of Instacart's IPO and the propriety of Defendants' disclosures in the Registration Statement given the apparent disagreement between the articles cited by Defendants and those referenced by Plaintiffs.

24

DATED:  December 10, 2024   Respectfully Submitted,

**LEVI & KORSINSKY, LLP**

By: _s/ Adam M. Apton_
Adam M. Apton (SBN 316506)
aapton@zlk.com
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671

*Attorneys for Plaintiffs*
*and Lead Counsel for the Class*

25

Opposition to Motion to Dismiss       No. 5:24-cv-00465-EJD