UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ANDY DEAN STEPHENS,<br><br>Plaintiff,<br><br>v.<br><br>MAPLEBEAR INC., et al.,<br><br>Defendants. | Case No.   5:24-cv-00465-EJD<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF Nos. 84, 86 |

When Maplebear Inc., d/b/a Instacart,[1] fared poorly after its IPO, investors sued for violations of federal securities law. Defendants now move to dismiss for failure to state a claim. Because the amended complaint does not sufficiently allege securities violations, the Court **GRANTS** the motion.

I.   **BACKGROUND**

Instacart was founded in 2012 as a grocery technology company. Am. Compl. ¶ 162, ECF No. 55. The company partners with various grocery stores across the country to offer virtual storefronts on its website and mobile app through which customers can order items for pickup or delivery. This business model provides Instacart with two primary revenue streams. One stream comes from individual consumers who use Instacart's platform. Those consumers pay fees on individual orders or subscriptions to Instacart's services. The other comes from Instacart's grocery store partners. In addition to fees per order, those partners may also pay Instacart for advertising or for the right to use Instacart's platform to sell directly to consumers. *Id.* ¶¶ 163–64.

---

[1] Throughout this Order, the Court refers to Maplebear as "Instacart" since that is how the public generally recognizes the company.

1    In its early years, Instacart's growth was unremarkable. Heading into 2020, Instacart was responsible for a gross transaction value (GTV), or total grocery sales, of only $5.1 billion—a large number, but one that pales in comparison to the overall $800 billion U.S. grocery market. *Id.* ¶ 165. That quickly changed when the COVID-19 pandemic hit. Instacart's GTV quadrupled to $20.7 billion, and its revenues increased almost eightfold from $215 million to $1.5 billion. *Id.* ¶ 166. This in turn pushed Instacart to a peak valuation of $39 billion in 2021. *Id.* ¶ 168. However, the pandemic-era boost proved to be short lived. As COVID-19 waned and lockdowns lifted, Instacart's growth slowed. By the time Instacart launched its IPO in September 2023, its valuation had fallen to between $8.6 and $9.3 billion. *Id.* ¶¶ 169–74.

According to Plaintiffs, the IPO was a last-ditch attempt by Instacart and its venture capital backers to cut their losses. Allegedly, Instacart made two categories of false and misleading statements during its IPO in an effort to inflate its stock price and recoup as much value as possible. First, Instacart allegedly made false and misleading statements about the strength of its brand. *Id.* ¶¶ 225–32, 355–63. Second, Instacart allegedly made false and misleading statements about its financial forecasts. *Id.* ¶¶ 234–38, 240–44, 365–70, 372–76.

Plaintiffs now seek to hold Instacart and several other defendants liable for those alleged misstatements under both the Securities Act and the Securities Exchange Act (Exchange Act). Plaintiffs raise claims under Sections 11 and 15 of the Securities Act against Instacart, its underwriters, and certain individual officers and directors.[2] Plaintiffs raise claims under Sections 10(b) and 20(a) of the Exchange Act against Instacart, Fidji Simo (its CEO), and Nick Giovanni (its CFO).

---

[2] The underwriters are Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; BofA Securities, Inc.; Barclays Capital Inc.; Citigroup Global Markets Inc.; Robert W. Baird & Co. Inc.; Citizens JMP Securities, LLC; LionTree Advisors LLC; Oppenheimer & Co. Inc.; Piper Sandler & Co.; SoFi Securities LLC; Stifel, Nicolaus & Co., Inc.; Wedbush Securities Inc.; Blaylock Van, LLC; Drexel Hamilton, LLC; Loop Capital Markets LLC; R. Seelaus & Co., LLC; Samuel A. Ramirez & Co., Inc.; Stern Brothers & Co.; and Tigress Financial Partners LLC. The individual officers and directors are Fidji Simo; Nick Giovanni; Alan Ramsay; Apoorva Mehta; Jeffrey Jordan; Meredith Kopit Levien; Barry McCarthy; Michael Moritz; Lily Sarafan; Frank Slootman; and Daniel Sundheim.

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS    2

## II. LEGAL STANDARD

On a motion to dismiss, courts are limited to the pleadings and any material that is properly subject to judicial notice or incorporation by reference.[3] *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). In evaluating whether these materials are sufficient to state a claim, courts must assume the truth of all factual allegations and draw all reasonable inferences in favor of the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). They do not, however, accept conclusory allegations or draw unreasonable inferences. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

In most cases, plaintiffs can avoid dismissal simply by pleading a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the pleading burden is higher for securities fraud claims under Sections 10(b) and 20(a) of the Exchange Act. For those claims, a plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA). *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). To comply with Rule 9(b), the plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted). The PSLRA requires similar levels of particularity for allegations of falsity, but it imposes stricter particularity requirements for scienter. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876–77 (9th Cir. 2012). Namely, to show scienter under the PSLRA, the plaintiff must establish a *strong* inference of scienter. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). This means the "inference of scienter . . . must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

---

[3] Defendants request judicial notice and incorporation by reference of various SEC filings, publicly available articles, and stock price data. ECF Nos. 85, 102. Plaintiffs do not object except to the extent that Defendants use some of those documents to contest the allegations of the complaint. Opp'n at 24 n.2, ECF No. 99. As such, the Court **GRANTS** the request for judicial notice and incorporation by reference, but only to the extent the noticed or incorporated documents show the information available in the public domain. The Court does not use those documents for the truth asserted or to resolve factual disputes. *See Khoja*, 899 F.3d at 999, 1003.

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS    3

1    By contrast, claims under Sections 11 and 15 of the Securities Act do not inherently require allegations of fraud, so they do not automatically trigger Rule 9(b). The typical plausibility pleading standard applies to Section 11 and 15 claims unless those claims "sound[] in fraud," in which case Rule 9(b) applies. *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citation omitted). This occurs when a complaint relies on the same allegations to support both its Securities Act and Exchange Act claims, or when the complaint challenges the same statements under both Acts. *Id.*; *In re Rigel*, 697 F.3d at 886. That is the case here. Although Plaintiffs nominally disclaim any allegations of fraud for their Section 11 and 15 claims, the complaint relies on essentially the same factual allegations and challenges almost the exact same statements across all claims. *See In re Rigel*, 697 F.3d at 885. While Plaintiffs raise their Securities Act claims against different defendants than their Exchange Act claims, that does not change the result. *Thant v. Rain Oncology Inc.*, No. 5:23-cv-03518, 2025 WL 588994, at *3 (N.D. Cal. Feb. 24, 2025). Therefore, Rule 9(b) applies to Plaintiffs' Section 11 and 15 claims in this matter.

## III.    DISCUSSION

To state a claim under Section 10(b), plaintiffs must plead (1) the falsity of material statements or omissions, (2) scienter, (3) a connection between the challenged statements or omissions and a securities transaction, (4) reliance, (5) economic loss, and (6) loss causation. *Or. Pub. Emps.*, 774 F.3d at 603. Section 11 claims are significantly less demanding. Plaintiffs need only plead (1) the falsity of statements or omissions and (2) materiality. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996). Loss causation is not part of the prima facie case for Section 11 claims, so plaintiffs need not plead loss causation to state such a claim. *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546 (N.D. Cal. 2009); *Aaron v. Empresas La Moderna, S.A. de C.V.*, 46 F. App'x 452, 455 (9th Cir. 2002). But the lack of loss causation, sometimes called negative causation, is an affirmative defense to Section 11 liability. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013); *see also In re Charles Schwab*, 257 F.R.D. at 546; *In re Shoretel Inc., Sec. Litig.*, No. 08-cv-00271, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009).

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS    4

Defendants argue that Plaintiffs have failed to plead falsity under both Sections 10(b) and 11, scienter under Section 10(b), and loss causation (negative causation) under Section 10(b) (Section 11). The Court begins by addressing whether Plaintiffs have pled actionably false or misleading statements before turning to scienter and loss causation/negative causation. The Court ends with Plaintiffs' claims for secondary liability under Sections 20(a) and 15, which depend on the existence of primary liability under Sections 10(b) and 11.

### A.     False or Misleading Statements

Defendants group several arguments under the rubric of falsity, so the Court discusses each in turn. The Court starts with the most fundamental: whether Plaintiffs have sufficiently pled their theories of falsity. Plaintiffs have not done so because they have not pled, as a factual matter, that the brand-related events Instacart allegedly concealed or lied about actually happened, and they have not explained how the challenged forecasting statements relate to their theory of falsity. That alone means Plaintiffs have failed to plead falsity. But because the Court grants leave to amend, it also addresses Instacart's other arguments—about opinion statements, forward-looking statements, and puffery—as guidance for amendment.

#### 1.     Theories of Falsity

Plaintiffs offer two accounts of what happened at Instacart that made its statements false or misleading. First, Plaintiffs say that Instacart's brand awareness and market share were declining leading up to its IPO. This allegedly caused Instacart's positive statements about its branding and marketing efforts to be false or misleading. Second, Plaintiffs say that Instacart used a deficient forecasting process, rendering false or misleading all of Instacart's forecast-related statements.

##### a.     Brand and Marketing Statements

To support their account of Instacart's brand and marketing failures, Plaintiffs rely almost exclusively on allegations from a single confidential witness, CW3, described as the "Manager of Market Research for Brand, Campaigns, & Sentiment" for Instacart from May 2021 to March 2023. Am. Compl. ¶ 58. Although Plaintiffs have offered sufficient detail for the Court to credit CW3's allegations at the pleading stage, *see Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), CW3's allegations do not substantiate Plaintiffs' theory.

The bulk of CW3's allegations focus on an advertising campaign that Instacart conducted with the celebrity Lizzo in August 2022. Am. Compl. ¶¶ 190–91. CW3 was responsible for monitoring Instacart's brand awareness in connection with that campaign, and he utilized various studies to do so. *Id.* ¶ 192–93. One, known as the "Brand Tracker" study, reportedly showed a decline in brand awareness in the third quarter of 2022 as a whole, and also from one month to the next in that quarter. *Id.* ¶ 196. The Brand Tracker further showed declining brand awareness in the fourth quarter of 2022. *Id.* ¶¶ 202, 205. A second study, known as the "Campaign Awareness Research Study," showed decreased brand awareness over the same period as well. *Id.* ¶ 197. From this, CW3 concluded that the Lizzo campaign was a failure.

In CW3's telling, he reported these results to Instacart's senior management, but none believed him. *Id.* ¶¶ 199–204. Then, in apparent retaliation for bearing bad news, Instacart terminated CW3 and his team in March 2023. *Id.* ¶ 205.

These allegations are insufficient because they describe events pre-dating the challenged statements. The brand awareness data that CW3 discusses run from the third quarter of 2021 through the end of 2022. *Id.* ¶¶ 196–97, 202. Instacart's IPO and the challenged statements did not come until nine months later in September 2023. *Id.* ¶ 177. Falsity, though, is measured against the state of affairs when a statement is made, not the one nine months prior. *In re Stac Elecs.*, 89 F.3d at 1404. Much could have changed in those intervening months. For example, Instacart may have experienced a reversal of fortune on brand awareness trends.

To support their theory that brand awareness was declining during Instacart's IPO, Plaintiffs needed to offer allegations "contemporaneous" with the IPO. *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (citation omitted). Earlier allegations can offer context, support, and corroboration, but they are not substitutes for contemporaneous allegations. *Id.* The complaint is silent about brand awareness trends in 2023 and the weeks leading up to Instacart's IPO. As such, Plaintiffs have not sufficiently pled their theory of falsity. None of their challenges to Instacart's brand and marketing statements, including their Regulation S-K challenge, may proceed.

### b.     Forecasting and Growth

Plaintiffs make a stronger case that Instacart's process for financial forecasting was flawed. However, the Court need not decide whether Plaintiffs have sufficiently alleged flawed forecasting because Plaintiffs' claims fail for another reason: the statements that Plaintiffs challenge on growth and forecasting grounds are largely not about forecasts at all.

Two of these challenged statements are commonsensical truisms about how customers "satisfied" with Instacart "will continue to order on Instacart," and how "lower fees make ordering online more appealing." Am. Compl. ¶¶ 235, 366. Neither requires any sort of sophisticated economic modeling or forecasting, and they therefore create no impressions about the quality of Instacart's forecasting process. Others are backward-looking rather than forecasts, such as statements that Instacart has "demonstrated [its] ability to help [its] retail partners drive strong growth" and that Instacart's "pandemic-accelerated growth . . . helped establish a business with much greater scale." *Id.* ¶¶ 234, 236, 365, 367. These statements do not purport to make any forecasts, nor do they imply anything about Instacart's forecasts. Yet another challenged statement—that Instacart sees "lower levels of order volume growth in the second quarter and a portion of the third quarter . . . followed by higher levels of order volume growth in the second half of the year during the back-to-school period and holiday season," *id.* ¶¶ 238, 369—is better characterized as a description of seasonality in Instacart's business, not a forecast.

Many of the challenged statements are also better viewed as simply identifying the things that Instacart needs to do, or the benchmarks it needs to hit, to be successful. For instance, Instacart stated that its business was "dependent upon [its] ability to continue . . . cost-effectively increasing [its] engagement with existing customers," and that failure to do so may cause "the value of [its] offerings [to] be diminished." *Id.* ¶¶ 240, 372. Similarly, Instacart explained that, "to be successful, [it] need[s] to effectively increase market acceptance across all age, income, and other demographically different groups." *Id.* ¶¶ 241, 373. It also stated that "[t]he successful promotion of [its] brand . . . will depend on . . . [its] marketing efforts." *Id.* ¶¶ 242, 374; *see also id.* ¶¶ 243, 375 ("Any expansion in our market depends on a number of factors . . . ."). None of these statements purport to forecast Instacart's growth.

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS     7

To be sure, there are some forecast-related statements. But for those statements to be actionable, they need to "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). That is, such statements must imply to investors that Instacart was using a sophisticated forecasting process when Instacart was not.

Two such statements are simple warnings that Instacart's predictions may prove to be inaccurate. Am. Compl. ¶¶ 237, 368 ("Some data and other information . . . are also based on management's estimates . . . . and you are cautioned not to give undue weight to such estimates."); ¶¶ 243, 375 ("The estimates of market opportunity and forecasts of market growth included in this prospectus may prove to be inaccurate . . . . [and] are subject to significant uncertainty . . . ."). Warnings that an estimate may be wrong do not affirmatively imply anything about the sophistication or thoroughness, or lack thereof, of Instacart's forecasting efforts.

There are another two statements that contain predictions. One contains Instacart's prediction that it "do[es] not expect [its] pandemic-accelerated growth rates to recur in future periods." *Id.* ¶¶ 236, 367. The other notes that Instacart previously suffered negative impacts from world events such as supply chain disruptions and the war in Ukraine, and simply observed that "such impact may continue in future periods." *Id.* ¶¶ 244, 376. These are far from detailed forecasts that could only be generated by sophisticated forecasting methods. They are instead basic observations that appeal to common sense, and they therefore create no affirmative misimpression about Instacart's forecasting process.

Finally, Plaintiffs do challenge one specific forecast that plausibly implies Instacart had used sophisticated methods: a claim that Instacart expected to grow at a compound annual growth rate of 10–18% over the next several years after its IPO. *Id.* ¶ 370. These statements were made at a series of roadshows promoting Instacart's IPO between September 11 and 18, 2023. *Id.* The problem is that these statements came before Plaintiffs' proposed class period, which begins on September 19, 2023. *Id.* ¶ 273. Statements made outside of the proposed class period are not actionable. *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-cv-05558, 2018 WL 4181954, at *4 (N.D. Cal. Aug. 31, 2018) (collecting cases).

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS    8

For these reasons, the Court concludes that Plaintiffs have failed to plead any of the challenged growth or forecasting statements are actionably false or misleading.

### 2. Opinion Statements

Opinions are statements that are "inherently subjective and uncertain," often identified through their use of words like "believe" or "think." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183–84, 186 (2015). Statements of opinion are actionable under federal securities law. But due to the inherent uncertainty that opinions convey, they are subject to a higher standard for falsity than other statements. *Omnicare*, 575 U.S. 175 (Section 11); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 610 (9th Cir. 2017) (applying *Omnicare* to Section 10(b)). Opinions are actionable under federal securities law in only three ways. First, an opinion is false if its speaker does not believe that opinion (subjective falsity) *and* that opinion is incorrect (objective falsity). *City of Dearborn Heights*, 856 F.3d at 615–16 (discussing *Omnicare*, 575 U.S. 175). Second, an opinion is false if it contains an embedded statement of fact that is false. *Id.* Finally, an opinion is actionably misleading omission if it excludes details and creates a misimpression about the speaker's basis for that opinion by doing so. *Id.*

In this case, the Court concludes that certain challenged brand and marketing statements— those at paragraphs 226–27, 229, 356–57, and 359 of the complaint—are opinions because they use words like "believe." Plaintiffs advance only an omission theory in support of their challenges to these opinions, arguing that Instacart was being too positive and failed to disclose information about its poor brand performance. "An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189. Although Plaintiffs have pled that Instacart's marketing campaign involving Lizzo was a failure, the complaint does not explain why things were so dire that it was misleading for Instacart to be optimistic about its prospects. Nor have Plaintiffs pled much about the investigation that Instacart executives did or did not conduct when forming those opinions ahead of the IPO. In any case, because Plaintiffs' branding allegations significantly pre-date Instacart's IPO, Plaintiffs have not pled that there was even any negative news to disclose. *Supra* Section III.A.1.a.

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS     9

1    Consequently, Plaintiffs have failed to plead that any of the opinions they challenge are
2    misleading.

### 3. Forward-Looking Statements

Like opinions, forward-looking statements also receive enhanced protections under federal securities law. These protections flow from two sources: the PSLRA safe harbor, 15 U.S.C. § 77z-2 (Securities Act), § 78u-5 (Exchange Act), and the common law "bespeaks caution" doctrine, *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017). The PSLRA safe harbor is the "statutory version" of the bespeaks caution doctrine, so the two are very similar. *Emps. Teamsters Loc. Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004). That said, they are not identical. The safe harbor protects forward-looking statements so long as they are accompanied by meaningful cautionary language *or* the speaker does not have actual knowledge of their falsity. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021) (citation omitted). On the other hand, the bespeaks caution doctrine cannot be triggered by lack of knowledge; only cautionary language can unlock the doctrine's protection. *In re Atossa*, 868 F.3d at 798; *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994).

Here, despite Instacart's attempt to invoke the safe harbor, only the bespeaks caution doctrine applies. The safe harbor expressly excludes from its protection any statements "made in connection with an initial public offering." 15 U.S.C. §§ 77z-2(b)(2)(D), 78u-5(b)(2)(D). Since all statements being challenged in this litigation—except one that is plainly not forward-looking (Am. Compl. ¶ 363)—were made in connection with Instacart's IPO, only the bespeaks caution doctrine can offer protection. *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1103 n.20 (C.D. Cal. 2003).

A statement is forward-looking for purposes of the bespeaks caution doctrine if it predicts future growth or performance, details future plans, or states the assumptions underlying those predictions or plans. *Cf.* 15 U.S.C. § 78u-5(i)(1) (defining forward-looking statements in the context of the PSLRA safe harbor). Unsurprisingly, many of the challenged forecasting statements are forward-looking. Am. Compl. ¶¶ 235–36, 244, 366–67, 370, 376. So too are many of the challenged brand and marketing statements. *Id.* ¶¶ 226–30, 356–60.

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS    10

To trigger the bespeaks caution doctrine, a forward-looking statement must "contain[] enough cautionary language or risk disclosure" to render that statement "not misleading." *In re Atossa*, 868 F.3d at 798 (first quoting *In re Worlds of Wonder*, 35 F.3d at 1413; and then quoting *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005)). To clear that bar, "the language bespeaking caution [must] relate directly to that to which plaintiffs claim to have been misled." *Id.* (quoting *In re Worlds of Wonder*, 35 F.3d at 1415) (alteration in original).

Instacart provided such cautionary language for the challenged forecasting statements. In the risk factors accompanying its IPO prospectus, Instacart cautioned investors that "[t]he estimates of market opportunity and forecasts of market growth . . . may prove to be inaccurate" because they "are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate." Am. Compl. ¶ 243. Instacart told investors that, as a result, "the forecasts of market growth included in this prospectus should not be taken as indicative of our future growth." *Id.* Instacart did not hide the ball on the challenged brand and marketing statements either. Instacart warned that "failure to achieve increased market acceptance" through marketing and increasing brand awareness "could seriously harm [its] business." *Id.* ¶ 241. Instacart also warned, "If we fail to maintain and enhance our brand . . . our business, financial condition, and results of operations may suffer." *Id.* ¶ 242.

All this makes abundantly clear to investors that Instacart's forward-looking brand and forecasting statements may prove to be wrong. That is enough to invoke the protections of the bespeaks caution doctrine for almost all of the challenged forward-looking statements in this case. The one exception is the challenged statement made at Instacart's IPO roadshow (*id.* ¶ 370), since there is no indication that any of the cautionary language from Instacart's prospectus was provided at the roadshow.

Plaintiffs try to avoid this result by arguing that Instacart's brand risk disclosures were not meaningful. According to Plaintiffs, those disclosures implied that Instacart's brand awareness *could* decrease while concealing that brand awareness had *already* decreased. *See In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948–49 (9th Cir. 2023). This fails because Plaintiffs have not pled that brand awareness was decreasing near the IPO. *Supra* Section III.A.1.a.

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS   11

1    The bespeaks caution doctrine therefore protects Instacart from liability for the forward-looking statements at paragraphs 226–30, 235–36, 244, 356–60, 366–67, 376 of the complaint.

### 4. Puffery

Puffery consists of "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers," *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (citation omitted), that are "not capable of objective verification," *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1097 (9th Cir. 2022) (internal quotations and citation omitted). Such statements are not actionable under federal securities law because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys.*, 759 F.3d at 1060 (citation omitted).

Although there is no one-size-fits-all test for puffery, case law provides guidance by example. For instance, generic discussions of growth and opportunity, without reference to particular indicators measuring those two concepts, are puffery. *Id.*; *Macomb Cnty.*, 39 F.4th at 1098. So too are statements touting the "quality" or "superior[ity]" of a company's offerings, and statements downplaying generic "problem[s]." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206–07 (9th Cir. 2016). Likewise, assertions that a company's product features or operations, framed in "general terms," contribute to topline performance metrics are inactionably vague because they "provide[] nothing concrete upon which [a plaintiff] could rely." *Or. Pub. Emps.*, 774 F.3d at 606 (citation omitted). Finally, vague gestures towards a company becoming "stronger" are puffery. *Police Ret. Sys.*, 759 F.3d at 1060.

According to this guidance, most of the challenged brand and marketing statements are puffery. Several are generic discussions of growth and opportunity. Am. Compl. ¶¶ 227, 357 ("We believe we have a significant opportunity to increase our brand awareness to fuel new customer acquisition."); ¶¶ 231, 361 ("[O]ur brand and leading market position enable us to benefit from organic, word-of-mouth growth . . . ."); ¶¶ 232, 362 ("We have built an efficient sales and marketing engine to support our organic motion and drive growth.").

Others describe Instacart's operations with vaguely positive terms. *Id.* ¶¶ 226, 356 ("strength of our brand"); ¶¶ 232, 362 ("efficient sales and marketing engine").

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS     12

Still others promise topline performance improvements based on generalized descriptions of operations. *Id.* ¶¶ 226, 356 ("We believe the strength of our brand enables us to attract customers to Instacart . . . ."); ¶¶ 228, 358 ("[W]e believe that we can continue growing average monthly GTV . . . due to our ability to drive customer engagement through product enhancements and continued marketing investment."); ¶¶ 232, 362 ("[W]e have developed a broader set of marketing strategies to attract customers to . . . Instacart."; "Our marketing efforts drive sales for our retail and brand partners.").

Lastly, some statements do little more than boast about Instacart's strength. *Id.* ¶¶ 225, 355 (characterizing Instacart as "the leading grocery technology company in North America"); ¶ 363 ("There's no doubt we are a much stronger company now than in 2021 . . . .").

To be sure, even generalized statements of optimism can be actionable if they "address specific aspects of a company's operation that the speaker knows to be performing poorly" and create misleadingly positive impressions about those aspects. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017). But that is not the situation here, where Plaintiffs have not sufficiently alleged that Instacart's brand was doing poorly or that any challenged statement created misimpressions about the sophistication of Instacart's forecasting process. *Supra* Section III.A.1. Thus, the statements identified above are inactionable puffery.

### B.   Scienter

Scienter requires Plaintiffs to demonstrate that Instacart's management knew or recklessly disregarded information showing that the challenged statements were false. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012).

On brand and marketing, Plaintiffs stake their argument largely on CW3's allegations that he presented the poor results from the Lizzo marketing campaign to management. Am. Compl. ¶¶ 199–204. From Plaintiffs' perspective, this meant that management must have known about (or recklessly disregarded) Instacart's negative brand performance. However, CW3 reported to Instacart's management well before Instacart's IPO. In fact, he was let go in March 2023, half a year ahead of the IPO. *Id.* ¶ 205. CW3's reports therefore say little about any Instacart officer's state of mind with respect to branding and marketing around the time of the IPO.

1    Apart from CW3, Plaintiffs can point only to generalized allegations about motive and
2    access to information. Neither does the trick.

3    Plaintiffs' motive arguments center around stock sales made by Instacart's officers, the
4    theory being that Instacart's officers sought to profit by inflating Instacart's stock price and selling
5    their stock while the price was inflated. The issue is that Instacart's officers were subject to a
6    lock-up period that prevented them from making discretionary stock sales within 180 days of
7    Instacart's IPO. Lopez Decl., Ex. 1 at 84, ECF No. 84-2. The stock sales that Plaintiffs identify
8    were nondiscretionary sales to cover tax obligations. Am. Compl. ¶ 349; Lopez Decl., Exs. 19–
9    20, ECF Nos. 84-20, 84-21. Sales to satisfy tax obligations are not indicative of scienter. *Provenz*
10   *v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (explaining that "credible and wholly innocent
11   explanations for stock sales," such as "the need to free cash to meet matured tax liabilities," do not
12   support scienter) (citation omitted); *see also Hoang v. ContextLogic, Inc.*, No. 21-cv-03930, 2023
13   WL 6536162, at *26 (N.D. Cal. Mar. 10, 2023).

14   That just leaves Plaintiffs' access-to-information argument. Ostensibly, Plaintiffs believe
15   that Instacart's management had access to information that would have let them realize the
16   company's brand was faring badly. To the extent Plaintiffs are referring to CW3's reports, that is
17   not sufficient for the reasons above. To the extent Plaintiffs are referring to other, unspecified
18   information, that is also not sufficient. To succeed on this type of argument, sometimes known as
19   a "core operations" argument, Plaintiffs needed to offer "detailed and specific allegations about
20   management's exposure to factual information within the company." *S. Ferry LP, No. 2 v.*
21   *Killinger*, 542 F.3d 776, 785 (9th Cir. 2008). The complaint is silent about what other forms of
22   information Instacart's management had access to. Thus, Plaintiffs have failed to plead a strong
23   inference of scienter for the challenged brand and marketing statements.

24   As for the challenged forecasting statements, Plaintiffs make no meaningful argument that
25   they established scienter for those statements. *See* Opp'n at 19–22. This despite the fact that
26   Instacart specifically argued against scienter for those statements in its motion. MTD at 18–20,
27   ECF No. 84. Plaintiffs' silence concedes a lack of scienter. *In re Intel Corp. Sec. Litig.*, No. 5:20-
28   cv-05194, 2023 WL 2767779, at *26 n.11 (N.D. Cal. Mar. 31, 2023).

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS   14

United States District Court
Northern District of California

### C. Loss Causation/Negative Causation

Loss causation is essentially proximate cause in the securities fraud context. *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024). To allege loss causation, a plaintiff must plead facts showing that a "defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* (quoting *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018)). Although it is common to show loss causation by alleging that the defendant's fraud was revealed to the market, that is not the only way plaintiffs can do so. *Mineworkers' Pension Scheme*, 881 F.3d at 753–54. Any mechanism by which the alleged fraud foreseeably caused the plaintiff's loss will do, even if the loss came before the defendant's fraud was publicly revealed. *Id.*

In this case, Plaintiffs allege that their loss occurred when Instacart's stock price fell between September 22, 2023 and October 2, 2023. Am. Compl. ¶¶ 378–85. However, they have failed to plead any relevant link between Instacart's alleged fraud and those losses. The September and October losses were not accompanied by any disclosure of poor brand performance or poor forecasting processes. Nor is there any other connection between those two topics and the fall in Instacart's stock price. Instead, the analyst reports cited in the complaint point to other reasons for Instacart's poor results: competition from others in the industry, "structural headwinds against adoption," slower growth in online grocery delivery, and the risk that customers would leave Instacart for companies offering "more services and better value." *Id.* ¶¶ 378–79, 383. None of those reasons for decline have any apparent relation to Plaintiffs' theories of fraud related to Instacart's brand performance or forecasting process. Rather, those reasons relate to overall market dynamics and competition. As such, Plaintiffs have not pled loss causation as required to sustain a Section 10(b) claim.

However, this does not automatically mean that Instacart has established negative causation for Plaintiffs' Section 11 claims. Negative causation is an affirmative defense for which Instacart bears a "heavy burden." *Hildes*, 734 F.3d at 860 (citation omitted). All that it takes to overcome negative causation is to show that the alleged fraud "*touches upon* the *reasons* for an investment's decline in value." *Id.* at 861 (citation omitted).

On a pleading attack, the Court can only dismiss claims due to an affirmative defense if the "allegations in the complaint suffice to establish" that defense. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)). While Plaintiffs' allegations were insufficient to affirmatively establish loss causation, the Court cannot say that they were sufficient to establish negative causation, either. The allegations fail to demonstrate that the alleged fraud did not touch upon the reasons for Instacart's stock drop at all. That being so, the Court finds that Instacart has not shown that its negative causation defense requires dismissal of Plaintiffs' Section 11 claims.

### D. Sections 20(a) and 15

Sections 20(a) and 15 create secondary liability that depends on the existence of primary liability under Sections 10(b) and 11 respectively. *In re Rigel*, 697 F.3d at 886. Since Plaintiffs have failed to plead their Section 10(b) and Section 11 claims, their Section 20(a) and Section 15 claims fail too.

## IV. CONCLUSION

The Court **GRANTS** Defendants' motion to dismiss all claims. Plaintiffs may file an amended complaint addressing the deficiencies identified above within **thirty (30) days** of this Order. The parties shall file a stipulated schedule or joint statement setting forth competing schedules within **fourteen (14) days** of this Order.

**IT IS SO ORDERED.**

Dated: May 9, 2025

EDWARD J. DAVILA
United States District Judge

Case No.: 5:24-cv-00465-EJD
ORDER GRANTING MOT. TO DISMISS       16